# EXHIBIT "A"



# Notice of Service of Process

**null / ALL**
**Transmittal Number: 24596805**
**Date Processed: 03/11/2022**

| | |
|---|---|
| **Primary Contact:** | Lori Baisden<br>Boxley Materials Company<br>15418 W Lynchburg Salem Tpke<br>Blue Ridge, VA 24064-3033 |
| **Electronic copy provided to:** | Melissa Woods<br>David Hamm<br>Chris Gaskill<br>Julie Adams<br>Natalya Budnyatsky |

| | |
|---|---|
| **Entity:** | Georgia Stone Products, LLC<br>Entity ID Number  3828031 |
| **Entity Served:** | Georgia Stone Products, LLC |
| **Title of Action:** | Boggs Materials, Inc. vs. Summit Materials, LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Breach of Warranty |
| **Court/Agency:** | Chesterfield County Court of Common Pleas, SC |
| **Case/Reference No:** | 2022CP1300175 |
| **Jurisdiction Served:** | South Carolina |
| **Date Served on CSC:** | 03/09/2022 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | UPS |
| **Sender Information:** | Kilpatrick Townsend & Stockton, LLP<br>202-508-5800 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
251 Little Falls Drive, Wilmington, Delaware 19808-1674  (888) 690-2882  |  sop@cscglobal.com

**South Carolina Secretary of State**

# Business Entities Online

File, Search, and Retrieve Documents Electronically

---

# GEORGIA STONE PRODUCTS, LLC

## Corporate Information

**Entity Type:** Limited Liability Company

**Status:** Good Standing

**Domestic/Foreign:** Foreign

**Incorporated State:** Georgia

## Important Dates

**Effective Date:** 06/29/2021

**Expiration Date:** N/A

**Term End Date:** N/A

**Dissolved Date:** N/A

## Registered Agent

**Agent:** Corporation Service Company

**Address:** 508 Meeting Street
West Columbia, South Carolina  29169

---

## Official Documents On File

| Filing Type | Filing Date |
|---|---|
| Application for a Certificate of Authority to Transact Business | 06/29/2021 |

---

For filing questions please contact us at **803-734-2158**

Copyright © 2022 State of South Carolina

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

STATE OF SOUTH CAROLINA
COUNTY OF CHESTERFIELD

IN THE COURT OF COMMON PLEAS
FOURTH JUDICIAL CIRCUIT
Case No.: 2022-CP-_____

BOGGS MATERIALS, INC., BOGGS
CONTRACTING, INC., and LYNCHES
RIVER CONTRACTING, INC.,

        Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN
MATERIALS COMPANY, LLC; and
GEORGIA STONE PRODUCTS, LLC,

        Defendants.

**SUMMONS**

TO THE ABOVE NAMED DEFENDANTS:

     YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is served upon you, and to serve a copy of your Answer to the Complaint on the undersigned at their offices located at 607 14th Street, NW, Washington, DC 20005-2018, within 30 days after service thereof, exclusive of the day of such service, if you fail to answer the Complaint within the time aforesaid, judgment of default will be rendered against you for the relief demanded in the Complaint.

                         KILPATRICK TOWNSEND & STOCKTON, LLP
                         607 14th Street, NW, Suite 900
                         Washington, DC 20005-2018
                         Tel:   202-508-5800
                         Fax:  202-508-5858
                         Email: abullock@kilpatricktownsend.com

                         /s/ Alexander McMillan Bullock
                         Alexander McMillan Bullock (SC #1004)

                         *Attorney for Plaintiffs*

Dated: March 7, 2022.
Washington, DC

1

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

STATE OF SOUTH CAROLINA  
COUNTY OF CHESTERFIELD

IN THE COURT OF COMMON PLEAS  
FOURTH JUDICIAL CIRCUIT  
Case No.: 2022-CP-_____

BOGGS MATERIALS, INC., BOGGS  
CONTRACTING, INC., and LYNCHES  
RIVER CONTRACTING, INC.,

Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN  
MATERIALS COMPANY, LLC; and  
GEORGIA STONE PRODUCTS, LLC,

Defendants.

**COMPLAINT**  
**(Jury Trial Demanded)**

Plaintiffs Boggs Materials, Inc. ("BMI"), Boggs Contracting, Inc. ("BCI"), and Lynches River Contracting, Inc. ("LRCI") (collectively, "Plaintiffs" or "Paving Contractors"), by and though counsel, hereby complain of the Defendants Summit Materials, LLC ("Summit"), American Materials Company, LLC ("AMC"), and Georgia Stone Products, LLC ("GSP") (collectively, "Defendants" or "Suppliers"), and allege to this Honorable Court as follows:

**PARTIES, JURISDICTION & VENUE**

1. Plaintiff BMI is a North Carolina corporation, registered and doing business in South Carolina, including in Chesterfield County.

2. Plaintiff BCI is a North Carolina corporation, registered and doing business in South Carolina, including in Chesterfield County.

3. Plaintiff LRCI is a South Carolina Corporation and does business in South Carolina, including in Chesterfield County.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

4.     Defendant Summit is a limited liability company organized under the laws of Delaware, with its principal place of business in Colorado, and doing business in Chesterfield County, South Carolina.

5.     Defendant AMC is a limited liability company organized under the laws of North Carolina and doing business in Chesterfield County, South Carolina.

6.     Defendant GSP is a limited liability company organized under the laws of Georgia and doing business in Chesterfield County, South Carolina.

7.     All Defendants are affiliated entities, with Defendant Summit being the ultimate parent company over the other Defendants.

8.     This Honorable Court has jurisdiction over the subject matter of this action and the Parties hereto.

9.     Venue is proper in Chesterfield County as the real property related to the transactions giving rise to this action is in Chesterfield County, the Defendants jointly and collectively operate the quarry at issue in this Complaint in Chesterfield County, and the Defendants' actions and breaches of contract giving rise to this action primarily occurred in Chesterfield County.

## FACTS

10.     The Plaintiffs/Paving Contractors are affiliated entities engaged in the business of manufacturing, sale, and application of construction materials including warm and hot asphalt mix, recycled crushed concrete and construction aggregates, among other things.

11.     The Paving Contractors use and depend upon stone and sand aggregate supplied by Defendants to meet the requirements of construction and paving contracts in both North and South Carolina, including contracts with the South Carolina Department of Transportation ("SCDOT") and the North Carolina Department of Transportation ("NCDOT").

2

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

12.     Defendants/Suppliers are all affiliated entities engaged in the business of mining, producing, selling, and supplying aggregate materials from mines and quarries including, but not limited to, from the Lynches River Quarry located at or about 3410 Hwy 601, South Jefferson, Chesterfield County, South Carolina.

### Agreement for the Supply of Aggregates Between Parties

13.     The real property where the Lynches River Quarry is located is owned and, prior to June 2014, was operated by the principals that also own the Paving Contractors.

14.     In June of 2014, BMI and Defendants entered into a series of agreements to lease the Lynches River Quarry to Defendants ("Mining Lease"), and for Defendants to supply aggregate to BMI and its affiliates for use in their business and to perform under their contracts with their customers ("Supply Agreement" or "Agreement").

15.     A true and accurate copy of the Supply Agreement is attached hereto as **Exhibit A** and is incorporated by reference as if fully set forth herein.

16.     Defendants induced BMI and its principals to enter into the Supply Agreement with preferential supply terms that Suppliers warranted and promised to comply with in that Agreement.

17.     Those terms are material to the Agreement and include, but are not limited to, the following provisions:

      a.  Suppliers' commitment to give BMI and its affiliates first priority supply of all stone aggregate from the quarry (Supply Agreement § 3(d));

      b.  Suppliers' commitment to give BMI and its affiliates preferential pricing treatment on the purchase of stone aggregate (Supply Agreement §§ 4(a)-(c));

      c.  Suppliers' commitment to fill all Purchase Orders for stone aggregate submitted by BMI and its affiliates in a timely manner (time being of the essence) or to

3

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

compensate BMI and its affiliates for any increased costs incurred as a result of Suppliers' inability to fill those Purchase Orders (Supply Agreement §§ 3(a), (b), (d));

    d.  Suppliers' commitment to supply BMI and its affiliates with stone aggregates that meet the Specifications of the Supply Agreement (Supply Agreement § 3(c), Exhibit B);

    e.  Suppliers' commitment to supply BMI and its affiliates with unwashed stone aggregate (Supply Agreement § 6(b)(ii)); and

    f.  Suppliers' commitment to allow audits of their records to determine if they have complied with the Supply Agreement's terms (Supply Agreement § 4(f)).

18.    The Supply Agreement expressly applies to BMI and its affiliates, including all of the Plaintiffs/Paving Contractors.

19.    Defendant Summit is a party to and signatory of the Supply Agreement.

20.    Construction Materials Group LLC ("CMG") and Buckhorn Materials, LLC ("Buckhorn") were also originally parties to the Supply Agreement, but upon information and belief were merged into Defendant AMC on or about June 16, 2014 and April 17, 2017, respectively.

21.    Upon information and belief, AMC assumed all obligations and liabilities of CMG and Buckhorn, including those of the Supply Agreement, as a result of the merger.

22.    AMC advertises that it is as an industry leader in the aggregates business and that it operates the Buckhorn Plant at or about 3410 Hwy 601, South Jefferson, Chesterfield County, South Carolina.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

23.    Section 10 of the Supply Agreement prohibits assignment of that Agreement without the written consent of the other parties.

24.    However, each party has the right under Section 10 to assign the Supply Agreement without prior written consent to an Affiliate with the same or better ability to perform the obligations of the Supply Agreement.

25.    The Plaintiffs have never approved any assignment of the Supply Agreement by any of the Defendants.

26.    Upon information and belief, the original Supplier signatories to the Supply Agreement have assigned that agreement without BMI's written consent.

27.    Since August 2021, the Lynches River Quarry has been operated by Defendant GSP, a subsidiary of Summit.

28.    As evidenced by its failures to comply with the terms of the Supply Agreement, GSP does not have the same or better ability to perform the Suppliers' obligations under the Supply Agreement.

29.    Defendants have therefore, in addition to other material breaches set out herein, breached the Supply Agreement by assigning their obligations thereunder to GSP without obtaining BMI's written consent.

30.    In the alternative, GSP is bound by the terms of the Supply Agreement as the Supplier's assignee and is liable for the breaches of that Agreement.

31.    Pursuant to Section 11 of the Supply Agreement, Defendant Summit unconditionally "guarantees the prompt payment and performance of all obligations of Suppliers hereunder and likewise agrees to be responsible for any damages to which any Supplier may, at any time, be entitled by reason of a breach of such obligations."

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## Defendants Repeatedly Breach the Supply Agreement

32.    Despite the plain and unambiguous terms of the Supply Agreement, Suppliers have repeatedly and consistently failed to supply aggregates to the Paving Contractors as required by the Agreement.

33.    On April 16, 2021, Drew Boggs, the Paving Contractors' principal, notified Suppliers that they have been and continue to be in breach of the Supply Agreement for failure to supply aggregates to the Paving Contractors in the quantities and quality, and with the timeliness required by the Agreement.

34.    With respect to quantity, Suppliers have failed to fill Purchase Orders from the Paving Contractors from April 2020 to present.

35.    Further, Suppliers, through GSP, notified BMI that Suppliers do not maintain, and do not intend to maintain, adequate supply of aggregates to fill Purchase Orders from the Paving Contractors for current projects.

36.    Suppliers are unable to fill Purchase Orders from the Paving Contractors because they have given priority to orders from third parties and have supplied third parties with aggregates despite agreeing to allocate any and all aggregates to the Paving Contractors on a first priority basis, in direct breach of the express terms of the Supply Agreement.

37.    Suppliers' failure to provide aggregates to the Paving Contractors on a first priority basis is a material breach of the Supply Agreement.

38.    With respect to quality, Suppliers have failed to supply the Paving Contractors with aggregates according to the Specifications required by the Agreement.

6

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

39.    Specifically, the Supply Agreement requires Suppliers to provide aggregates for use in asphalt, to be produced in an "unwashed" condition and in accordance with each Purchase Order and the Specifications of the Agreement.

40.    In 2021, Suppliers ceased supplying unwashed aggregates and communicated their refusal to supply unwashed aggregates to fill the Paving Contractors' Purchase Orders.

41.    Suppliers instead provided washed aggregates in response to Purchase Orders.

42.    Suppliers' failure to supply unwashed aggregates materially breaches the Supply Agreement.

43.    Suppliers' failure to supply unwashed aggregates has caused and will continue to cause significant harm to the Paving Contractors because washed aggregates contain a materially higher moisture content, which requires the Paving Contractors to expend significantly more costs in the asphalt manufacturing process in order to produce asphalt that complies with the requirements under their contracts with their clients.

44.    Even when Suppliers have supplied unwashed aggregates, Suppliers have repeatedly breached the Supply Agreement by supplying aggregates that do not comply with Purchase Orders and Specifications, thereby causing harm to the Paving Contractors by forcing them to cover their aggregate needs by locating alternate sources of materials, haul those materials, and leave labor crews idle awaiting material in the fulfilment of the Paving Contractors' contractual obligations to their own clients.

45.    The Paving Contractors have performed testing on the aggregates provided by Suppliers for Specification compliance and the aggregates failed to comply over Ninety-Six Percent (96%) of the time.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

46.    BMI gave formal notice of the above-listed breaches, but Suppliers failed and refused to cure those breaches, and, in fact, have continued to knowingly commit repeated material breaches of the Supply Agreement.

47.    Suppliers' repeated and pervasive breaches have caused and continue to cause significant harm and serious detrimental impacts to the Paving Contractors' businesses and their ability to meet their own contractual requirements.

48.    The harm caused by the Suppliers' breaches of the Supply Agreement are not merely monetary and cannot be fully remedied by money damages.

49.    Specifically, Suppliers' breaches force Paving Contractors repeatedly to obtain aggregates that meet the Supply Agreement's requirements from other sources in order to meet the needs of Paving Contractors' current projects, repeatedly exposing the Paving Contractors to jeopardy of penalties and liquidated damages under time sensitive public and private contracts, and potential termination of those contracts.

50.    In addition to the harms already suffered, Suppliers' continued breaches will cause substantially more pronounced harm at this time because paving work has a significant seasonal component, and the Paving Contractors are committed to contracts that require substantial work in Spring 2022 within the critical path of multiple projects.

51.    To avoid further detrimental impacts on their businesses and existing contracts, and to urge Suppliers to meet their obligations under the Supply Agreement going forward, the Paving Contractors gave further notice of breach in January 2022 and requested assurances that Suppliers would provide aggregates in the quantities and quality needed by the Paving Contractors in accordance with the terms of the Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

52.    To facilitate Suppliers' performance of their obligations under the Supply Agreement, Paving Contractors included with their request for assurances letter their forecast of material orders for 2022.

53.    The Paving Contractors also sent a notice to Suppliers invoking their right to conduct an audit pursuant to Section 4(f) of the Supply Agreement "to determine if Supplier is in compliance with the terms of [the Supply Agreement]."

54.    True and accurate copies of the Paving Contractors' request for assurances and audit request are attached hereto as **Exhibits B and** C, respectively.

55.    Suppliers responded to both of the Paving Contractors' letters on February 16, 2022, a true and accurate copy of which is attached as **Exhibit D**.

56.    Without addressing any of the concerns raised in the Paving Contractors' request for assurances, Suppliers simply stated they are not in default under the Supply Agreement.

57.    Suppliers also stated that they did not intend to supply Paving Contractors with sufficient materials to meet their 2022 needs.

58.    Suppliers also rejected the Paving Contractors audit notice, stating that the Supply Agreement only allows audits "to the extent necessary to determine overcharges or underpayments …."

59.    Suppliers attempt to limit the Paving Contractors' right to conduct the audit, and the scope of that audit, by citing a "Purpose" provision that does not exist in the Supply Agreement.

60.    Since these letters were exchanged, Suppliers have continued to supply aggregates that meet the required specifications.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

61.    For example, on February 18, 2022, Suppliers delivered thirteen truckloads of aggregate to Paving Contractors, seven of which did not meet specifications because they were contaminated with "fines" (stone/sand particles that are too small for the specified asphalt mix).

62.    Below are photographs from these out-of-specification deliveries:



ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175



ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

63.    On February 28, 2022 Suppliers provided Paving Contractors with ten truckloads of aggregate that was also materially out of spec because it contained "fines" rendering the materials useless to Paving Contractors.

64.    When confronted with the quality of material Suppliers had delivered, GSP's employee, John Rehrer stated, "I really have nothing to say and don't understand how we shipped this material to you."

65.    Suppliers have also continued to be out of stock for aggregates ordered by the Paving Contractors in February and have repeatedly been unable to fill Paving Contractor's purchase orders.

66.    While Paving Contractors can cover discrete failures by Suppliers to fill purchase order or deliveries of out of specification aggregates, Suppliers' violations of the Supply Agreement are pervasive, and Suppliers have indicated that they do not intend to comply with the Supply Agreements' requirements going forward.

67.    This presents an untenable situation as the Paving Contractors are about to enter their busy season and cannot fulfill their contractual obligations to their customers when they are consistently receiving deficient materials from Supplier on those occasions that Suppliers are able to provide any material deliveries at all.

### FIRST CLAIM FOR RELIEF
### (Specific Performance – Against All Defendants/Suppliers)

68.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

69.    Plaintiffs and Defendants have a valid agreement for the sale of aggregates in the form of the Supply Agreement.

70.    The Supply Agreement is binding on all Defendants.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

71.     Plaintiffs and Defendants agreed in Section 10(g) of the Supply Agreement (which is incorporated herein by reference) that Plaintiffs are entitled to specific performance to enforce each and every term, condition, and obligation of Suppliers under the Supply Agreement.

72.     Plaintiffs have performed their obligations under the Supply Agreement and remain ready, able, and willing to perform thereunder.

73.     Plaintiffs have no adequate remedy at law to obtain aggregates on the same priority basis, quantities, and preferred pricing as under the Supply Agreement, and other sources of aggregate are at best unreliable due to the current state of supply chain issues.

74.     Further, as expressly stated in the Supply Agreement, Defendants' commitments to Plaintiffs to provide aggregates on the terms set-forth in the Agreement were material inducements to Plaintiffs to enter into the Supply Agreement, as well as enter into and consent to other transactions that have benefited Defendants. *See* Supply Agreement, Whereas clauses.

75.     As a result, enforcement of the Supply Agreement in the form of specific performance is equitable and necessary.

76.     Pursuant to the express terms of the Supply Agreement and under S.C. Code Ann. § 36-2-716, Plaintiffs are entitled to specific performance requiring Defendants to supply them with aggregates, on a first priority basis, in the quality and quantity required by the Supply Agreement and Plaintiffs' Purchase Orders.

77.     Under the circumstances, aggregates are sufficiently unique and other proper circumstances exist for specific performance as set forth herein.

78.     Further, Plaintiffs have a right to the aggregates from the Lynches River Quarry under the Supply Agreement because, after reasonable efforts by Plaintiffs to cover, cover under

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

the circumstances is unfeasible and the circumstances reasonably indicate that such effort will be unavailing.

79.    Finally, Plaintiffs have an unequivocal right under Section 4(f) of the Supply Agreement to conduct audits "to determine if Supplier is in compliance with the terms of this Agreement."

80.    Plaintiffs' audit rights include the right to audit Defendants' records related to the Lynches River Quarry to determine compliance with ALL provisions of the Supply Agreement, including, but not limited to, the first priority sale terms, preferred pricing terms, non-assignment clause, and Specification requirements.

81.    Defendants' rejection of Plaintiffs' audit notice is a material breach of the Supply Agreement.

82.    Plaintiffs are entitled to specific performance of the audit provision in Section 4(f) of the Supply Agreement.

83.    As such, Plaintiffs are entitled to an order from this Honorable Court commanding Suppliers perform their obligations under the Supply Agreement.

### SECOND CLAIM FOR RELIEF
### (Breach of Contract – Against All Defendants/Suppliers)

84.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

85.    The Supply Agreement is a valid and enforceable contract.

86.    Defendants have materially breached the terms of the Supply Agreement by failing and refusing to provide aggregates in the quantities and qualities required by the Agreement, by failing to provide aggregates to Plaintiffs on a first priority basis, by assigning their obligations

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

under the Supply Agreement in violation of the Agreement's non-assignment clause, and in other ways to be shown through this litigation and trial.

87.    As a direct and proximate result of the actions of Defendants, Plaintiffs have suffered damages not less than $7,500, in an amount to be determined at trial.

88.    As such, Plaintiffs are entitled to recover damages from Defendants, jointly and severally, in an amount to be determined at trial, but in any event not less than $7,500, as well as pre and post-judgment interest and reasonable attorney's fees as allowed by law.

### THIRD CLAIM FOR RELIEF
### (Breach of Warranty & Guaranty Obligations – Against Defendant Summit)

89.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

90.    Pursuant to Section 11 of the Supply Agreement, Summit unconditionally warrantied and guaranteed the other Defendants' performance under the Supply Agreement as well as the other Defendants' liabilities, including payment of any damages for which Defendants are determined to be liable to Plaintiffs.

91.    Summit has breached its warranty and guaranty obligations by failing to ensure Defendants' performance to-date, and by failing to provide assurances of performance in response to Plaintiffs' requests for assurances.

92.    As such, Plaintiffs are entitled to recover damages from Summit, jointly and severally, in an amount to be determined at trial, but in any event not less than $7,500, as well as pre and post-judgment interest and reasonable attorney's fees as allowed by law, including as specifically provided under Section 11 of the Supply Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## FOURTH CLAIM FOR RELIEF
### (Injunctive Relief – Against All Defendants/Suppliers)

93.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

94.    Pursuant to Rule 65 of the South Carolina Rules of Civil Procedure, Plaintiffs are entitled to, and hereby petition for, preliminary and permanent injunctive relief commanding Suppliers perform their obligations under the Supply Agreement, as follows:

      a.  Commanding Defendants to make available all records necessary to facilitate Plaintiffs' audit under Section 4(f) of the Supply Agreement, including all records requested in Exhibit C hereto;

      b.  Enjoining Defendants from supplying aggregates to third parties without giving first priority to Plaintiffs; and

      c.  Requiring Defendants to supply unwashed aggregates and aggregates that meet the Specification requirement of the Supply Agreement and Plaintiffs' Purchase Orders.

95.    Plaintiffs are entitled to such relief as there is no adequate remedy at law, Plaintiffs will suffer irreparable harm should the Court not act, and the public interest will not be disserved by the issuance of such injunctive relief.

96.    Such injunctive relief will preserve the status quo prior to Defendants' breach of the same.

97.    As such, Plaintiffs are entitled to an order from this Honorable Court commanding Suppliers to fulfill and perform their obligations under the Supply Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray unto the Court for relief against Defendants, jointly and severally, as follows:

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

1. That the Court order Defendants to specifically perform their obligations under the Supply Agreement;

2. That Plaintiffs have and recover of Defendants damages in an amount to be determined at trial, but in any event not less than $7,500, plus pre and post-judgment interest;

3. That the Court tax the costs of this action against the Defendants;

4. That the Court award Plaintiffs attorney's fees as permitted by law;

5. That the Court grant preliminary and permanent injunctive relief to Plaintiffs as requested above; and

6. That the Court grant such other and further relief as the Court deems just and proper.

### Jury Trial Request

Plaintiffs request trial by jury on all issues so triable.

KILPATRICK TOWNSEND & STOCKTON, LLP
607 14th Street, NW, Suite 900
Washington, DC 20005-2018
Tel:   202-508-5800
Fax:   202-508-5858
Email: abullock@kilpatricktownsend.com

/s/ Alexander McMillan Bullock
Alexander McMillan Bullock (SC #1004)

*Attorney for Plaintiffs*

Dated: March 7, 2022.
Washington, DC

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit A

Execution Version

## BOGGS MATERIALS, INC.
## AGGREGATES SUPPLY AGREEMENT

THIS AGGREGATES SUPPLY AGREEMENT (this "**Agreement**") is dated as of June 9, 2014 (the "**Effective Date**"), by and among (i) **BUCKHORN MATERIALS, LLC**, a South Carolina limited liability company, with offices at 3410 Hwy 601 South, Jefferson, SC 29718 ("**Buckhorn**"), **CONSTRUCTION MATERIALS GROUP LLC**, a North Carolina limited liability company, with offices at 1357 Eddie Horton Road, Mt. Croghan, SC 29727 ("**CMG**", and together with Buckhorn, each a "**Supplier**" and collectively the "**Suppliers**") and **SUMMIT MATERIALS, LLC**, a Delaware limited liability company ("**Summit**"), and (ii) **BOGGS MATERIALS, INC.**, a North Carolina corporation, with offices at 1613 W. Roosevelt Blvd, Monroe, NC 28110 ("**BMI**").

### RECITALS

A.      BMI is engaged in the business of the manufacturing, sale and application of construction materials, including cold mix asphalt, warm mix asphalt and hot mix asphalt, recycled crushed concrete and construction aggregates.

B.      Buckhorn is engaged in the business of mining, producing and selling aggregate materials from the Lynches River Quarry located at 3410 Hwy 601 South, Jefferson, SC 29718 and surrounding properties leased by Buckhorn under the Lynches River Lease, as defined below (the "**Lynches River Quarry**"), and CMG is engaged in the business of mining, producing and selling aggregate materials from the Black Creek Sand Mine located at 1357 Eddie Horton Road, Mt. Croghan, SC 29727 (the "**Black Creek Sand Mine**" and together with the Lynches River Quarry, the "**Supplier Quarries**").

C.      Hinkle Contracting Company, LLC, a Kentucky limited liability company ("**Hinkle**"), is a wholly-owned subsidiary of Summit.

D.      BMI, A Mining Group, LLC, a Florida limited liability company ("**AMG**"), Hinkle and certain other parties thereto have entered into as of the date hereof a Membership Interest Purchase Agreement (the "**Buckhorn MIPA**"), pursuant to which Hinkle acquired ownership of Buckhorn, and Hinkle and certain other parties thereto have entered into as of the date hereof a Membership Interest Purchase Agreement (the "**CMG MIPA**" and together with the Buckhorn MIPA, the "**Membership Interest Purchase Agreements**"), pursuant to which Hinkle acquired ownership of CMG.

E.      Pursuant to the terms of the Membership Interest Purchase Agreements and as additional consideration for the purchase and sale of the membership interests of Suppliers thereunder, the Suppliers have agreed to sell Aggregates to BMI, and BMI has agreed to purchase Aggregates from Suppliers, on and subject to the terms and conditions of this Agreement.

F.      The execution and delivery of this Agreement by BMI and Suppliers are conditions precedent to and form an essential part of the transactions consummated in the Membership Interest Purchase Agreements. The parties acknowledge and agree that BMI was only willing to enter into and perform under the Membership Interest Purchase Agreements based on the commitments of Suppliers under this Agreement and that the Suppliers and Summit were only willing to enter into and perform under the Membership Interest Purchase Agreements based on the commitments of BMI under this Agreement.

G.      On the date hereof and also as a condition precedent to the consummation of the transactions under the Membership Interest Purchase Agreements, Affiliates of BMI are entering into that certain Mining Lease Agreement to lease mining rights to the Lynches River Quarry and related

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

properties to Buckhorn (the "**Lynches River Lease**") and that certain Mining Lease Agreement to lease mining rights to the Black Creek Sand Mine to CMG (the "**Black Creek Sand Mine Lease**" and together with the Lynches River Lease, the "**Mining Leases**").

## AGREEMENTS

NOW, THEREFORE, in consideration of the Membership Interest Purchase Agreements, the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, hereby agree as follows:

     1.    **DEFINITIONS**. For purposes of this Agreement:

"**Affiliate**" when used with respect to any Person, means (i) if such Person is a corporation, any officer or director thereof and any Person which is, directly or indirectly, the beneficial owner (by itself or as part of any group) of more than fifty percent (50%) of any class of any equity security (within the meaning of the Securities Exchange Act, as amended) thereof, and, if such beneficial owner is a partnership, any partner thereof, or if such beneficial owner is a corporation, any Person controlling, controlled by or under common control with such beneficial owner, or any officer or director of any such beneficial owner or of any corporation occupying any such control relationship, (ii) if such Person is a partnership, any partner thereof, and (iii) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person. For purposes of this definition, "control" (including the correlative terms "controlling," "controlled by" and "under common control with"), with respect to any Person, shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by agreement or otherwise.

"**Aggregates**" means Sand Aggregates and Stone Aggregates.

"**Applicable Law**" means all provisions of any constitution, statute, law, rule, regulation, decision, order, decree, judgment, ruling, release, license, permit, stipulation, or other official pronouncement enacted, promulgated, or issued by any governmental authority, court of competent jurisdiction or arbitrator or arbitration panel.

"**Asphalt Plants**" means any and all asphalt plants owned or operated by any of BMI or its Affiliates, as such asphalt plants may be altered, modified, reconditioned or expanded, and any asphalt plants, in replacement thereof, including without limitation, the BMI asphalt plants located at Lugoff, SC, Lynches River, SC, Mullins, SC, Monroe, NC and Rock Hill, SC.

"**Bona Fide Market Price**" means a market price that is offered by a third-party source regularly engaged in the business of selling Aggregates in the applicable local market in which Company desires to purchase Aggregates and capable of supplying the quantities and qualities of Aggregates desired by the Company. A Bona Fide Market Price must be verifiable in a manner mutually agreed to by Supplier and Company (*e.g.* copy of paid invoice or purchase order between Company and such third party), such agreement not to be unreasonably withheld.

"**Company**" means BMI or any Affiliate of BMI that purchases Aggregates pursuant to this Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP130175

"**Person**" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity (or any department, agency, or political subdivision thereof) or any other entity.

"**Sand Aggregates**" means sand, coarse and fine, meeting the requirements of the Departments of Transportation of the states of North Carolina and South Carolina.

"**Stone Aggregates**" means those granite and lime stone products (but excluding recycled crushed concrete), meeting the requirements of the Departments of Transportation of the states of North Carolina and South Carolina.

      **2.**    **TERM**. The initial period of this Agreement will begin on the Effective Date and shall continue for a minimum of ten (10) years (the "**Initial Term**"), unless earlier terminated as provided herein; provided that such Initial Term shall automatically renew for successive one (1) year periods (each one (1) year extension a "**Renewal Term**" and the Initial Term and each Renewal Term collectively the "**Term**"), unless the Suppliers and BMI mutually agree not to renew this Agreement at least one (1) year prior to the end of the applicable Term; provided further, that this Agreement shall terminate (i) upon the expiration or termination of the Lynches River Lease (unless the basis for such termination is the acquisition of the Lynches River Quarry or the assumption of the lessor's interest in the Lynches River Lease by Supplier or its Affiliate) and (ii) solely with respect to CMG's supply of Aggregates under this Agreement, upon the expiration or termination of the Black Creek Sand Mine Lease (unless the basis for such termination is the acquisition of the Black Creek Sand Mine or the assumption of the lessor's interest in the Black Creek Sand Mine by Supplier or its Affiliate).

      **3.**    **SALE AND PURCHASE OF AGGREGATES**.

      (a)    Purchase Orders. During the Term, Company may order and Supplier shall, subject to the terms hereof, supply, the quantities and specifications of Aggregates that Company may specify in written purchase orders delivered to Supplier (each a "**Purchase Order**"). In the event of any conflict between the terms and conditions of this Agreement and those in Company's Purchase Order, the terms and conditions of this Agreement will govern; *provided, however,* if any terms in Company's Purchase Order are in addition to, but do not conflict with, the terms of this Agreement, then such additional terms will apply. A list of purchase orders submitted by Company to Supplier that are outstanding as of the date hereof, including the prices and volume by product and reference numbers relating to such purchase orders, is set forth on Exhibit A.

      (b)    Requirements. Subject to Supplier's ability to supply the Aggregates in the quantities, quality and timeliness required by Company at the prices under this Agreement and upon the other terms and conditions in this Agreement, including the Specifications (as defined below) (the "**Requirements Conditions**") and to the extent permitted by Applicable Law, Company agrees to purchase one hundred (100%) percent of BMI's and its Affiliates' requirements for Aggregates from Supplier during the Term. Upon receipt of each Purchase Order, Supplier shall make available and supply to Company the Aggregates according to the Requirements Conditions. If Supplier is unable to supply the Aggregates to fulfill a Purchase Order according to the Requirements Conditions, Supplier shall promptly notify Company and Company may rescind all or any part of its Purchase Order and may purchase Aggregates, of similar type or quantity, from another producer without cost or liability to Supplier. Without limiting Company's rights or remedies, if the purchase price paid by Company for Aggregates to such third party (including the delivered haul cost to Company's Asphalt Plant) exceeds the delivered purchase price provided herein, the excess of the amount actually paid by Company to the third party for such Aggregates (taking into account the delivered haul cost to Company's Asphalt Plant) over the amount that Company would have paid to Supplier for such Aggregates under this Agreement shall be paid by

Supplier to Company within 10 days after written notice from Company; provided, that the third party price for such Replacement Aggregates must be a Bona Fide Market Price. Except as set forth above, neither Company nor BMI is guaranteeing any specific quantities of Aggregates that Company may need from time to time during the Term and Company shall only become obligated to purchase Aggregates, and Supplier shall, subject to the terms hereof, only become committed to supply such Aggregates, upon Company's submission of a Purchase Order. For the avoidance of doubt and without limiting Section 3(d) below, Supplier shall accept and fulfill each and every Company Purchase Order provided that such Purchase Order is provided by such Company within a commercially reasonable notice period for the production of the Aggregates required, consistent with past practices, and in quantities customarily ordered by such Company (or as otherwise may be commercially reasonable); provided, that, for the avoidance of doubt, Supplier reserves the right not to accept a Purchase Order during a Force Majeure Event. Except as otherwise expressly provided for in this Agreement, Company shall not purchase Aggregates from a third party source.

(c)     Delivery. Supplier will inspect and test the Aggregates prior to delivery to ensure they comply with the Specifications. Company shall purchase Sand Aggregates hereunder at the Black Creek Sand Mine and Stone Aggregates at the Lynches River Quarry, or such other locations as specified in the Purchase Order. Supplier will deliver, at times reasonably requested by Company to maximize availability of Company's trucks, the Aggregates into top loading industry standard trucks at its load-out facilities. Company is responsible for arranging and scheduling of suitable delivery vehicles to the delivery point and for their safe operation while at Supplier's facilities. All such vehicles must comply with all safety and operating rules and requirements imposed by Supplier for operations at its plants and provided to Company in advance. Deliveries will be considered "on time" and "timely" if the subject Aggregates are available and ready for top loading at the designated facility no later than the delivery date specified in the Purchase Order (the "**Delivery Date**"). Time is of the essence with respect to deliveries, and Company may suffer financial loss if Supplier fails to maintain a service level ensuring that Aggregates are timely delivered by Supplier to Company (i) within Supplier's applicable lead times and (ii) in proper condition (proper quality, quantity and type). Failure on the part of Supplier to fill Purchase Orders on a timely basis, or failure on the part of Company to accept the Aggregates, will give rise to any remedies provided by law or in equity, including the right to cancel such unfilled Purchase Orders.

(d)     Aggregate Availability. Supplier shall maintain sufficient manufacturing capabilities to supply Aggregates to Company in accordance with Purchase Orders that Company may issue from time to time, all in accordance with the terms of this Agreement. Supplier shall allocate any and all Aggregates to Company on a first priority basis with respect to any third party purchase order received by Supplier after receipt of a Company Purchase Order. In the event of a Force Majeure Event, Supplier shall assist Company in locating reliable alternate sources and suppliers of Aggregates to ensure a continued supply during such difficulties. If such difficulties obligate Company to purchase Replacement Aggregates from a third party, then solely with respect to Replacement Aggregates for unfilled Purchase Orders, Company may deduct any excess of the purchase price of such Replacement Aggregates over the prices provided for in this Agreement from future Supplier invoices (in each case taking into account the delivered haul cost to Company's Asphalt Plant); provided, that the third party price for such Replacement Aggregates must be a Bona Fide Market Price. For purposes hereof, "Replacement Aggregates" shall mean the complete quantity of Aggregates subject to the Purchase Order, regardless of whether Supplier is willing or able to partially fulfill such Purchase Order.

(e)     Calculations of Shipped Aggregates. The quantity of Aggregates delivered to Company each month ("**Shipped Aggregates**") will be determined by the weight tickets of shipped Aggregates at Supplier's truck scales located at the load-out point at its quarry, and Supplier will furnish such calculation, and a copy of such weight tickets, on or before the seventh (7th) business day following the Delivery Date. Supplier will be responsible, at its cost, for the maintenance and calibration of the scales

and will ensure such scales are calibrated and inspected by the Department of Agriculture on at least a semi-annual basis.

4.    **PURCHASE PRICE AND PAYMENT**.

(a)    Pricing.  Prices of the Aggregates for Purchase Orders in place as of the Effective Date are set forth on Exhibit A.  The purchase price of any Aggregates supplied pursuant to Section 3 shall be no greater than the lesser of (i) the prevailing best third party customer price per ton commensurate with such product and volume sold by Supplier, and (ii) the prevailing market price for such Aggregates.  All prices shall be F.O.B. at the applicable Supplier Quarry or the other applicable supply location designated by Company.

(b)    Price Adjustments.  The parties will meet on a calendar-quarter basis, or shall meet at the request of Company or Supplier, to review the prices for the Aggregates.  In determining prevailing market prices for the Aggregates to be supplied to any Asphalt Plant, the Supplier shall take into account the delivered haul cost to such Asphalt Plant.  Supplier acknowledges that competitive Aggregates pricing is necessary for BMI and its Affiliates to successfully bid and acquire asphalt volume, while BMI acknowledges that its asphalt mix sales, from which its Aggregates requirements are derived, drive a substantial portion of Supplier's total sales volume; as such, both parties agree to use all commercially reasonable efforts, including but not limited to job-specific pricing of Aggregates, to maximize the sale or purchase, as the case may be, of Aggregates for each party.  During the first fifteen (15) years of the Term, any increase in the prices for Aggregates shall not exceed the greater of (i) (A) during the first five years of the Term, 4% per calendar year, (B) during the sixth through tenth years of the Term, 5% per calendar year and (C) during the eleventh through fifteenth years of the Term, 6% per calendar year, and (ii) the percentage change of Supplier's operating costs per ton (including all direct production and or selling costs incurred in the ordinary course of business by Buckhorn or CMG, as the case may be).  All costs supporting the percentage changes pursuant to subsection 4(b)(ii) shall be included and allocated in accordance with generally accepted accounting principles applied consistently and subject to audit by Company if requested.  For purposes of measuring such percentage changes, the baseline pricing as of the Effective Date will be the calendar year 2013 pricing between Supplier and Company applicable to Aggregate type and job type.

(c)    Price Warranty.  Notwithstanding anything herein to the contrary, Supplier warrants that the prices for the Aggregates sold to Company hereunder (taking into account the delivered haul cost to each Asphalt Plant) are no less favorable than those prices Supplier is extending to any other customer (taking into account the delivered haul cost to such other customer's facility) for the same or similar products from the Supplier Quarries.  If Supplier subsequently grants another customer pricing on terms more favorable than those being provided to Company at such time in violation of the foregoing warranty, Supplier shall notify Company and adjust the prices charged to Company accordingly (with such modified pricing to take effect as of the date such pricing was granted to the other customer).  In addition, if another supplier offers Company more favorable pricing for aggregates similar to the Aggregates prior to Company's submission of a Purchase Order to Supplier, then Company must notify Supplier thereof and afford Supplier a reasonable opportunity to confirm such pricing and reconsider and amend its pricing to meet the lower pricing offered by the other supplier; provided, that such lower pricing must be a Bona Fide Market Price.  If Supplier elects not to amend its pricing, Company is relieved of its requirement to purchase any quantity of Aggregates offered by Supplier at a price higher than such lower pricing and Company may then purchase such Aggregates from that third-party source at a price no higher than such lower pricing.  If, at Company's request, Supplier quotes prices and quantities for Aggregates to Company in connection with Company's submission of a bid for a project (or has quoted such prices prior to the Effective Date), and Company uses (or used) such quote in a bid for a project and is awarded such bid, then (i) Supplier shall reserve availability of such Aggregates for Company, and (ii) Company shall

submit a Purchase Order to Supplier for the Aggregates subject to such quote to be used in such bid, and Supplier shall sell such Aggregates to Company at no higher than the price set forth in the quote.

(d)    Payment. Supplier shall invoice Company for the price of the Aggregates at the time of shipment or as otherwise mutually agreed. Company shall pay all conforming invoices in full within 45 days after the receipt of the invoice, except no invoices shall be paid unless title and risk of loss to the applicable Aggregates has passed to Company under Section 5(b). All nonconforming invoices shall be paid in full within 45 days of the date of final resolution.

(e)    Taxes. All prices for the Aggregates shall include sales, use, excise or similar taxes or duties based on the sale of the Aggregates (excluding such taxes or duties based on Supplier's gross receipts or business operations). If Supplier is required to collect any such taxes from Company, Supplier shall separately detail such taxes on the invoice to Company. If Company is required to pay such taxes under Applicable Law, Company will pay such invoiced amounts to Supplier, and upon receipt of same, Supplier shall be solely responsible for timely remitting such taxes to the proper taxing authority. Company reserves the right to pay such taxes directly to the proper taxing authority (and promptly informs Supplier of such), or provide Supplier with a valid tax exemption certificate.

(f)    Audit. Company has the right from time to time to have a third party audit Supplier's records to determine if Supplier is in compliance with the terms of this Agreement. If any audit discloses any overcharges or underpayments by Supplier, Supplier shall promptly make restitution to Company therefor, plus interest at the rate of 1.5% per month. If such restitution payments are greater than the cost of the audit, Supplier shall also be liable for the cost of the audit.

(g)    Financial Condition. At all times during the Term, each of Supplier and Company must satisfy the reasonable financial requirements established or modified by the other party. Upon reasonable request made by Supplier or Company during the term hereof, Company or Supplier, respectively, shall submit to Supplier or Company, respectively, within 30 days from the date of request sufficient financial information (on a confidential basis and only to the extent not publicly available) to demonstrate Company's or Supplier's respective compliance with such financial requirements.

## 5.    ACCEPTANCE; TITLE AND RISK OF LOSS.

(a)    Acceptance and Shortage Claims. All Aggregates shall be received subject to Company's inspection (which inspection shall not affect the warranties under this Agreement). Company may reject any delivery or cancel all or any part of any Purchase Order if Supplier fails to make delivery in conformity with the terms and conditions hereof or any Purchase Order. Company's acceptance of any non-conforming delivery will not constitute a waiver of its right to reject future deliveries. In the event that Company does not accept some or all Aggregates in a given shipment, at Company's option, (i) Supplier shall provide a comparable quality substitute (for which substitution Supplier must assume any expense and price differential) or (ii) if Supplier cannot provide such comparable quality substitute within 48 hours of notice from Company, Company may purchase Aggregates from another supplier as an alternate source as Company, in its sole discretion, deems necessary, in which case Supplier shall reimburse Company for any additional reasonable costs and expenses incurred by Company in purchasing Aggregates from such other supplier as an alternate source. At any time upon identification and notification of defective Aggregates or nonconforming shipments, Supplier shall, at Company's option and at Supplier's sole cost and expense, reimburse Company for any amounts paid or cure such defective Aggregates or nonconforming shipments. Payment for or passage of title to Aggregates shipped prior to Company's inspection will not constitute an acceptance thereof. Supplier shall correct shortages at no additional cost to Company.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

(b)    Risk of Loss.  Title and risk of loss of the Aggregates sold by Supplier and purchased by Company will pass to Company when the Aggregates are loaded into Company's carrier vehicles at the applicable Quarry or other supply location designated by Company.

## 6.    WARRANTY.

(a)    General.  Supplier represents and warrants to Company that (i) it has the requisite power, authority and authorization to enter into this Agreement and carry out the terms hereof, (ii) the execution, delivery and performance of this Agreement are not prohibited or impaired by any judgment or other agreement to which Supplier is a party or by which it is bound, (iii) Supplier is and at all times during the Term shall be in possession of all approvals, licenses and permits necessary to mine, manufacture, render, process, deliver and sell Aggregates; (v) Supplier has and will have the right to render, sell and deliver all Aggregates free and clear of all liens and encumbrances, and (vi) Supplier shall at all times comply with Applicable Laws.

(b)    Aggregates.  Supplier warrants good and marketable title with respect to the Aggregates sold by it to Company under this Agreement and further warrants that:

(i)    Aggregates will be free of debris and other physical contaminants, subject to general standards in the aggregates industry and as specified by the then-prevailing Department of Transportation of North or South Carolina (as applicable, the **"DOT"**);

(ii)    All Aggregates sold to Company Asphalt Plants for use in asphalt shall be produced unwashed and sized according to the ranges specified on Exhibit B and all other requirements outlined in the applicable DOT's respective codes and specifications for road based materials, with the exception of gradation;

(iii)    Aggregates, other than those used in asphalt, sold as sized products for use on DOT projects, or any other projects requiring compliance with DOT specifications, shall conform to the governing DOT's standard specifications; and

(iv)    All Aggregates shall (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the **"Specifications"**).

Supplier and Company acknowledge and agree that market demand, competitive cost and/or supply dynamics may require amendments to the definition of "Specifications" and the Supplier's warranties set forth in Section 6(b) which amendments shall be mutually agreed upon in writing by the parties.  Subject to the foregoing, Supplier reserves the right to replace, upgrade and modify its processing plant capabilities, and following the first fifteen (15) years of the Term, Supplier and Company shall mutually amend the definition of "Specifications" and the Supplier's warranties set forth in Section 6(b) as necessary to satisfy the requirements of both parties; provided, that, the definition of "Specifications" shall always include the specifications set forth in Section 6(b)(i), (iii) and (iv)(x) and Supplier's warranties under this Section 6(b) shall always include the warranty in Section 6(b)(i), (iii) and (iv)(x).

(c)    Company's Remedy.  If any Aggregates fail to meet the warranties set forth above, Company may elect, in addition to its other rights and remedies, at Supplier's expense to take one or more of the following actions:  (A) reject a portion of the, or the entire, shipment or lot, as Company deems appropriate, and return the same to Supplier at Supplier's expense; (B) cancel any outstanding portion of the Purchase Order; (C) elect that Supplier shall replace the nonconforming Aggregates with Aggregates that comply with the requirements of this Agreement, at Supplier's cost; (D) retain the Aggregates and

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

recover damages from the Supplier for breach of warranty; and (E) elect that Supplier shall refund any purchase price paid with respect thereto and all other amounts, including shipping and transport charges, incurred by Company for such nonconforming Aggregates.  Supplier shall take any remedial action elected by Company under this Section.

(d)     Disclaimer.  Without limiting the foregoing, and notwithstanding any other provision of this Agreement to the contrary, neither party will be liable for lost profits, lost revenues, lost opportunity costs, costs of financing, consequential, punitive, special, or incidental damages arising from Supplier's failure to deliver Aggregates required hereunder, or from the termination of this Agreement; provided, that the foregoing shall not apply to indemnification of third party claims, intentional or willful breaches or gross negligence.

**7.     TERMINATION**.  In addition to any other rights it may have, each party shall have the right at its option to terminate this Agreement upon thirty (30) days written notice to the other party if an Event of Default has occurred with respect to the other party as described in Section 8 below.  Upon expiration or any termination of this Agreement by either party as provided in this Section 7, all rights and obligations of the parties under this Agreement shall cease except any right or obligation which accrued prior to the effective date of such expiration or termination.

**8.     EVENTS OF DEFAULT**.  The occurrence or existence of any one or more of the events or conditions described below shall constitute an "**Event of Default**" under the Agreement with respect to the defaulting or affected party:

(a)     Payment Default.  The failure of a party to make any undisputed payments under this Agreement when due and such failure continues unremedied for fifteen (15) business days after notice of such breach or non-compliance from the non-defaulting party (except that the failure to make a payment or portion thereof that is the subject of a bona fide dispute being resolved pursuant to Section 10 will not constitute a default under this subsection until three (3) business days after resolution of such dispute resulting in a determination of the relevant payments owed); or

(b)     Other Default.  (i) The breach of or noncompliance with a material provision of this Agreement (other than a payment default described in Section 8(a) above) which remains uncured within thirty (30) days after notice of such breach or noncompliance is given to the breaching or noncomplying party; *provided, however*, that if it is not practicable to correct the default within the thirty (30) day period and the defaulting party has commenced corrective action and is taking all good faith, commercially reasonable efforts to correct same, then such cure period will be extended for so long as it reasonably required to correct the default undertaking such good faith, commercially reasonable efforts, or (ii) a successive breach of or noncompliance with such material provision within twelve (12) months thereafter; or

(c)     Insolvency.  By either party, upon written notice to the other party, if the other party becomes insolvent, fails to pay its debts as they come due or makes any assignment for the benefit of creditors or becomes subject to any federal or state receivership, liquidation or bankruptcy or insolvency case or proceeding (voluntary or involuntary), but if involuntary, only if such case or proceeding is not dismissed within 90 days from the date instituted.

**9.     EFFECT OF TERMINATION; REMEDIES**.  Upon expiration or termination of this Agreement for any reason, at Company's option, Supplier shall complete all Purchase Orders submitted to Supplier by Company prior to the effective date of termination and Company shall pay for such orders upon acceptance of the Aggregates by Company, subject to any set-offs.  Company may set off any damages, losses or expenses that Company incurs which arise out of or are connected to breach of this

Agreement from amounts owed to Supplier. Expiration or termination of this Agreement for any reason shall not affect any liabilities or obligations of either party that have accrued at the date of expiration or termination or which by their nature survive expiration or termination. Following the occurrence and during the continuance of an Event of Default, the non-defaulting party may terminate this Agreement as contemplated in Section 7 (in which event the parties shall only be liable for amounts due and owing as of the date of termination) or may pursue such other remedies as expressly provided herein or otherwise provided by law.

**10.    GENERAL PROVISIONS.**

(a)    Notices. Any notice or other communication provided for hereunder shall be in writing and may be (i) served by personal delivery, (ii) made by facsimile transmission, or (iii) sent by overnight courier service (with all fees prepaid) to the receiving party as follows:

If to BMI:

> Boggs Materials, Inc.
> P.O. Box 1609
> Monroe, NC 28111
> Attention: Drew Boggs
> Facsimile: 866-554-3442

*with a copy to:*

> K&L Gates LLP
> Hearst Tower, 47th Floor
> 214 North Tryon Street
> Charlotte, North Carolina 28202
> Attn: C. Chad Warpula, Esq.
> Fax: 704-353-3210

If to a Supplier:

> Buckhorn Materials LLC
> 3410 Hwy 601 South
> Jefferson, SC 29718
> Attn: Richard Moses
> Facsimile No.: _843-672-3579
>
> Construction Materials Group LLC
> 1357 Eddie Horton Road
> Mt. Croghan, SC 29727
> Attn: Richard Moses
> Facsimile No.: 843-672-3579
>
> Hinkle Contracting Company, LLC
> P.O. Box 200
> 395 North Middletown Road
> Paris, Kentucky 40362-0200
> Attention: Thomas Hinkle
>                  Steve Hullett
>                  Warren Hawkridge
> Facsimile No.: (859) 987-0727
>
> Summit Materials, LLC
> 3550 Wynkoop, 3rd Floor
> Denver, CO 80202

Attn: Thomas Hill
Anne Benedict
Facsimile No.: (303) 893-6993

*with a copy to:*   Gibson, Dunn & Crutcher
200 Park Avenue
New York, New York 10166-0193
Attention: Steven R. Shoemate
Facsimile No.: (212) 351-5316

Any such notice or communication shall be deemed to be given, if delivered in person, on the date delivered, if made by facsimile transmission, on the date transmitted, or, if sent by overnight courier service, on the date sent as evidenced by the bill of lading; and shall be deemed received, if delivered in person, on the date of personal delivery, if made by facsimile transmission, upon confirmation of receipt (including electronic confirmation), or if sent by overnight courier, on the first business day after the day sent. Any party sending a notice or other communication by facsimile transmission shall also send a hard copy of such notice or other communication by one of the other means of providing notice set forth in this Section 10(a). Any notice or other communication shall be given to such other representative or at such other address as a party to this Agreement may furnish to the other party pursuant to this Section 10(a).

(b)    Indemnification. Each party (the **"Indemnifying Party"**) shall indemnify, defend, and save the other party, its Affiliates, officers, and employees (the **"Indemnified Parties"**) harmless only from such claims, litigation, liabilities, and expenses that result from, arise out of, or are caused by the Indemnifying party's acts or omissions or the acts or omissions of the Indemnifying Party's affiliates, subcontractors or agents. The indemnification obligation of the Indemnifying Party under this Agreement shall extend only to the Indemnified Parties and no other person or entity. The obligations of indemnification shall survive termination or expiration of this Agreement.

(c)    Insurance. Each party (the **"Covenant Party"**) shall maintain (i) worker's compensation and employer's liability insurance to fully protect against loss from personal injury, including death, to any of its employees; and (ii) comprehensive automobile liability, general liability, and property damage insurance. All such insurance shall be written by insurers acceptable to the other Party, having minimum coverage of $2,000,000 combined single limit, on an "occurrence" basis and not on a "claims made" basis. All general liability policies shall provide minimum coverage of $2,000,000 per occurrence and provide a minimum aggregate limit of $3,000,000 per occurrence. All policies, except for worker's compensation policies, shall name the other Party as an additional insured with primary coverage (with any other third-party coverage provided for the other Party to be deemed as excess only) and shall indemnify, defend, and protect the other party from all claims, expenses, and liabilities related with any act or omission of the Covenant Party, its invitees, or any person performing work directly or indirectly on behalf of the Covenant Party. All insurance shall expressly provide that all rights of subrogation against the other Party are waived and that no amendment or cancellation of any policy shall be effective until 30 days' written notice to the other Party. Before entering onto the other party's property or premises, the Covenant Party shall furnish certificates satisfactory to the other party evidencing the required insurance.

(d)    Relationship. Each party hereto will act as an independent contractor, and nothing contained in or arising out of this Agreement will be construed to imply or create any joint venture, partnership, agency, or other relationship. The parties agree that no fiduciary relationship is created by this Agreement. No persons other than the parties hereto or their permitted assigns shall be deemed to have any interest under this Agreement.

(e)   Assignment.   No party may assign this Agreement or delegate any duties hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that, each party shall have the right to assign this Agreement to an Affiliate with the same or better ability to perform the obligations in all respects hereunder, without the prior written consent of the other parties.   No rights shall inure to the benefit of any assignee of any party hereto as to which the other parties' consent is required hereunder, unless such other parties have consented in writing to the assignment to such assignee.   A change of control of Supplier or BMI or Boggs Paving, Inc.   shall be deemed an assignment under this Agreement (other than a change of control of BMI, Boggs Paving, Inc. or Supplier occurring after compliance by such party with the terms of Section 10(f) below).   For the purposes of the foregoing, a "**change of control**" means any sale or transfer, by any person or persons directly or indirectly controlling the Supplier or Company, as applicable, on the date hereof, of such control to a person or persons not controlling the Supplier or Company, as applicable, on the date hereof, or any sale or transfer of all or a substantial portion of all of Supplier's or Company's, as applicable, business or assets, whether consummated pursuant to a voluntary or involuntary levy, sale, execution or other legal process, transfer, gift, assignment or sale in bankruptcy, insolvency or any compulsory procedure; provided, that, such sales or transfers shall not constitute a "change of control" if they are made to an Affiliate.   For purposes hereof, each of the following shall not be deemed an assignment under this Agreement: (i) any transfer of direct or indirect ownership in Supplier or Company resulting from an initial public offering of the stock of Supplier or Company, or any direct or indirect owner of Supplier or Company, on a national exchange in the United States of America, and (ii) if Supplier's or Company's, or any direct or indirect owner of Supplier's or Company's, stock is publicly traded on a national exchange in the United States of America, transfers of stock in Supplier or Company, or such direct or indirect owner of Supplier or Company, as applicable. No assignment will be valid unless the assignee shall execute and deliver to the other parties hereto an assumption agreement in form satisfactory to the other parties hereto, including an assumption by the assignee of all of the obligations of the assignor and the assignee's ratification of and agreement to be bound by all of the provisions of this Agreement. This Agreement shall be binding upon the parties hereto and their successors and assigns, and shall inure to the benefit of the parties hereto and their permitted successors and assigns.

(f)   Sale of Business.   If, at any time prior to the fifth (5th) anniversary of the Effective Date of this Agreement, Company (which shall, for the purposes of Section 10(f), be deemed to include Boggs Paving, Inc. and Boggs Transport, Inc.) or Supplier (including their respective successors and assigns, the "**ROFR Seller**") wishes to effect a sale of all or any part of its business or assets (other than sales of assets in the ordinary course of business), in the case of Company, to a third party with asphalt and/or paving operations in South Carolina or North Carolina (which shall include Affiliates of Company), and in the case of Supplier, to a third party with aggregates operations in South Carolina or North Carolina (but which shall not include Affiliates of Supplier) pursuant to a bona fide offer from an independent third party purchaser, then the ROFR Seller shall first deliver to Supplier or Company, as applicable (the "**ROFR Buyer**"), a notice of offer from such third party purchaser, which shall include (i) a description of the business or assets being offered (the "**Offered Assets**"), (ii) the name of the third party purchaser, (iii) the purchase price, all other material terms of the proposed sale and, if applicable, the negotiated purchase agreement between the ROFR Seller and the third party purchaser (the "**Third Party Agreement**") and (iv) an offer to sell the Offered Assets to the ROFR Buyer at the same price, upon the same material terms and, if applicable, in accordance with a purchase agreement substantially in the form of the Third Party Agreement. The ROFR Buyer may deliver to the ROFR Seller an acceptance notice on or before the tenth (10th) business day after the ROFR Seller's delivery of the offer notice described above. The ROFR Buyer's acceptance of the ROFR Seller's offer shall be subject to the execution and delivery of a purchase and sale agreement in a form reasonably satisfactory to the ROFR Buyer and ROFR Seller and in accordance with the terms herein, which execution and delivery shall occur within sixty (60) days of the delivery of such acceptance notice; *provided, that*, if the notice of offer includes a

Third Party Agreement, the ROFR Buyer's acceptance of the ROFR Seller's offer shall be subject to the execution and delivery of a purchase agreement substantially in the form of such Third Party Agreement, which execution and delivery shall occur within thirty (30) days of the delivery of such acceptance notice. If the ROFR Buyer fails to deliver an acceptance notice within the ten (10) day exercise period, the ROFR Seller may sell the Offered Assets upon the terms and conditions set forth in the offer notice. If a ROFR Seller, after complying with this Section 10(f), consummates a transaction with a third party purchaser by purchase, merger or otherwise, this Section 10(f) shall no longer apply to such ROFR Seller, the third party purchaser or the surviving entity, as applicable, following such transaction.

(g)     No Waiver; Remedies. The failure by any party hereto to insist upon strict performance of any term or condition of this Agreement or failure or delay to exercise any right or remedy provided herein or by applicable law, or failure to notify properly the other party upon a breach, or the acceptance of or payments for any Aggregates hereunder will not release any party from any of the obligations of this Agreement and will not be deemed a waiver of any right of any party to insist upon strict performance hereof or any of its rights or remedies as to any prior or subsequent default hereunder. Time shall be of the essence in the performance of this Agreement. All remedies hereunder are cumulative and without limitation to any other rights or remedies available at law, in equity or otherwise. Suppliers and Company specifically acknowledge and agree that failure to comply with the terms of this Agreement may result in irreparable harm to Company and its Affiliates and to Suppliers and its Affiliates, respectively, and that Company and Suppliers shall be entitled to specific performance to enforce each and every term and condition of, and obligation of Supplier and Company, respectively, under, this Agreement.

(h)     Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of South Carolina, without regard to conflicts of laws principles.

(i)     Headings. The headings in this Agreement are for convenience of reference only and will not limit or otherwise affect any of the terms hereof.

(j)     Entire Agreement. This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, promises, covenants, arrangements, or communications, whether oral or written, by any officer, employee, or representative of any party hereto with respect thereto.

(k)     Amendments. No amendment hereto will be valid unless made in writing and signed by the parties hereto.

(l)     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original. It shall not be necessary in making proof of the contents of this Agreement to produce or account for more than one such counterpart.

(m)     Severability. If any provision of this Agreement is found to be unenforceable, the balance of this Agreement shall continue to be in full force and effect.

(n)     Force Majeure Event. Neither party will be considered in default of its performance of any obligation hereunder (other than an obligation to make any payment due hereunder) to the extent that (i) performance of such obligation is prevented or delayed by acts of God; war (declared or undeclared); terrorism or other criminal conduct; fire; flood; sabotage; strikes, or labor or civil disturbances (other than contributed to by the affected party); governmental requests, restrictions, laws, regulations, orders; unavailability of, or delays in, utilities or transportation; embargoes, or unforeseen circumstances or any other similar or dissimilar events or causes beyond party's reasonable control, and (ii) only to the extent such event could not have been avoided or overcome through the exercise of commercially reasonable

efforts (each, a "**Force Majeure Event**"). If any Force Majeure Event does arise, occur, or result, the party subject thereto shall use commercially reasonable efforts to minimize the consequences of such event and to overcome such event as soon as reasonably possible. A party desiring to rely upon any Force Majeure Event as an excuse for failure, default, or delay in performance shall provide the other party with prompt written notice of the facts giving rise to said event when it arises, the commercially reasonable efforts taken by such party to overcome said event and of the cessation of said event when it ceases to exist.

     **11.**    **JOINDER BY SUMMIT AND UNCONDITIONAL GUARANTY**. Summit, being financially interested in Suppliers and as an inducement to BMI to enter into this Agreement, hereby joins this Agreement for the purposes of acknowledging and agreeing to the obligations and duties herein imposed on Suppliers and hereby unconditionally guarantees the prompt payment and performance of all obligations of Suppliers hereunder and likewise agrees to be responsible for any damages to which any Supplier may, at any time, be entitled by reason of a breach of such obligations. Summit further hereby agrees that BMI has full authority to make any changes, modifications and alterations in this Agreement which shall be agreeable to the Suppliers and that such changes, modifications and alterations will not relieve Summit from any responsibility hereunder. Summit also agrees that it shall not be released from the obligations of this Agreement, nor shall said obligations be diminished or otherwise affected by any extension of time or other indulgence granted to any Supplier, by release from liability of any other guarantor of this matters guaranteed hereunder or by any waiver with respect to the terms or conditions of the Agreement, or with respect to the performance and observance of any of the other obligations of any Supplier under this Agreement, it being the intent hereof that Summit shall, at all times, be and remain liable to BMI to the same extent as if the Guarantor were jointly and severally liable with the Suppliers to BMI for the performance of all the obligations of Suppliers under this Agreement. Summit hereby waives (a) all notices of any kind whatsoever with respect to this Agreement and all other obligations of any Supplier to BMI relating to the Agreement, including but not limited to notice of the acceptance of this guaranty and reliance thereon, of any default under this Agreement of presentment, of protest, of demand, of notice of non-payment, of notice of dishonor, and notice of protest; (b) the right to require, and the benefit of any law which may require, the enforcement of any other rights before enforcing the liability of Summit; (c) all defenses whatever to Summit's liability under this Section 11 except the defense of confirmed payment or confirmed performance; and (d) any and all claims to subrogation to the rights of BMI should Summit be required to make any payment or perform any obligation hereunder until all of the obligations of all Suppliers to BMI shall have been satisfied in full. Summit agrees that BMI may proceed against Summit directly and independently of any Supplier. Summit agrees to pay, in addition to all other sums due, all costs and expenses of enforcing the obligations of Suppliers and Summit under this Agreement, including a reasonable attorney's fee at the time of enforcement, should this Agreement be placed in the hands of an attorney for enforcement, or if enforced through bankruptcy, probate, or other judicial proceedings..

     **12.**    **MONROE PROJECT**. For the avoidance of doubt, notwithstanding anything herein to the contrary, the purchase and sale of Aggregates by Customer and Supplier, respectively, with respect to the construction of the Design-Build Monroe Connector/Bypass TIP R-3329/R-2553, generally described as US 74 near I-485 in Mecklenburg County to US 74 between the towns of Wingate and Marshville in Union County, N.C. shall be in all respects pursuant to and in accordance with that certain Monroe Bypass Aggregate Supply Agreement, dated as of June 9, 2014, among Buckhorn, CMG, Monroe Bypass Constructors, LLC, Boggs Paving, Inc. and Anderson Columbia Co., Inc.

*Signatures on Following Page*

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**IN WITNESS WHEREOF**, the parties hereto have caused this Aggregates Supply Agreement to be executed on the date indicated below, effective as of the date first above written.

**Buckhorn Materials, LLC**

By: _Michael Brady_

Name: _Michael Brady_

Title: _Vice President_

Date: _06/09/14_

**Construction Materials Group LLC**

By: _Michael Brady_

Name: _Michael Brady_

Title: _Manager_

Date: _06/09/14_

**Summit Materials, LLC**

By: _Michael Brady_

Name: _Michael Brady_

Title: _Executive Vice President_

Date: _06/09/14_

**Boggs Materials, Inc.**

By: _____

Name: _____

Title: _____

Date: _____

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**IN WITNESS WHEREOF**, the parties hereto have caused this Aggregates Supply Agreement to be executed on the date indicated below, effective as of the date first above written.

**Buckhorn Materials, LLC**

By:_____

Name:_____

Title:_____

Date:_____


**Construction Materials Group LLC**

By:_____

Name:_____

Title:_____

Date:_____


**Summit Materials, LLC**

By:_____

Name:_____

Title:_____

Date:_____


**Boggs Materials, Inc.**

By: *Carl A. Boggs III*

Name: *CARL A. BOGGS, III*

Title: *President*

Date: *6-6-14*

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# EXHIBIT A

## PURCHASE ORDERS

See attached.

Related Party Purchase Order Summary - Buckhorn Materials LLC

| Date | From: | To: | Order # | Project | Material | P/O Quantity (tons) | Delivered Quantity to Date (tons) | Remaining Tons to Deliver | FOB Material Price | Haul Price [1] | Total Unit Price | P/O Amount | Remaining Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27-Feb-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3278 | 175: Brandlewood Plantation Road | MBC | 6,200 | 5,785 | 415 | $7.10 | $7.25 | $14.25 | $88,350.00 | $5,913.75 |
| 30-Aug-12 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3302 | SC File # 29.1208 | MBC | 500 | | 500 | $7.50 | $4.50 | $12.00 | $6,000.00 | $6,000.00 |
| | | | | | Class A&B Rip Rap | 35 | | 35 | $4.00 | $4.50 | $8.50 | $647.50 | $647.50 |
| | | | | | Clean Stone (#5) | 30 | | 30 | $11.50 | $4.50 | $16.00 | $480.00 | $480.00 |
| 22-Apr-03 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3364 | Idlewild Road Widening | #67 Stone | 100 | 18 | 82 | $14.00 | $7.80 | $21.80 | $2,180.00 | $1,787.60 |
| | | | | | ABC | 200 | 75 | 125 | $8.00 | $5.00 | $13.00 | $2,600.00 | $1,625.00 |
| | | | | | Ballast | 60 | | 60 | $14.50 | $7.80 | $12.30 | $1,354.50 | $1,354.50 |
| | | | | | Pit Gravel | 986 | | 986 | $14.00 | $10.90 | $12.30 | $12,127.80 | $12,127.80 |
| | | | | | #57 Stone | 23 | 146 | 986 | $14.00 | $7.80 | $12.30 | $503.40 | $0 |
| | | | | | Class A&B Rip Rap | 40 | 40 | 460 | $14.00 | $24.80 | $24.90 | $12,450.00 | $11,454.00 |
| 31-Jul-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3370 | SC File # 29.1308, FAP No. 5429(031) | ABC | 200 | 4,022 | 460 | $0.50 | Hourly | TBD | TBD | TBD |
| | | | | | A58 | 201 | 13 | 31 | $15.00 | $7.50 | $22.50 | $1,280.00 | $1,072.50 |
| | | | | | Class B Rip Rap | 44 | 13 | 70 | $15.00 | $16.00 | $31.00 | $990.00 | $697.50 |
| | | | | | Ballast | 70 | | 20 | $4.50 | $19.50 | $17.50 | $1,365.00 | $1,365.00 |
| 22-Oct-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3376 | SC File # 46.042287, FAP No. M813 (154) | MBC | 20 | | 20 | $7.50 | $10.00 | $17.50 | $350.00 | $350.00 |
| 9-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3381 | SC File # 28.04187, Etc. DT12(004) | MBC | 20 | | 20 | $7.50 | $16.25 | $16.25 | $325.00 | $325.00 |
| | | | | | #89 | 303 | 359 | | $12.00 | $7.80 | $19.80 | $5,940.00 | $0 |
| 18-Sep-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3385 | 2013 Road Paving Program #1104.5 | Rip Rap | 50 | 200 | | $14.00 | $9.60 | $23.60 | $1,180.00 | $0 |
| | | | | | #57 | 71 | 395 | | $10.00 | $5.15 | $15.15 | $1,060.50 | $0 |
| | | | | | #89 | 450 | 577 | | $12.10 | $5.50 | $17.50 | $7,875.00 | $0 |
| | | | | | #6 | 20 | 107 | | $12.00 | $5.25 | $17.25 | $345.00 | $0 |
| 30-Oct-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3385 | 2013 Road Paving Program N1104-5 | MBC | 1,400 | 1,281 | 119 | $8.00 | $6.50 | $14.50 | $20,300.00 | $1,725.50 |
| 7-Aug-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3388 | SC File # 29.042358, St. Proj No. C-42358 | Pit Gravel / Processed Fines | 100 | 445 | | $3.50 | $5.15 | $8.65 | $985.00 | $0 |
| 16-Jan-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3404 | Wal-Mart #4148 | #89 | 186 | 232 | | $12.00 | $8.00 | $20.00 | $3,720.00 | $0 |
| | | | | | #5 | 87 | 936 | | $11.00 | $9.75 | $19.75 | $1,719.25 | $0 |
| | | | | | Class B Rip Rap | 10 | | 82 | $14.00 | $11.00 | $25.00 | $250.00 | $250.00 |
| | | | | | Screenings (Sand) | 252 | 175 | 77 | $7.00 | $8.75 | $15.75 | $3,969.00 | $1,212.75 |
| | | | | | Coarse Screenings | 2,268 | 151 | 2,117 | $7.50 | $8.75 | $15.75 | $35,721.00 | $33,342.75 |
| | | | | | Concrete Sand | 2,205 | | 2,205 | $7.50 | $8.75 | $15.75 | $35,831.25 | $35,831.25 |
| | | | | | Screenings (Sand) | 79 | | 79 | $7.50 | $8.75 | $16.25 | $1,244.25 | $1,244.25 |
| 3-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3407 | SC File # 12.101404 Etc. | #89M | 600 | 600 | | $7.00 | $8.75 | $15.75 | $9,510.00 | $9,510.00 |
| | | | | | Rip Rap | 100 | 100 | 100 | $12.00 | $8.85 | $21.00 | $2,100.00 | $2,100.00 |
| 1-Apr-14 | Buckhorn Materials, LLC / RMD Construction | Boggs Paving, Inc. | 3413 | SC File # 29.042819 | #89M | 150 | | 150 | $12.00 | $5.00 | $17.00 | $2,550.00 | $2,550.00 |
| 28-Feb-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3416 | Wal-Mart #4148 | #89M | 100 | n/a | n/a | $11.00 | $8.75 | $19.75 | n/a | n/a |
| 28-Feb-14 | Buckhorn Materials, LLC / RMD Construction | Boggs Paving, Inc. | 3416 | Wal-Mart #4148 | Quarry Overburden | TBD | | n/a | $1.00 | $9.00 | $10.00 | n/a | n/a |
| **Subtotal: Non-IV Intercompany Purchase Orders** | | | | | | 17,395 | 15,053 | 8,348 | | | | $265,339.95 | $132,913.90 |
| 2-Jun-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3409 | SC File 932.0381770 I-26 Design Build Project #5 | #5 | 78 | | 78 | $12.50 | $7.50 | $20.00 | $1,560.00 | $1,560.00 |
| | | | | | #6 | 24,798 | | 24,798 | $12.50 | $7.50 | $20.00 | $495,960.00 | $495,960.00 |
| | | | | | #7 | 72,485 | | 72,485 | $12.50 | $7.50 | $20.00 | $1,449,700.00 | $1,449,700.00 |
| | | | | | #89 | 62,195 | | 62,195 | $13.00 | $7.50 | $20.50 | $1,274,997.50 | $1,274,997.50 |
| | | | | | Coarse Screenings | 50,605 | | 50,605 | $8.00 | $7.50 | $15.50 | $784,377.50 | $784,377.50 |
| | | | | | Washed Screenings | 10,000 | | 10,000 | $8.00 | $7.50 | $15.50 | $155,000.00 | $155,000.00 |
| | | | | | Fine Screenings | As Needed | | n/a | $4.00 | $7.50 | $11.50 | n/a | n/a |
| **Subtotal: I-26 Project** | | | | | | 220,161 | | 220,161 | | | | | |
| **Total Buckhorn Materials, LLC (Excluding Monroe Bypass)** | | | | | | 237,556 | 15,053 | 228,509 | — | — | $18.64 | $4,426,954.95 | $4,291,510.00 |

1. All material FOB to jobsite, therefore stated haul prices are representative of estimated cost. Actual cost is currently passed through to Boggs Paving as incurred without mark-up.

ELECTRONICALLY FILED - 2020 Mar 06 ... 2020CP1300175

Related Party Purchase Order Summary - Construction Materials Group, LLC

| Date | From: | To: | Order # | Project | Material | P/O Quantity (tons) | Delivered Quantity to Date (tons) | Remainin g Tons to Deliver | FOB Material Price | Haul Price [1] | Total Unit Price | P/O Amount | Remaining Amount |
|------|-------|-----|---------|---------|----------|---------------------|-----------------------------------|----------------------------|--------------------|----------------|------------------|------------|-------------------|
| 6-May-13 | Construction Materials Group, LLC | Boggs Paving, Inc | 8-3300 | CMC Union Womens' Center | Fill Sand | 4,000 | - | 4,000 | $3.50 | $5.30 | $8.80 | $35,200.00 | $35,200.00 |
| 1-Jul-13 | Construction Materials Group, LLC | Boggs Paving, Inc. | 3370 | SC File 29.120R8, FAP No. 5A29(001) | Sand | 441 | - | 441 | $3.00 | $8.50 | $11.50 | $5,071.50 | $5,071.50 |
| Total Construction Materials Group, LLC | | | | | | 4,441 | - | 4,441 | - | $9.07 | $40,271.50 | $40,271.50 | |

1. All material FOB to jobsite, therefore stated haul prices are representative of estimated cost. Actual cost is currently passed through to Boggs Paving as incurred without markup.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP130017S

## EXHIBIT B

### AGGREGATES PRODUCTS AND SPECIFICATIONS

| 0 - 5% | 0 - 15% | 25-45% | 90 - 100% | |
| | 0-5% | 0-10% | 15 - 35% | 90 - 100% |
| | | 0-5% | 0 - 10% | 45 - 65% |
| | | | 0 - 5% | 15 - 35% |
| | | | | 10 - 25% |
| | | | | 8 - 15% |
| | | | | 5 - 10% |
| 0 - .6% | 0 - .6% | 0 - .6% | 0 - 1% | 3 - 6% |

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit B


**KILPATRICK TOWNSEND**
ATTORNEYS AT LAW

KILPATRICK TOWNSEND & STOCKTON LLP
www.kilpatricktownsend.com

1001 West Fourth Street
Winston-Salem, NC 27101-2400
t 336 607 7300  f 336 607 7500

direct dial 336 607 7432
direct fax 336 734 2612
dgreene@kilpatricktownsend.com

January 18, 2022

*Via Email and Federal Express Overnight Delivery*

Buckhorn Materials, LLC
3410 Hwy 601 South
Jefferson, SC 29718
Attn: Richard Moses

Construction Materials Group LLC
1357 Eddie Horton Rd.
Mt. Croghan, SC 29727
Attn: Richard Moses

Hinkle Contracting Company, LLC
395 North Middletown Rd.
Paris, KY 40362-0200
Attn: Thomas Hinkle, Steve Hullett, Warren Hawkridge

Summit Materials, LLC
3550 Wynkoop
3rd Floor
Denver, CO 80202
Attn: Thomas Hill, Anne Benedict

Georgia Stone Products
Attn: Bart Boyd
4870 Leland Dr.
Cumming, GA 30041
Bart.Boyd@georgiastoneproducts.com

> Re:    Notice of Default and Demand for Assurances of Performance under Aggregate
> Supply Agreement

Dear Mr. Moses, Mr. Hinkle, Mr. Hullett, Mr. Hawkridge, Mr. Hill, Ms. Benedict, and Mr. Boyd,

This firm represents Boggs Materials, Inc. and its affiliates. This letter serves as follow up to Drew Boggs's April 16, 2021 letter regarding Buckhorn's breaches of the Aggregates Supply

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

January 18, 2022
Page 2

Agreement ("the Agreement") dated June 9, 2014, with respect to the operation of the Lynches River Quarry ("Quarry"), and also provides a projection for the 2022 Aggregate needs of Boggs Materials, Inc. ("BMI") in order to avoid further breaches of the Agreement by the Suppliers and their affiliates. A copy of the Agreement is enclosed for your reference.

First, as conveyed in the April 16, 2021 letter to Buckhorn Materials, LLC, Hinkle Contracting Company, LLC, and Summit Materials, LLC (collectively, "the Suppliers"[1]) (letter enclosed herewith), Buckhorn and the Suppliers have been and continue to be in breach of the Agreement for failure to supply Aggregates[2] in the quantities, quality and timeliness required by BMI pursuant to the terms of the Agreement. Section 3(a) of the Agreement requires the Suppliers to supply "the quantities and specifications of Aggregates that [BMI] may specify in written purchase orders delivered to Supplier." Suppliers have repeatedly and consistently breached this provision by failing to fill BMI purchase orders over the last year. As recently as this week, Suppliers and their affiliate Georgia Stone informed Chuck Steele of BMI that they did not have stone to fill BMI's purchase orders for current projects. BMI has been forced to purchase Aggregates from other suppliers at significantly increased costs, and Suppliers are liable for those and other damages incurred by BMI and its affiliates for Suppliers' breaches of the Agreement.

Georgia Stone has further breached the Agreement by violating Section 6(b)(ii), which requires Suppliers to provide BMI Aggregates "for use in asphalt [to] be produced unwashed and sized according to the ranges specified on Exhibit B" of the Agreement, and Section 6(b)(iv), which requires "[a]ll Aggregates [to] (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the 'Specifications')." And, Georgia Stone recently communicated that it intends to cease complying with the Agreement's requirement that it supply unwashed Aggregates.

Specifically, Suppliers have repeatedly supplied Aggregates that do not comply with purchase orders and the Specifications. Enclosed herewith is a spreadsheet showing the results of BMI's testing of Aggregates from Suppliers for Specification compliance. As you can see, Suppliers' Aggregates fail to comply more than 96% of the time. At the formation and execution of the Agreement, Suppliers understood and agreed that a primary and significant inducement to BMI to enter into the Agreement was BMI's own aggregate needs to fulfill its own contractual obligations to its customers, including certain state DOT contracts. Those DOT contracts include aggregate specifications BMI must meet and that were expressly referenced in the Agreement. Suppliers' repeated and pervasive non-compliance and failures have caused and continue to cause significant financial harm and serious detrimental impacts on BMI's ability to meets its own contractual requirements.

---

[1] We understand that the Quarry is currently being operated to Georgia Stone Supply ("Georgia Stone"), which is another Summit subsidiary. Under Section 10(e) of the Agreement Georgia Stone and the other Suppliers are bound by the Agreement and jointly responsible for breaches thereof.
[2] Capitalized terms used herein have the meaning assigned to them in the Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

January 18, 2022
Page 3

Additionally, Georgia Stone has informed BMI that it will only be providing washed Aggregates and has begun to supply washed instead of unwashed Aggregates in response to BMI's purchase orders. This is unacceptable as washed Aggregates significantly increase BMI's cost to produce asphalt due to increased moisture content and since it is a different material than the 'Course Screenings' us of this material requires all new Asphalt Mix Designs at a significant cost. The Agreement is explicit that Suppliers are to meet BMI's purchase orders by providing unwashed Aggregates, and BMI expects Suppliers, including Georgia Stone to comply with the Agreement.

As noted, these numerous failures have caused, and continue to cause, BMI and its affiliates significant damages. BMI and its affiliates reserve all rights with respect to these breaches, including, but not limited to, the remedies outlined in Section 6(c) of the Agreement. In an effort to avoid further breaches of the Agreement and mitigate its damages, and without waiving any of its rights to recover for damages already incurred as a result of Suppliers' breaches, BMI hereby requests that Suppliers provide assurances in writing that Suppliers will provide BMI Aggregates in response to its purchase orders that comply with the Agreement's requirements, and that all Aggregates from the Quarry will be made available to BMI and its affiliates on a **first priority** basis as required by Section 3(d) of the Agreement.

To facilitate Suppliers' compliance with the Agreement, enclosed herewith is BMI's 2022 Aggregate Needs & Schedule. Pursuant to Section 3(b) of the Agreement, Buckhorn and its Suppliers "shall accept and fulfill each and every [BMI] Purchase Order provided that such Purchase Order is provided by [BMI] within a commercially reasonable notice period." Further, Section 3(d) of the Agreement requires Buckhorn and its Suppliers to "maintain sufficient manufacturing capabilities to supply Aggregates to [BMI] in accordance with Purchase Orders." In addition to the quantities and timing provided under the 2022 Schedule, all Aggregates supplied for use in asphalt "shall be produced unwashed and sized according to the ranges specified" in the Agreement, pursuant to Section 6(b)(ii) of the Agreement. Failure to supply Aggregates in the quantities, quality and timeliness of the proposed 2022 Aggregate Needs & Schedule, and in accordance with the specifications in Sections 6(b)(i)-(iii) of the Agreement, will constitute further events of default under Section 8 of the Agreement.

Please provide your written assurances that you will be able to comply with the quantities, specifications, and timing provided under the 2022 Aggregate Needs & Schedule no later than 5:00 pm on January 21, 2022. BMI is specifically concerned about the availability of 6 stone, 7 stone, and 89's, following correspondence with Georgia Stone on January 12, 2022, in which Georgia Stone conveyed a shortage of these Aggregates. BMI seeks assurances that Suppliers are able to fulfill its 2022 Aggregate Needs and comply with its 2022 Schedule, including, but not limited to, the ability to provide 6 stone, 7 stone, and 89's to BMI.

The above breaches of the Agreement are material and constitute events of default pursuant to section 8(b) of the Agreement. BMI gave formal notice of these breaches in its April 16, 2021 letter, but Suppliers failed to cure those breaches, and, in fact, have continued to commit material breaches of the Agreement. This letter is further notice that BMI considers Suppliers to be in

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

January 18, 2022
Page 4

default if the above breaches are not promptly and fully cured. BMI reserves all rights under the Agreement.

Sincerely,

Dustin T. Greene

DTG:kef
Encl.
cc:    Gibson, Dunn & Crutcher
        200 Park Ave.
        New York, NY 10166-0193
        Attn: Steven R. Shoemate

        Drew Boggs

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Execution Version

## BOGGS MATERIALS, INC.
## AGGREGATES SUPPLY AGREEMENT

THIS AGGREGATES SUPPLY AGREEMENT (this "**Agreement**") is dated as of June 9, 2014 (the "**Effective Date**"), by and among (i) **BUCKHORN MATERIALS, LLC**, a South Carolina limited liability company, with offices at 3410 Hwy 601 South, Jefferson, SC 29718 ("**Buckhorn**"), **CONSTRUCTION MATERIALS GROUP LLC**, a North Carolina limited liability company, with offices at 1357 Eddie Horton Road, Mt. Croghan, SC 29727 ("**CMG**", and together with Buckhorn, each a "**Supplier**" and collectively the "**Suppliers**") and **SUMMIT MATERIALS, LLC**, a Delaware limited liability company ("**Summit**"), and (ii) **BOGGS MATERIALS, INC.**, a North Carolina corporation, with offices at 1613 W. Roosevelt Blvd, Monroe, NC 28110 ("**BMI**").

## RECITALS

A.    BMI is engaged in the business of the manufacturing, sale and application of construction materials, including cold mix asphalt, warm mix asphalt and hot mix asphalt, recycled crushed concrete and construction aggregates.

B.    Buckhorn is engaged in the business of mining, producing and selling aggregate materials from the Lynches River Quarry located at 3410 Hwy 601 South, Jefferson, SC 29718 and surrounding properties leased by Buckhorn under the Lynches River Lease, as defined below (the "**Lynches River Quarry**"), and CMG is engaged in the business of mining, producing and selling aggregate materials from the Black Creek Sand Mine located at 1357 Eddie Horton Road, Mt. Croghan, SC 29727 (the "**Black Creek Sand Mine**" and together with the Lynches River Quarry, the "**Supplier Quarries**").

C.    Hinkle Contracting Company, LLC, a Kentucky limited liability company ("**Hinkle**"), is a wholly-owned subsidiary of Summit.

D.    BMI, A Mining Group, LLC, a Florida limited liability company ("**AMG**"), Hinkle and certain other parties thereto have entered into as of the date hereof a Membership Interest Purchase Agreement (the "**Buckhorn MIPA**"), pursuant to which Hinkle acquired ownership of Buckhorn, and Hinkle and certain other parties thereto have entered into as of the date hereof a Membership Interest Purchase Agreement (the "**CMG MIPA**" and together with the Buckhorn MIPA, the "**Membership Interest Purchase Agreements**"), pursuant to which Hinkle acquired ownership of CMG.

E.    Pursuant to the terms of the Membership Interest Purchase Agreements and as additional consideration for the purchase and sale of the membership interests of Suppliers thereunder, the Suppliers have agreed to sell Aggregates to BMI, and BMI has agreed to purchase Aggregates from Suppliers, on and subject to the terms and conditions of this Agreement.

F.    The execution and delivery of this Agreement by BMI and Suppliers are conditions precedent to and form an essential part of the transactions consummated in the Membership Interest Purchase Agreements. The parties acknowledge and agree that BMI was only willing to enter into and perform under the Membership Interest Purchase Agreements based on the commitments of Suppliers under this Agreement and that the Suppliers and Summit were only willing to enter into and perform under the Membership Interest Purchase Agreements based on the commitments of BMI under this Agreement.

G.    On the date hereof and also as a condition precedent to the consummation of the transactions under the Membership Interest Purchase Agreements, Affiliates of BMI are entering into that certain Mining Lease Agreement to lease mining rights to the Lynches River Quarry and related

properties to Buckhorn (the "**Lynches River Lease**") and that certain Mining Lease Agreement to lease mining rights to the Black Creek Sand Mine to CMG (the "**Black Creek Sand Mine Lease**" and together with the Lynches River Lease, the "**Mining Leases**").

## AGREEMENTS

NOW, THEREFORE, in consideration of the Membership Interest Purchase Agreements, the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1.    **DEFINITIONS**.  For purposes of this Agreement:

"**Affiliate**" when used with respect to any Person, means (i) if such Person is a corporation, any officer or director thereof and any Person which is, directly or indirectly, the beneficial owner (by itself or as part of any group) of more than fifty percent (50%) of any class of any equity security (within the meaning of the Securities Exchange Act, as amended) thereof, and, if such beneficial owner is a partnership, any partner thereof, or if such beneficial owner is a corporation, any Person controlling, controlled by or under common control with such beneficial owner, or any officer or director of any such beneficial owner or of any corporation occupying any such control relationship, (ii) if such Person is a partnership, any partner thereof, and (iii) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person. For purposes of this definition, "control" (including the correlative terms "controlling," "controlled by" and "under common control with"), with respect to any Person, shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by agreement or otherwise.

"**Aggregates**" means Sand Aggregates and Stone Aggregates.

"**Applicable Law**" means all provisions of any constitution, statute, law, rule, regulation, decision, order, decree, judgment, ruling, release, license, permit, stipulation, or other official pronouncement enacted, promulgated, or issued by any governmental authority, court of competent jurisdiction or arbitrator or arbitration panel.

"**Asphalt Plants**" means any and all asphalt plants owned or operated by any of BMI or its Affiliates, as such asphalt plants may be altered, modified, reconditioned or expanded, and any asphalt plants, in replacement thereof, including without limitation, the BMI asphalt plants located at Lugoff, SC, Lynches River, SC, Mullins, SC, Monroe, NC and Rock Hill, SC.

"**Bona Fide Market Price**" means a market price that is offered by a third-party source regularly engaged in the business of selling Aggregates in the applicable local market in which Company desires to purchase Aggregates and capable of supplying the quantities and qualities of Aggregates desired by the Company.  A Bona Fide Market Price must be verifiable in a manner mutually agreed to by Supplier and Company (*e.g.* copy of paid invoice or purchase order between Company and such third party), such agreement not to be unreasonably withheld.

"**Company**" means BMI or any Affiliate of BMI that purchases Aggregates pursuant to this Agreement.

"**Person**" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity (or any department, agency, or political subdivision thereof) or any other entity.

"**Sand Aggregates**" means sand, coarse and fine, meeting the requirements of the Departments of Transportation of the states of North Carolina and South Carolina.

"**Stone Aggregates**" means those granite and lime stone products (but excluding recycled crushed concrete), meeting the requirements of the Departments of Transportation of the states of North Carolina and South Carolina.

**2.**    **TERM**.  The initial period of this Agreement will begin on the Effective Date and shall continue for a minimum of ten (10) years (the "**Initial Term**"), unless earlier terminated as provided herein; provided that such Initial Term shall automatically renew for successive one (1) year periods (each one (1) year extension a "**Renewal Term**" and the Initial Term and each Renewal Term collectively the "**Term**"), unless the Suppliers and BMI mutually agree not to renew this Agreement at least one (1) year prior to the end of the applicable Term; provided further, that this Agreement shall terminate (i) upon the expiration or termination of the Lynches River Lease (unless the basis for such termination is the acquisition of the Lynches River Quarry or the assumption of the lessor's interest in the Lynches River Lease by Supplier or its Affiliate) and (ii) solely with respect to CMG's supply of Aggregates under this Agreement, upon the expiration or termination of the Black Creek Sand Mine Lease (unless the basis for such termination is the acquisition of the Black Creek Sand Mine or the assumption of the lessor's interest in the Black Creek Sand Mine by Supplier or its Affiliate).

**3.**    **SALE AND PURCHASE OF AGGREGATES**.

(a)    Purchase Orders.  During the Term, Company may order and Supplier shall, subject to the terms hereof, supply, the quantities and specifications of Aggregates that Company may specify in written purchase orders delivered to Supplier (each a "**Purchase Order**").  In the event of any conflict between the terms and conditions of this Agreement and those in Company's Purchase Order, the terms and conditions of this Agreement will govern; *provided, however*, if any terms in Company's Purchase Order are in addition to, but do not conflict with, the terms of this Agreement, then such additional terms will apply.  A list of purchase orders submitted by Company to Supplier that are outstanding as of the date hereof, including the prices and volume by product and reference numbers relating to such purchase orders, is set forth on Exhibit A.

(b)    Requirements.  Subject to Supplier's ability to supply the Aggregates in the quantities, quality and timeliness required by Company at the prices under this Agreement and upon the other terms and conditions in this Agreement, including the Specifications (as defined below) (the "**Requirements Conditions**") and to the extent permitted by Applicable Law, Company agrees to purchase one hundred (100%) percent of BMI's and its Affiliates' requirements for Aggregates from Supplier during the Term. Upon receipt of each Purchase Order, Supplier shall make available and supply to Company the Aggregates according to the Requirements Conditions.  If Supplier is unable to supply the Aggregates to fulfill a Purchase Order according to the Requirements Conditions, Supplier shall promptly notify Company and Company may rescind all or any part of its Purchase Order and may purchase Aggregates, of similar type or quantity, from another producer without cost or liability to Supplier.  Without limiting Company's rights or remedies, if the purchase price paid by Company for Aggregates to such third party (including the delivered haul cost to Company's Asphalt Plant) exceeds the delivered purchase price provided herein, the excess of the amount actually paid by Company to the third party for such Aggregates (taking into account the delivered haul cost to Company's Asphalt Plant) over the amount that Company would have paid to Supplier for such Aggregates under this Agreement shall be paid by

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP130017S

Supplier to Company within 10 days after written notice from Company; provided, that the third party price for such Replacement Aggregates must be a Bona Fide Market Price. Except as set forth above, neither Company nor BMI is guaranteeing any specific quantities of Aggregates that Company may need from time to time during the Term and Company shall only become obligated to purchase Aggregates, and Supplier shall, subject to the terms hereof, only become committed to supply such Aggregates, upon Company's submission of a Purchase Order. For the avoidance of doubt and without limiting Section 3(d) below, Supplier shall accept and fulfill each and every Company Purchase Order provided that such Purchase Order is provided by such Company within a commercially reasonable notice period for the production of the Aggregates required, consistent with past practices, and in quantities customarily ordered by such Company (or as otherwise may be commercially reasonable); provided, that, for the avoidance of doubt, Supplier reserves the right not to accept a Purchase Order during a Force Majeure Event. Except as otherwise expressly provided for in this Agreement, Company shall not purchase Aggregates from a third party source.

(c)    Delivery. Supplier will inspect and test the Aggregates prior to delivery to ensure they comply with the Specifications. Company shall purchase Sand Aggregates hereunder at the Black Creek Sand Mine and Stone Aggregates at the Lynches River Quarry, or such other locations as specified in the Purchase Order. Supplier will deliver, at times reasonably requested by Company to maximize availability of Company's trucks, the Aggregates into top loading industry standard trucks at its load-out facilities. Company is responsible for arranging and scheduling of suitable delivery vehicles to the delivery point and for their safe operation while at Supplier's facilities. All such vehicles must comply with all safety and operating rules and requirements imposed by Supplier for operations at its plants and provided to Company in advance. Deliveries will be considered "on time" and "timely" if the subject Aggregates are available and ready for top loading at the designated facility no later than the delivery date specified in the Purchase Order (the "**Delivery Date**"). Time is of the essence with respect to deliveries, and Company may suffer financial loss if Supplier fails to maintain a service level ensuring that Aggregates are timely delivered by Supplier to Company (i) within Supplier's applicable lead times and (ii) in proper condition (proper quality, quantity and type). Failure on the part of Supplier to fill Purchase Orders on a timely basis, or failure on the part of Company to accept the Aggregates, will give rise to any remedies provided by law or in equity, including the right to cancel such unfilled Purchase Orders.

(d)    Aggregate Availability. Supplier shall maintain sufficient manufacturing capabilities to supply Aggregates to Company in accordance with Purchase Orders that Company may issue from time to time, all in accordance with the terms of this Agreement. Supplier shall allocate any and all Aggregates to Company on a first priority basis with respect to any third party purchase order received by Supplier after receipt of a Company Purchase Order. In the event of a Force Majeure Event, Supplier shall assist Company in locating reliable alternate sources and suppliers of Aggregates to ensure a continued supply during such difficulties. If such difficulties obligate Company to purchase Replacement Aggregates from a third party, then solely with respect to Replacement Aggregates for unfilled Purchase Orders, Company may deduct any excess of the purchase price of such Replacement Aggregates over the prices provided for in this Agreement from future Supplier invoices (in each case taking into account the delivered haul cost to Company's Asphalt Plant); provided, that the third party price for such Replacement Aggregates must be a Bona Fide Market Price. For purposes hereof, "Replacement Aggregates" shall mean the complete quantity of Aggregates subject to the Purchase Order, regardless of whether Supplier is willing or able to partially fulfill such Purchase Order.

(e)    Calculations of Shipped Aggregates. The quantity of Aggregates delivered to Company each month ("**Shipped Aggregates**") will be determined by the weight tickets of shipped Aggregates at Supplier's truck scales located at the load-out point at its quarry, and Supplier will furnish such calculation, and a copy of such weight tickets, on or before the seventh (7th) business day following the Delivery Date. Supplier will be responsible, at its cost, for the maintenance and calibration of the scales

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

and will ensure such scales are calibrated and inspected by the Department of Agriculture on at least a semi-annual basis.

**4.    PURCHASE PRICE AND PAYMENT.**

(a)    Pricing.  Prices of the Aggregates for Purchase Orders in place as of the Effective Date are set forth on Exhibit A.  The purchase price of any Aggregates supplied pursuant to Section 3 shall be no greater than the lesser of (i) the prevailing best third party customer price per ton commensurate with such product and volume sold by Supplier, and (ii) the prevailing market price for such Aggregates.  All prices shall be F.O.B. at the applicable Supplier Quarry or the other applicable supply location designated by Company.

(b)    Price Adjustments.  The parties will meet on a calendar-quarter basis, or shall meet at the request of Company or Supplier, to review the prices for the Aggregates.  In determining prevailing market prices for the Aggregates to be supplied to any Asphalt Plant, the Supplier shall take into account the delivered haul cost to such Asphalt Plant.  Supplier acknowledges that competitive Aggregates pricing is necessary for BMI and its Affiliates to successfully bid and acquire asphalt volume, while BMI acknowledges that its asphalt mix sales, from which its Aggregates requirements are derived, drive a substantial portion of Supplier's total sales volume; as such, both parties agree to use all commercially reasonable efforts, including but not limited to job-specific pricing of Aggregates, to maximize the sale or purchase, as the case may be, of Aggregates for each party.  During the first fifteen (15) years of the Term, any increase in the prices for Aggregates shall not exceed the greater of (i) (A) during the first five years of the Term, 4% per calendar year, (B) during the sixth through tenth years of the Term, 5% per calendar year and (C) during the eleventh through fifteenth years of the Term, 6% per calendar year, and (ii) the percentage change of Supplier's operating costs per ton (including all direct production and or selling costs incurred in the ordinary course of business by Buckhorn or CMG, as the case may be).  All costs supporting the percentage changes pursuant to subsection 4(b)(ii) shall be included and allocated in accordance with generally accepted accounting principles applied consistently and subject to audit by Company if requested.  For purposes of measuring such percentage changes, the baseline pricing as of the Effective Date will be the calendar year 2013 pricing between Supplier and Company applicable to Aggregate type and job type.

(c)    Price Warranty.  Notwithstanding anything herein to the contrary, Supplier warrants that the prices for the Aggregates sold to Company hereunder (taking into account the delivered haul cost to each Asphalt Plant) are no less favorable than those prices Supplier is extending to any other customer (taking into account the delivered haul cost to such other customer's facility) for the same or similar products from the Supplier Quarries.  If Supplier subsequently grants another customer pricing on terms more favorable than those being provided to Company at such time in violation of the foregoing warranty, Supplier shall notify Company and adjust the prices charged to Company accordingly (with such modified pricing to take effect as of the date such pricing was granted to the other customer).  In addition, if another supplier offers Company more favorable pricing for aggregates similar to the Aggregates prior to Company's submission of a Purchase Order to Supplier, then Company must notify Supplier thereof and afford Supplier a reasonable opportunity to confirm such pricing and reconsider and amend its pricing to meet the lower pricing offered by the other supplier; provided, that such lower pricing must be a Bona Fide Market Price.  If Supplier elects not to amend its pricing, Company is relieved of its requirement to purchase any quantity of Aggregates offered by Supplier at a price higher than such lower pricing and Company may then purchase such Aggregates from that third-party source at a price no higher than such lower pricing. If, at Company's request, Supplier quotes prices and quantities for Aggregates to Company in connection with Company's submission of a bid for a project (or has quoted such prices prior to the Effective Date), and Company uses (or used) such quote in a bid for a project and is awarded such bid, then (i) Supplier shall reserve availability of such Aggregates for Company, and (ii)  Company shall

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP130017S

submit a Purchase Order to Supplier for the Aggregates subject to such quote to be used in such bid, and Supplier shall sell such Aggregates to Company at no higher than the price set forth in the quote.

(d)    Payment.  Supplier shall invoice Company for the price of the Aggregates at the time of shipment or as otherwise mutually agreed.  Company shall pay all conforming invoices in full within 45 days after the receipt of the invoice, except no invoices shall be paid unless title and risk of loss to the applicable Aggregates has passed to Company under Section 5(b).  All nonconforming invoices shall be paid in full within 45 days of the date of final resolution.

(e)    Taxes.  All prices for the Aggregates shall include sales, use, excise or similar taxes or duties based on the sale of the Aggregates (excluding such taxes or duties based on Supplier's gross receipts or business operations).  If Supplier is required to collect any such taxes from Company, Supplier shall separately detail such taxes on the invoice to Company.  If Company is required to pay such taxes under Applicable Law, Company will pay such invoiced amounts to Supplier, and upon receipt of same, Supplier shall be solely responsible for timely remitting such taxes to the proper taxing authority.  Company reserves the right to pay such taxes directly to the proper taxing authority (and promptly informs Supplier of such), or provide Supplier with a valid tax exemption certificate.

(f)    Audit.  Company has the right from time to time to have a third party audit Supplier's records to determine if Supplier is in compliance with the terms of this Agreement.  If any audit discloses any overcharges or underpayments by Supplier, Supplier shall promptly make restitution to Company therefor, plus interest at the rate of 1.5% per month.  If such restitution payments are greater than the cost of the audit, Supplier shall also be liable for the cost of the audit.

(g)    Financial Condition.  At all times during the Term, each of Supplier and Company must satisfy the reasonable financial requirements established or modified by the other party.  Upon reasonable request made by Supplier or Company during the term hereof, Company or Supplier, respectively, shall submit to Supplier or Company, respectively, within 30 days from the date of request sufficient financial information (on a confidential basis and only to the extent not publicly available) to demonstrate Company's or Supplier's respective compliance with such financial requirements.

## 5.    ACCEPTANCE; TITLE AND RISK OF LOSS.

(a)    Acceptance and Shortage Claims.  All Aggregates shall be received subject to Company's inspection (which inspection shall not affect the warranties under this Agreement).  Company may reject any delivery or cancel all or any part of any Purchase Order if Supplier fails to make delivery in conformity with the terms and conditions hereof or any Purchase Order.  Company's acceptance of any non-conforming delivery will not constitute a waiver of its right to reject future deliveries.  In the event that Company does not accept some or all Aggregates in a given shipment, at Company's option, (i) Supplier shall provide a comparable quality substitute (for which substitution Supplier must assume any expense and price differential) or (ii) if Supplier cannot provide such comparable quality substitute within 48 hours of notice from Company, Company may purchase Aggregates from another supplier as an alternate source as Company, in its sole discretion, deems necessary, in which case Supplier shall reimburse Company for any additional reasonable costs and expenses incurred by Company in purchasing Aggregates from such other supplier as an alternate source.  At any time upon identification and notification of defective Aggregates or nonconforming shipments, Supplier shall, at Company's option and at Supplier's sole cost and expense, reimburse Company for any amounts paid or cure such defective Aggregates or nonconforming shipments.  Payment for or passage of title to Aggregates shipped prior to Company's inspection will not constitute an acceptance thereof.  Supplier shall correct shortages at no additional cost to Company.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

(b)    Risk of Loss. Title and risk of loss of the Aggregates sold by Supplier and purchased by Company will pass to Company when the Aggregates are loaded into Company's carrier vehicles at the applicable Quarry or other supply location designated by Company.

## 6.    WARRANTY.

(a)    General. Supplier represents and warrants to Company that (i) it has the requisite power, authority and authorization to enter into this Agreement and carry out the terms hereof, (ii) the execution, delivery and performance of this Agreement are not prohibited or impaired by any judgment or other agreement to which Supplier is a party or by which it is bound, (iii) Supplier is and at all times during the Term shall be in possession of all approvals, licenses and permits necessary to mine, manufacture, render, process, deliver and sell Aggregates; (v) Supplier has and will have the right to render, sell and deliver all Aggregates free and clear of all liens and encumbrances, and (vi) Supplier shall at all times comply with Applicable Laws.

(b)    Aggregates. Supplier warrants good and marketable title with respect to the Aggregates sold by it to Company under this Agreement and further warrants that:

(i)    Aggregates will be free of debris and other physical contaminants, subject to general standards in the aggregates industry and as specified by the then-prevailing Department of Transportation of North or South Carolina (as applicable, the "**DOT**");

(ii)    All Aggregates sold to Company Asphalt Plants for use in asphalt shall be produced unwashed and sized according to the ranges specified on Exhibit B and all other requirements outlined in the applicable DOT's respective codes and specifications for road based materials, with the exception of gradation;

(iii)    Aggregates, other than those used in asphalt, sold as sized products for use on DOT projects, or any other projects requiring compliance with DOT specifications, shall conform to the governing DOT's standard specifications; and

(iv)    All Aggregates shall (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the "**Specifications**").

Supplier and Company acknowledge and agree that market demand, competitive cost and/or supply dynamics may require amendments to the definition of "Specifications" and the Supplier's warranties set forth in Section 6(b) which amendments shall be mutually agreed upon in writing by the parties. Subject to the foregoing, Supplier reserves the right to replace, upgrade and modify its processing plant capabilities, and following the first fifteen (15) years of the Term, Supplier and Company shall mutually amend the definition of "Specifications" and the Supplier's warranties set forth in Section 6(b) as necessary to satisfy the requirements of both parties; *provided, that*, the definition of "Specifications" shall always include the specifications set forth in Section 6(b)(i), (iii) and (iv)(x) and Supplier's warranties under this Section 6(b) shall always include the warranty in Section 6(b)(i), (iii) and (iv)(x).

(c)    Company's Remedy. If any Aggregates fail to meet the warranties set forth above, Company may elect, in addition to its other rights and remedies, at Supplier's expense to take one or more of the following actions: (A) reject a portion of the, or the entire, shipment or lot, as Company deems appropriate, and return the same to Supplier at Supplier's expense; (B) cancel any outstanding portion of the Purchase Order; (C) elect that Supplier shall replace the nonconforming Aggregates with Aggregates that comply with the requirements of this Agreement, at Supplier's cost; (D) retain the Aggregates and

recover damages from the Supplier for breach of warranty; and (E) elect that Supplier shall refund any purchase price paid with respect thereto and all other amounts, including shipping and transport charges, incurred by Company for such nonconforming Aggregates. Supplier shall take any remedial action elected by Company under this Section.

(d)     Disclaimer. Without limiting the foregoing, and notwithstanding any other provision of this Agreement to the contrary, neither party will be liable for lost profits, lost revenues, lost opportunity costs, costs of financing, consequential, punitive, special, or incidental damages arising from Supplier's failure to deliver Aggregates required hereunder, or from the termination of this Agreement; provided, that the foregoing shall not apply to indemnification of third party claims, intentional or willful breaches or gross negligence.

**7.     TERMINATION**. In addition to any other rights it may have, each party shall have the right at its option to terminate this Agreement upon thirty (30) days written notice to the other party if an Event of Default has occurred with respect to the other party as described in Section 8 below. Upon expiration or any termination of this Agreement by either party as provided in this Section 7, all rights and obligations of the parties under this Agreement shall cease except any right or obligation which accrued prior to the effective date of such expiration or termination.

**8.     EVENTS OF DEFAULT**. The occurrence or existence of any one or more of the events or conditions described below shall constitute an **"Event of Default"** under the Agreement with respect to the defaulting or affected party:

(a)     Payment Default. The failure of a party to make any undisputed payments under this Agreement when due and such failure continues unremedied for fifteen (15) business days after notice of such breach or non-compliance from the non-defaulting party (except that the failure to make a payment or portion thereof that is the subject of a bona fide dispute being resolved pursuant to Section 10 will not constitute a default under this subsection until three (3) business days after resolution of such dispute resulting in a determination of the relevant payments owed); or

(b)     Other Default. (i) The breach of or noncompliance with a material provision of this Agreement (other than a payment default described in Section 8(a) above) which remains uncured within thirty (30) days after notice of such breach or noncompliance is given to the breaching or noncomplying party; *provided, however,* that if it is not practicable to correct the default within the thirty (30) day period and the defaulting party has commenced corrective action and is taking all good faith, commercially reasonable efforts to correct same, then such cure period will be extended for so long as it reasonably required to correct the default undertaking such good faith, commercially reasonable efforts, or (ii) a successive breach of or noncompliance with such material provision within twelve (12) months thereafter; or

(c)     Insolvency. By either party, upon written notice to the other party, if the other party becomes insolvent, fails to pay its debts as they come due or makes any assignment for the benefit of creditors or becomes subject to any federal or state receivership, liquidation or bankruptcy or insolvency case or proceeding (voluntary or involuntary), but if involuntary, only if such case or proceeding is not dismissed within 90 days from the date instituted.

**9.     EFFECT OF TERMINATION; REMEDIES**. Upon expiration or termination of this Agreement for any reason, at Company's option, Supplier shall complete all Purchase Orders submitted to Supplier by Company prior to the effective date of termination and Company shall pay for such orders upon acceptance of the Aggregates by Company, subject to any set-offs. Company may set off any damages, losses or expenses that Company incurs which arise out of or are connected to breach of this

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Agreement from amounts owed to Supplier. Expiration or termination of this Agreement for any reason shall not affect any liabilities or obligations of either party that have accrued at the date of expiration or termination or which by their nature survive expiration or termination. Following the occurrence and during the continuance of an Event of Default, the non-defaulting party may terminate this Agreement as contemplated in Section 7 (in which event the parties shall only be liable for amounts due and owing as of the date of termination) or may pursue such other remedies as expressly provided herein or otherwise provided by law.

10. **GENERAL PROVISIONS**.

(a)     Notices.  Any notice or other communication provided for hereunder shall be in writing and may be (i) served by personal delivery, (ii) made by facsimile transmission, or (iii) sent by overnight courier service (with all fees prepaid) to the receiving party as follows:

If to BMI:                          Boggs Materials, Inc.
                                    P.O. Box 1609
                                    Monroe, NC 28111
                                    Attention: Drew Boggs
                                    Facsimile: 866-554-3442

with a copy to:                     K&L Gates LLP
                                    Hearst Tower, 47th Floor
                                    214 North Tryon Street
                                    Charlotte, North Carolina 28202
                                    Attn: C. Chad Warpula, Esq.
                                    Fax: 704-353-3210

If to a Supplier:                   Buckhorn Materials LLC
                                    3410 Hwy 601 South
                                    Jefferson, SC 29718
                                    Attn: Richard Moses
                                    Facsimile No.: _843-672-3579

                                    Construction Materials Group LLC
                                    1357 Eddie Horton Road
                                    Mt. Croghan, SC 29727
                                    Attn: Richard Moses
                                    Facsimile No.: 843-672-3579

                                    Hinkle Contracting Company, LLC
                                    P.O. Box 200
                                    395 North Middletown Road
                                    Paris, Kentucky 40362-0200
                                    Attention: Thomas Hinkle
                                                Steve Hullett
                                                Warren Hawkridge
                                    Facsimile No.: (859) 987-0727

                                    Summit Materials, LLC
                                    3550 Wynkoop, 3rd Floor
                                    Denver, CO 80202

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Attn: Thomas Hill
      Anne Benedict
Facsimile No.: (303) 893-6993

*with a copy to:*      Gibson, Dunn & Crutcher
200 Park Avenue
New York, New York 10166-0193
Attention: Steven R. Shoemate
Facsimile No.: (212) 351-5316

Any such notice or communication shall be deemed to be given, if delivered in person, on the date delivered, if made by facsimile transmission, on the date transmitted, or, if sent by overnight courier service, on the date sent as evidenced by the bill of lading; and shall be deemed received, if delivered in person, on the date of personal delivery, if made by facsimile transmission, upon confirmation of receipt (including electronic confirmation), or if sent by overnight courier, on the first business day after the day sent. Any party sending a notice or other communication by facsimile transmission shall also send a hard copy of such notice or other communication by one of the other means of providing notice set forth in this Section 10(a). Any notice or other communication shall be given to such other representative or at such other address as a party to this Agreement may furnish to the other party pursuant to this Section 10(a).

(b)    Indemnification. Each party (the **"Indemnifying Party"**) shall indemnify, defend, and save the other party, its Affiliates, officers, and employees (the **"Indemnified Parties"**) harmless only from such claims, litigation, liabilities, and expenses that result from, arise out of, or are caused by the Indemnifying party's acts or omissions or the acts or omissions of the Indemnifying Party's affiliates, subcontractors or agents. The indemnification obligation of the Indemnifying Party under this Agreement shall extend only to the Indemnified Parties and no other person or entity. The obligations of indemnification shall survive termination or expiration of this Agreement.

(c)    Insurance. Each party (the **"Covenant Party"**) shall maintain (i) worker's compensation and employer's liability insurance to fully protect against loss from personal injury, including death, to any of its employees; and (ii) comprehensive automobile liability, general liability, and property damage insurance. All such insurance shall be written by insurers acceptable to the other Party, having minimum coverage of $2,000,000 combined single limit, on an "occurrence" basis and not on a "claims made" basis. All general liability policies shall provide minimum coverage of $2,000,000 per occurrence and provide a minimum aggregate limit of $3,000,000 per occurrence. All policies, except for worker's compensation policies, shall name the other Party as an additional insured with primary coverage (with any other third-party coverage provided for the other Party to be deemed as excess only) and shall indemnify, defend, and protect the other party from all claims, expenses, and liabilities related with any act or omission of the Covenant Party, its invitees, or any person performing work directly or indirectly on behalf of the Covenant Party. All insurance shall expressly provide that all rights of subrogation against the other Party are waived and that no amendment or cancellation of any policy shall be effective until 30 days' written notice to the other Party. Before entering onto the other party's property or premises, the Covenant Party shall furnish certificates satisfactory to the other party evidencing the required insurance.

(d)    Relationship. Each party hereto will act as an independent contractor, and nothing contained in or arising out of this Agreement will be construed to imply or create any joint venture, partnership, agency, or other relationship. The parties agree that no fiduciary relationship is created by this Agreement. No persons other than the parties hereto or their permitted assigns shall be deemed to have any interest under this Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP130017S

(e)    _Assignment_. No party may assign this Agreement or delegate any duties hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that, each party shall have the right to assign this Agreement to an Affiliate with the same or better ability to perform the obligations in all respects hereunder, without the prior written consent of the other parties. No rights shall inure to the benefit of any assignee of any party hereto as to which the other parties' consent is required hereunder, unless such other parties have consented in writing to the assignment to such assignee. A change of control of Supplier or BMI or Boggs Paving, Inc. shall be deemed an assignment under this Agreement (other than a change of control of BMI, Boggs Paving, Inc. or Supplier occurring after compliance by such party with the terms of Section 10(f) below). For the purposes of the foregoing, a **"change of control"** means any sale or transfer, by any person or persons directly or indirectly controlling the Supplier or Company, as applicable, on the date hereof, of such control to a person or persons not controlling the Supplier or Company, as applicable, on the date hereof, or any sale or transfer of all or a substantial portion of all of Supplier's or Company's, as applicable, business or assets, whether consummated pursuant to a voluntary or involuntary levy, sale, execution or other legal process, transfer, gift, assignment or sale in bankruptcy, insolvency or any compulsory procedure; provided, that, such sales or transfers shall not constitute a "change of control" if they are made to an Affiliate. For purposes hereof, each of the following shall not be deemed an assignment under this Agreement: (i) any transfer of direct or indirect ownership in Supplier or Company resulting from an initial public offering of the stock of Supplier or Company, or any direct or indirect owner of Supplier or Company, on a national exchange in the United States of America, and (ii) if Supplier's or Company's, or any direct or indirect owner of Supplier's or Company's, stock is publicly traded on a national exchange in the United States of America, transfers of stock in Supplier or Company, or such direct or indirect owner of Supplier or Company, as applicable. No assignment will be valid unless the assignee shall execute and deliver to the other parties hereto an assumption agreement in form satisfactory to the other parties hereto, including an assumption by the assignee of all of the obligations of the assignor and the assignee's ratification of and agreement to be bound by all of the provisions of this Agreement. This Agreement shall be binding upon the parties hereto and their successors and assigns, and shall inure to the benefit of the parties hereto and their permitted successors and assigns.

(f)    _Sale of Business_. If, at any time prior to the fifth (5th) anniversary of the Effective Date of this Agreement, Company (which shall, for the purposes of Section 10(f), be deemed to include Boggs Paving, Inc. and Boggs Transport, Inc.) or Supplier (including their respective successors and assigns, the **"ROFR Seller"**) wishes to effect a sale of all or any part of its business or assets (other than sales of assets in the ordinary course of business), in the case of Company, to a third party with asphalt and/or paving operations in South Carolina or North Carolina (which shall include Affiliates of Company), and in the case of Supplier, to a third party with aggregates operations in South Carolina or North Carolina (but which shall not include Affiliates of Supplier) pursuant to a bona fide offer from an independent third party purchaser, then the ROFR Seller shall first deliver to Supplier or Company, as applicable (the **"ROFR Buyer"**), a notice of offer from such third party purchaser, which shall include (i) a description of the business or assets being offered (the **"Offered Assets"**), (ii) the name of the third party purchaser, (iii) the purchase price, all other material terms of the proposed sale and, if applicable, the negotiated purchase agreement between the ROFR Seller and the third party purchaser (the **"Third Party Agreement"**) and (iv) an offer to sell the Offered Assets to the ROFR Buyer at the same price, upon the same material terms and, if applicable, in accordance with a purchase agreement substantially in the form of the Third Party Agreement. The ROFR Buyer may deliver to the ROFR Seller an acceptance notice on or before the tenth (10th) business day after the ROFR Seller's delivery of the offer notice described above. The ROFR Buyer's acceptance of the ROFR Seller's offer shall be subject to the execution and delivery of a purchase and sale agreement in a form reasonably satisfactory to the ROFR Buyer and ROFR Seller and in accordance with the terms herein, which execution and delivery shall occur within sixty (60) days of the delivery of such acceptance notice; _provided, that_, if the notice of offer includes a

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Third Party Agreement, the ROFR Buyer's acceptance of the ROFR Seller's offer shall be subject to the execution and delivery of a purchase agreement substantially in the form of such Third Party Agreement, which execution and delivery shall occur within thirty (30) days of the delivery of such acceptance notice. If the ROFR Buyer fails to deliver an acceptance notice within the ten (10) day exercise period, the ROFR Seller may sell the Offered Assets upon the terms and conditions set forth in the offer notice. If a ROFR Seller, after complying with this Section 10(f), consummates a transaction with a third party purchaser by purchase, merger or otherwise, this Section 10(f) shall no longer apply to such ROFR Seller, the third party purchaser or the surviving entity, as applicable, following such transaction.

(g)　No Waiver; Remedies. The failure by any party hereto to insist upon strict performance of any term or condition of this Agreement or failure or delay to exercise any right or remedy provided herein or by applicable law, or failure to notify properly the other party upon a breach, or the acceptance of or payments for any Aggregates hereunder will not release any party from any of the obligations of this Agreement and will not be deemed a waiver of any right of any party to insist upon strict performance hereof or any of its rights or remedies as to any prior or subsequent default hereunder. Time shall be of the essence in the performance of this Agreement. All remedies hereunder are cumulative and without limitation to any other rights or remedies available at law, in equity or otherwise. Suppliers and Company specifically acknowledge and agree that failure to comply with the terms of this Agreement may result in irreparable harm to Company and its Affiliates and to Suppliers and its Affiliates, respectively, and that Company and Suppliers shall be entitled to specific performance to enforce each and every term and condition of, and obligation of Supplier and Company, respectively, under, this Agreement.

(h)　Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of South Carolina, without regard to conflicts of laws principles.

(i)　Headings. The headings in this Agreement are for convenience of reference only and will not limit or otherwise affect any of the terms hereof.

(j)　Entire Agreement. This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, promises, covenants, arrangements, or communications, whether oral or written, by any officer, employee, or representative of any party hereto with respect thereto.

(k)　Amendments. No amendment hereto will be valid unless made in writing and signed by the parties hereto.

(l)　Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original. It shall not be necessary in making proof of the contents of this Agreement to produce or account for more than one such counterpart.

(m)　Severability. If any provision of this Agreement is found to be unenforceable, the balance of this Agreement shall continue to be in full force and effect.

(n)　Force Majeure Event. Neither party will be considered in default of its performance of any obligation hereunder (other than an obligation to make any payment due hereunder) to the extent that (i) performance of such obligation is prevented or delayed by acts of God; war (declared or undeclared); terrorism or other criminal conduct; fire; flood; sabotage; strikes, or labor or civil disturbances (other than contributed to by the affected party); governmental requests, restrictions, laws, regulations, orders; unavailability of, or delays in, utilities or transportation; embargoes, or unforeseen circumstances or any other similar or dissimilar events or causes beyond party's reasonable control, and (ii) only to the extent such event could not have been avoided or overcome through the exercise of commercially reasonable

efforts (each, a **"Force Majeure Event"**).  If any Force Majeure Event does arise, occur, or result, the party subject thereto shall use commercially reasonable efforts to minimize the consequences of such event and to overcome such event as soon as reasonably possible.  A party desiring to rely upon any Force Majeure Event as an excuse for failure, default, or delay in performance shall provide the other party with prompt written notice of the facts giving rise to said event when it arises, the commercially reasonable efforts taken by such party to overcome such event and of the cessation of said event when it ceases to exist.

      11.    **JOINDER BY SUMMIT AND UNCONDITIONAL GUARANTY**.  Summit, being financially interested in Suppliers and as an inducement to BMI to enter into this Agreement, hereby joins this Agreement for the purposes of acknowledging and agreeing to the obligations and duties herein imposed on Suppliers and hereby unconditionally guarantees the prompt payment and performance of all obligations of Suppliers hereunder and likewise agrees to be responsible for any damages to which any Supplier may, at any time, be entitled by reason of a breach of such obligations.  Summit further hereby agrees that BMI has full authority to make any changes, modifications and alterations in this Agreement which shall be agreeable to the Suppliers and that such changes, modifications and alterations will not relieve Summit from any responsibility hereunder.  Summit also agrees that it shall not be released from the obligations of this Agreement, nor shall said obligations be diminished or otherwise affected by any extension of time or other indulgence granted to any Supplier, by release from liability of any other guarantor of this matters guaranteed hereunder or by any waiver with respect to the terms or conditions of the Agreement, or with respect to the performance and observance of any of the other obligations of any Supplier under this Agreement, it being the intent hereof that Summit shall, at all times, be and remain liable to BMI to the same extent as if the Guarantor were jointly and severally liable with the Suppliers to BMI for the performance of all the obligations of Suppliers under this Agreement.  Summit hereby waives (a) all notices of any kind whatsoever with respect to this Agreement and all other obligations of any Supplier to BMI relating to the Agreement, including but not limited to notice of the acceptance of this guaranty and reliance thereon, of any default under this Agreement of presentment, of protest, of demand, of notice of non-payment, of notice of dishonor, and notice of protest; (b) the right to require, and the benefit of any law which may require, the enforcement of any other rights before enforcing the liability of Summit; (c) all defenses whatever to Summit's liability under this Section 11 except the defense of confirmed payment or confirmed performance; and (d) any and all claims to subrogation to the rights of BMI should Summit be required to make any payment or perform any obligation hereunder until all of the obligations of all Suppliers to BMI shall have been satisfied in full.  Summit agrees that BMI may proceed against Summit directly and independently of any Supplier.  Summit agrees to pay, in addition to all other sums due, all costs and expenses of enforcing the obligations of Suppliers and Summit under this Agreement, including a reasonable attorney's fee at the time of enforcement, should this Agreement be placed in the hands of an attorney for enforcement, or if enforced through bankruptcy, probate, or other judicial proceedings..

      12.    **MONROE PROJECT**.  For the avoidance of doubt, notwithstanding anything herein to the contrary, the purchase and sale of Aggregates by Customer and Supplier, respectively, with respect to the construction of the Design-Build Monroe Connector/Bypass TIP R-3329/R-2553, generally described as US 74 near I-485 in Mecklenburg County to US 74 between the towns of Wingate and Marshville in Union County, N.C. shall be in all respects pursuant to and in accordance with that certain Monroe Bypass Aggregate Supply Agreement, dated as of June 9, 2014, among Buckhorn, CMG, Monroe Bypass Constructors, LLC, Boggs Paving, Inc. and Anderson Columbia Co., Inc.

*Signatures on Following Page*

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**IN WITNESS WHEREOF**, the parties hereto have caused this Aggregates Supply Agreement to be executed on the date indicated below, effective as of the date first above written.

**Buckhorn Materials, LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Vice President

Date: 06/09/14

**Construction Materials Group LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Manager

Date: 06/09/14

**Summit Materials, LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Executive Vice President

Date: 06/09/14

**Boggs Materials, Inc.**

By: _____

Name: _____

Title: _____

Date: _____

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**IN WITNESS WHEREOF,** the parties hereto have caused this Aggregates Supply Agreement to be executed on the date indicated below, effective as of the date first above written.

**Buckhorn Materials, LLC**

By:_____

Name:_____

Title:_____

Date: _____


**Construction Materials Group LLC**

By:_____

Name:_____

Title:_____

Date: _____


**Summit Materials, LLC**

By:_____

Name:_____

Title:_____

Date: _____


**Boggs Materials, Inc.**

By: _____

Name: _CARL  A. BOGGS, III_

Title: _President_

Date: _6-6-14_

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## EXHIBIT A

### PURCHASE ORDERS

See attached.

# Related Party Purchase Order Summary - Buckhorn Materials LLC

| Date | From: | To: | Order # | Project | Material | P/O Quantity (tons) | Delivered Quantity to Date (tons) | Remaining Tons to Deliver | FOB Material Price | Haul Price[1] | Total Unit Price | P/O Amount | Remaining Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27-Feb-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3278 | 17S Brandlewood Plantation Road | MBC | 8,200 | 5,785 | 415 | $7.00 | $7.25 | $14.25 | $58,350.00 | $5,913 |
| 30-Aug-12 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3302 | SC File # 29.1308 | MBC | 500 | | 500 | $7.50 | $12.00 | $12.00 | $6,000.00 | $6,000 |
| | | | | | Class A&B Rip Rap | 35 | | 35 | $4.50 | $13.50 | $18.50 | $647.50 | $647 |
| | | | | | Clean Stone (#5) | 30 | | 30 | $4.50 | $16.00 | $16.00 | $480.00 | $480 |
| 22-Apr-03 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3354 | Idlewild Road Widening | #67 Stone | 100 | 18 | 82 | $11.50 | $4.50 | $16.00 | $480.00 | $480 |
| | | | | | ABC | 200 | 75 | 125 | $8.00 | $5.00 | $13.00 | $2,600.00 | $2,787 |
| | | | | | Ballast | 60 | | 60 | $15.00 | $10.00 | $25.00 | $1,380.00 | $1,554 |
| | | | | | Pit Gravel | 986 | | 986 | $4.50 | $7.80 | $12.30 | $12,127.80 | $12,127 |
| | | | | | #57 Stone | 23 | 146 | | $14.00 | $7.80 | $21.80 | $501.40 | $0 |
| | | | | | ASB | 500 | 40 | 460 | $10.50 | $14.50 | $24.50 | $12,650.00 | $11,454 |
| 31-Jul-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3370 | SC File # 29.1308, FAP No. 542(91001) | ABC | 200 | 4,022 | | $0.50 | Hourly | TBD | $100.00 | $1,077 |
| | | | | | Class B Rip Rap | 44 | 31 | 13 | $25.00 | $7.50 | $22.50 | $990.00 | $997 |
| | | | | | Ballast | 70 | | 70 | $15.00 | $4.50 | $19.50 | $1,365.00 | $1,365 |
| 22-Oct-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3376 | SC File # 46.042287, FAP No. WR13 (154) | MBC | 20 | | 20 | $7.50 | $10.00 | $17.50 | $350.00 | $350 |
| 9-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3381 | SC File # 28.04187, Etc. DT12(004) | MBC | 20 | | 20 | $7.50 | $8.75 | $16.25 | $325.00 | $325 |
| 18-Sep-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3385 | 2013 Road Paving Program #1104-5 | #89 | 300 | 359 | | $12.00 | $7.80 | $19.80 | $5,940.00 | $0 |
| | | | | | Rip Rap | 50 | 200 | | $9.60 | $9.60 | $23.60 | $1,180.00 | $0 |
| | | | | | #57 | 70 | | | $10.00 | $5.15 | $15.15 | $1,060.50 | $0 |
| | | | | | #89 | 450 | 385 | | $12.00 | $5.50 | $17.50 | $7,875.00 | $0 |
| | | | | | #6 | 100 | 577 | | $13.00 | $3.25 | $16.25 | $1,725 | $0 |
| | | | | | MBC | 1,400 | 1,285 | 119 | $8.00 | $6.50 | $14.50 | $20,300.00 | $1,725 |
| 30-Oct-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3385 | Pit Gravel / Processed Fines | Pit Gravel / Processed Fines | 100 | 446 | | $3.50 | $5.15 | $8.65 | $865.00 | $0 |
| 1-Aug-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3388 | SC File # 29.042358, St. Proj No. C-42358 | #89 | 186 | 232 | | $12.00 | $8.00 | $20.00 | $3,720.00 | $0 |
| 16-Jun-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3404 | Wal-Mart #4148 | #5 | 87 | 936 | | $11.00 | $8.75 | $19.75 | $1,718.25 | $0 |
| | | | | | Class B Rip Rap | 10 | 82 | | $14.00 | $11.00 | $25.00 | $250.00 | $0 |
| | | | | | Screenings (Sand) | 252 | 175 | 77 | $7.00 | $8.75 | $15.75 | $3,969.00 | $1,212 |
| | | | | | Concrete Sand | 2,205 | 151 | 2,117 | $7.00 | $8.75 | $15.75 | $35,721.00 | $33,342 |
| **Subtotal: Non-IV Intercompany Purchase Orders** | | | | | | 17,395 | 15,053 | 8,348 | $8.09 | $7.83 | $15.92 | $265,339.95 | $132,919.90 |
| 3-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3407 | SC File # 12.101404 Etc. | Screenings (Sand) | 79 | | 79 | $7.50 | $8.75 | $16.25 | $35,811.25 | $35,811 |
| | | | | | #89M | 600 | | 600 | $12.00 | $8.75 | $15.75 | $59,510.00 | $59,510 |
| | | | | | Rip Rap | 100 | | 100 | $7.00 | $8.75 | $15.75 | $2,100.00 | $2,100 |
| | | | | | #89M | 150 | | 150 | $12.00 | $5.00 | $17.00 | $2,550.00 | $2,550 |
| 1-Apr-14 | Buckhorn Materials, LLC / KMD Construction | Boggs Paving, Inc. | 3413 | SC File # 29.042819 | #57 | TBD | | n/a | n/a | | | n/a | n/a |
| 28-Feb-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3416 | Wal-Mart #4148 | Quarry Overburden | TBD | | n/a | $1.03 | $9.00 | $10.00 | n/a | n/a |
| 28-Feb-14 | Buckhorn Materials, LLC / KMD Construction | Boggs Paving, Inc. | 3416 | Wal-Mart #4148 | | | | | | | | | |
| **Subtotal: I-26 Project** | | | | | | | | | | | | | |
| 2-Jun-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3400 | SC File 932.038170 +/-26 Design Build Project #5 | #5 | 78 | | 78 | $12.50 | $7.50 | $20.00 | $1,560.00 | $1,560 |
| | | | | | #6 | 24,798 | | 24,798 | $12.50 | $7.50 | $20.00 | $495,960.00 | $495,960 |
| | | | | | #7 | 72,485 | | 72,485 | $12.50 | $7.50 | $20.00 | $1,449,700.00 | $1,449,700 |
| | | | | | #89 | 62,195 | | 62,195 | $13.00 | $7.50 | $20.50 | $1,274,997.50 | $1,274,997 |
| | | | | | Coarse Screenings | 50,605 | | 50,605 | $8.00 | $7.50 | $15.50 | $784,377.50 | $784,377 |
| | | | | | Washed Screenings | 10,000 | | 10,000 | $8.00 | $7.50 | $15.50 | $155,000.00 | $155,000 |
| | | | | | Fine Screenings | As Needed | | n/a | $4.00 | $7.50 | $11.50 | n/a | n/a |
| **Subtotal: I-26 Project** | | | | | | 220,161 | | 220,161 | | | $18.90 | | |
| **Total Buckhorn Materials, LLC (Excluding Monroe Bypass)** | | | | | | 237,556 | 15,053 | 228,509 | | | $18.64 | $4,426,954.95 | $4,161,595.00 |

1. All material FOB to jobsite, therefore stated haul prices are representative of estimated cost. Actual cost is currently passed through to Boggs Paving as incurred without mark-up.

ELECTRONICALLY FILED - 2022 Apr 07 ... CASE2022CP1300176

**Related Party Purchase Order Summary - Construction Materials Group, LLC**

| Date | From | To | Order # | Project | Material | P/O Quantity (tons) | Delivered Quantity to Date (tons) | Remainin # Tons to Deliver | FOB Material Price | Haul Price [1] | Total Unit Price | P/O Amount | Remaining Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6-May-13 | Construction Materials Group, LLC | Boggs Paving, Inc. | B-3380 | CMC Union Womens' Center | Fill Sand | 4,000 | - | 4,000 | $3.50 | $5.30 | $8.80 | $35,200.00 | $35,200.00 |
| 1-Jul-13 | Construction Materials Group, LLC | Boggs Paving, Inc. | 3370 | SC File 29.1088, FAP No. SA29(001) | Sand | 441 | - | 441 | $3.00 | $8.50 | $11.50 | $5,071.50 | $5,071.50 |
| **Total Construction Materials Group, LLC** | | | | | | **4,441** | **-** | **4,441** | **-** | **-** | **$9.07** | **$40,271.50** | **$40,271.50** |

1. All material FOB to plants, therefore stated haul prices are representative of estimated cost. Actual cost is currently passed through to Boggs Paving as incurred without mark-up.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## EXHIBIT B

### AGGREGATES PRODUCTS AND SPECIFICATIONS

| | | | | |
|---|---|---|---|---|
| 0 - 5% | 0 - 15% | 25-45% | 90 - 100% | |
| | 0-5% | 0-10% | 15 - 35% | 90 - 100% |
| | | 0-5% | 0 - 10% | 45 - 65% |
| | | | 0 - 5% | 15 - 35% |
| | | | | 10 - 25% |
| | | | | 8 - 15% |
| | | | | 5 - 10% |
| 0 - .6% | 0 - .6% | 0 - .6% | 0 - 1% | 3 - 6% |

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**Boggs Materials, Inc.**
**P.O. Box 1609**
**Monroe, NC 28111-1609**

April 16, 2021

Buckhorn Materials LLC
3410 Hwy 601 South
Jefferson, SC 29718
Attn: Richard Moses
Facsimile No.: 843-672-3579

Hinkle Contracting Company, LLC
P.O. Box 200
395 North Middletown Road
Paris, Kentucky 40362-0200
Attention: Thomas Hinkle, Steve Hullett, Warren Hawkridge
Facsimile No.: (859) 987-0727

Summit Materials, LLC
3550 Wynkoop, 3rd Floor
Denver, CO 80202
Attn: Thomas Hill, Anne Benedict
Facsimile No.: (303) 893-6993

*[BMI understands that many, if not all, of the individuals listed above who were named to receive notices in the referenced supply agreement are no longer with the companies; therefore, I am emailing this notice to known contacts who are employed by Summit at this time]:*

*Via Email to:*   *Bart Boyd:*      *bart.boyd@georgiastoneproducts.com*
            *Ab Boxley:*      *ab.boxley@boxley.com*
            *Anne Noonan:*     *anne.noonan@summit-materials.com*

**Re:    Aggregates Supply Agreement between Boggs Materials, Inc., Buckhorn**
**       Materials, LLC and Summit Materials, LLC, dated June 9, 2014**

Dear Bart/Ab/Anne:

In accordance with the above referenced Aggregates Supply Agreement, Paragraph 10(a) Notices, Boggs Materials, Inc. (BMI) is hereby notifying Buckhorn/Summit of the following breaches to the agreement, and is requesting that the following breaches be cured by immediate actions:

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

1. **Paragraph 3 SALE AND PURCHASE OF AGGREGATES**
   a. 3(c) Delivery: "Supplier will inspect and test the Aggregates prior to delivery to ensure they comply with the Specifications."
   b. 3(d) Aggregate Availability: "Supplier shall maintain sufficient manufacturing capabilities to supply Aggregates to Company....." and "Time is of the essence with respect to deliveries, and Company may suffer financial loss if Supplier fails to maintain a service level ensuring that Aggregates are timely delivered by Supplier to Company.

2. **Paragraph 6 WARRANTY**
   a. 6(b)(ii) "All Aggregates sold to Company Asphalt Plants for use in asphalt shall be produced unwashed and sized according to the ranges specified on Exhibit B and all other requirements outlined in the applicable DOT's respective codes and specifications for road based materials, with the exception of gradation;"
   b. 6(b)(iv) All Aggregates shall (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the "Specifications").

BMI views these issues as breaches and noncompliance with material provisions of the Aggregates Supply Agreement referenced herein, and is therefore notifying Buckhorn/Summit as such in accordance with the Agreement. BMI demands that Buckhorn/Summit take immediate corrective action and take all good faith, commercially reasonable efforts to correct these material breaches in order to mitigate further financial damages to BMI. BMI is and will continue to suffer material financial damages which could rise to consequential damages if these defaults are not cured without further delay.

As a reminder, BMI has been in constant contact with Buckhorn/Summit local staff over the past year and has communicated many of these and other concerns, which always seem to 'fall on deaf ears'. These issues have progressively grown worse instead of better. BMI sincerely desires to meet with Senior Level Executive Management of Summit Materials in order to receive assurances that Summit takes these issues seriously and will take any and all necessary steps to to correct these issues. Please accept this letter as a notice to cure and TIME IS OF THE ESSENCE.

Please contact me via mobile phone number (843) 855-0274 to schedule a time that we can meet to discuss these most important issues.

Sincerely,

BOGGS MATERIALS, INC.

*Drew Boggs*

Drew Boggs

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## Supply Agreement Requirement / Actual Gradation / In-Out

| Sieve Size | minimum passing | maximum passing | % passing | INOUT |
|---|---|---|---|---|
| #4 | 90.0% | 100.0% | 93.8% | IN |
| #8 | 45.0% | 65.0% | 54.2% | IN |
| #16 | 15.0% | 35.0% | 38.1% | OUT |
| #30 | | 25.0% | 25.8% | OUT |
| #50 | 8.0% | 16.0% | 12.1% | IN |
| #100 | 5.0% | 10.0% | 6.7% | IN |
| #200 | 3.0% | 6.0% | 3.2% | IN |

1. Table above for reference and formulas only ... do not adjust
2. Please insert gradation data in table below, gray fields only

## Averages

| Spec AVERAGES | #4 90%-100% | #8 45%-65% | #16 15%-35% | #30 10%-25% | #50 4%-15% | #100 3%-10% | #200 3%-6% | Moisture % |
|---|---|---|---|---|---|---|---|---|
| ALL | 86.6% | 73.0% | 50.0% | 33.0% | 11.4% | 8.5% | 5.6% | |
| Washed | 85.1% | 70.6% | 47.7% | 30.6% | 8.2% | 3.5% | 6.7% | |
| Unwashed | 87.0% | 74.6% | 52.1% | 34.3% | 13.2% | 8.3% | 5.0% | |

# of Washed Tests: 22
# of Unwashed Tests: 37
Total Tests: 59

| Failed Sieves | 50 | 54 | 53 | 49 | 23 | 34 |
|---|---|---|---|---|---|---|
| % Failed | 8.8% | 84.7% | 81.9% | 89.6% | 83.1% | 55.9% | 57.6% |

Total Failed Tests: 57
% Failed: 96.6%

## Actual Gradation

| Date | Test # | #4 | #8 | #16 | #30 | #50 | #100 | #200 | Moisture % | Washed / Unwashed |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/28/2020 | Test 1 | 93.60% | 54.20% | 38.10% | 25.80% | 12.10% | 6.70% | 3.20% | 4.90% | Washed |
| 8/28/2020 | Test 2 | 92.30% | 58.90% | 37.50% | 25.30% | 13.67% | 7.40% | 3.45% | 4.70% | Washed |
| 8/19/2020 | Test 3 | 91.60% | 59.50% | 34.50% | 25.05% | 11.40% | 6.50% | 2.70% | 3.70% | Washed |
| 8/13/2020 | Test 4 | 93.10% | 52.50% | 40.00% | 25.05% | 14.40% | 7.60% | 3.52% | 3.80% | Washed |
| 8/3/2020 | Test 5 | 93.30% | 64.30% | 41.90% | 25.03% | 13.03% | 6.80% | 2.28% | 8.00% | Washed |
| 7/30/2020 | Test 6 | 94.60% | 66.80% | 43.50% | 28.05% | 13.65% | 5.90% | 2.13% | 7.80% | Unwashed |
| 7/20/2020 | Test 7 | 92.70% | 51.20% | 28.85% | 17.30% | 11.00% | 7.30% | 4.62% | 0.85% | Unwashed |
| 6/25/2020 | Test 8 | 100.00% | 92.30% | 71.10% | 48.10% | 27.90% | 13.40% | 5.76% | 14.30% | Unwashed |
| 6/19/2020 | Test 9 | 100.00% | 94.50% | 78.30% | 53.80% | 28.70% | 10.50% | 3.07% | 6.00% | Unwashed |
| 6/11/2020 | Test 10 | 100.00% | 92.30% | 71.10% | 46.10% | 27.90% | 13.40% | 5.76% | 14.30% | Unwashed |
| 6/8/2020 | Test 11 | 89.60% | 68.60% | 22.00% | 14.90% | 10.30% | 7.10% | 4.81% | 1.20% | Unwashed |
| 5/26/2020 | Test 12 | 94.40% | 68.50% | 24.60% | 14.50% | 9.50% | 5.90% | 2.90% | 6.40% | Washed |
| 5/20/2020 | Test 13 | 97.60% | 68.60% | 48.70% | 33.10% | 21.90% | 10.70% | 3.60% | 10.80% | Washed |
| 5/18/2020 | Test 14 | 94.70% | 67.20% | 44.60% | 28.90% | 16.50% | 7.60% | 3.17% | 4.30% | Washed |
| 5/15/2020 | Test 15 | 97.70% | 79.00% | 55.90% | 36.90% | 20.80% | 9.70% | 4.26% | 3.50% | Washed |
| 5/12/2020 | Test 16 | 98.70% | 83.20% | 60.70% | 39.70% | 21.80% | 9.60% | 3.13% | 4.70% | Washed |
| 5/7/2020 | Test 17 | 96.50% | 70.60% | 46.50% | 29.20% | 18.50% | 8.30% | 4.00% | 7.50% | Washed |
| 5/4/2020 | Test 18 | 95.60% | 64.50% | 43.80% | 28.00% | 17.10% | 7.50% | 2.12% | 4.00% | Washed |
| 5/1/2020 | Test 19 | 97.70% | 74.80% | 51.60% | 33.00% | 18.60% | 8.60% | 3.59% | 6.10% | Washed |
| 4/30/2020 | Test 20 | 98.60% | 80.00% | 55.90% | 37.50% | 23.10% | 9.30% | 4.02% | 5.80% | Washed |
| 4/28/2020 | Test 21 | 96.00% | 77.50% | 53.50% | 38.30% | 18.60% | 8.60% | 4.04% | 5.70% | Washed |
| 4/27/2020 | Test 22 | 97.20% | 77.50% | 53.50% | 38.30% | 17.50% | 8.30% | 3.76% | 10.10% | Washed |
| 4/23/2020 | Test 23 | 97.20% | 78.40% | 52.30% | 32.30% | 17.50% | 9.00% | 4.03% | 6.30% | Unwashed |
| 4/22/2020 | Test 24 | 97.20% | 78.80% | 56.90% | 35.60% | 19.90% | 9.00% | 4.14% | 5.50% | Washed |
| 4/17/2020 | Test 25 | 98.00% | 78.30% | 52.40% | 34.00% | 19.60% | 8.90% | 4.46% | 7.30% | Washed |
| 4/10/2020 | Test 26 | 98.40% | 79.00% | 55.50% | 35.20% | 20.60% | 9.00% | 4.56% | 10.50% | Washed |
| 4/9/2020 | Test 27 | 98.60% | 81.40% | 56.90% | 35.70% | 18.15% | 9.20% | 8.21% | 1.70% | Washed |
| 4/7/2020 | Test 28 | 97.20% | 68.20% | 43.00% | 28.90% | 18.10% | 7.90% | 4.01% | 8.10% | Unwashed |
| 3/26/2020 | Test 29 | 96.50% | 78.50% | 49.80% | 30.00% | 18.70% | 9.70% | 4.03% | 12.60% | Washed |
| 3/24/2020 | Test 30 | 99.10% | 79.00% | 55.40% | 36.20% | 21.10% | 9.20% | 4.31% | 4.60% | Washed |
| 3/13/2020 | Test 31 | 96.00% | 76.60% | 53.80% | 34.40% | 19.20% | 9.20% | 4.32% | 2.00% | Unwashed |
| 3/10/2020 | Test 32 | 99.00% | 73.00% | 50.50% | 33.30% | 21.60% | 9.80% | 8.86% | 7.10% | Unwashed |
| 3/5/2020 | Test 33 | 94.80% | 69.20% | 46.10% | 31.00% | 20.20% | 13.00% | 8.44% | 3.30% | Unwashed |
| 2/27/2020 | Test 34 | 84.50% | 72.10% | 50.60% | 34.00% | 22.20% | 14.50% | 9.62% | 3.30% | Unwashed |
| 2/19/2020 | Test 35 | 86.20% | 81.20% | 58.10% | 38.20% | 23.50% | 14.50% | 9.28% | 3.30% | Unwashed |
| 2/17/2020 | Test 36 | 97.10% | 79.70% | 53.30% | 35.20% | 22.30% | 14.10% | 8.97% | 5.70% | Unwashed |

## Gradation Pass/Fail

| Test # | #4 90%-100% | #8 45%-65% | #16 15%-35% | #30 10%-25% | #50 4%-15% | #100 3%-10% | #200 3%-6% | Moisture % | Washed / Unwashed |
|---|---|---|---|---|---|---|---|---|---|
| Test 1 | PASS | PASS | FAIL | FAIL | PASS | PASS | PASS | 4.90% | Washed |
| Test 2 | PASS | PASS | FAIL | FAIL | PASS | PASS | FAIL | 4.70% | Washed |
| Test 3 | PASS | PASS | PASS | FAIL | PASS | PASS | PASS | 3.70% | Washed |
| Test 4 | PASS | PASS | FAIL | FAIL | PASS | PASS | PASS | 3.80% | Washed |
| Test 5 | PASS | FAIL | FAIL | FAIL | PASS | PASS | FAIL | 8.00% | Washed |
| Test 6 | PASS | FAIL | FAIL | FAIL | PASS | PASS | PASS | 7.80% | Unwashed |
| Test 7 | PASS | PASS | PASS | FAIL | PASS | PASS | PASS | 0.85% | Unwashed |
| Test 8 | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | PASS | 14.30% | Unwashed |
| Test 9 | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | PASS | 6.00% | Unwashed |
| Test 10 | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | PASS | 14.30% | Unwashed |
| Test 11 | PASS | FAIL | PASS | PASS | PASS | PASS | PASS | 1.20% | Unwashed |
| Test 12 | PASS | FAIL | PASS | PASS | PASS | PASS | PASS | 6.40% | Washed |
| Test 13 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 10.80% | Washed |
| Test 14 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 4.30% | Washed |
| Test 15 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 3.50% | Washed |
| Test 16 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 4.70% | Washed |
| Test 17 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | FAIL | 7.50% | Washed |
| Test 18 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 4.00% | Washed |
| Test 19 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 6.10% | Washed |
| Test 20 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 5.80% | Washed |
| Test 21 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 5.70% | Washed |
| Test 22 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 10.10% | Washed |
| Test 23 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | FAIL | 6.30% | Unwashed |
| Test 24 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 5.50% | Washed |
| Test 25 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 7.30% | Washed |
| Test 26 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 10.50% | Washed |
| Test 27 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | FAIL | 1.70% | Washed |
| Test 28 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 8.10% | Unwashed |
| Test 29 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 12.60% | Washed |
| Test 30 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS | 4.60% | Washed |
| Test 31 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | FAIL | 2.00% | Unwashed |
| Test 32 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | FAIL | 7.10% | Unwashed |
| Test 33 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 3.30% | Unwashed |
| Test 34 | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 3.30% | Unwashed |
| Test 35 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 3.30% | Unwashed |
| Test 36 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 5.70% | Unwashed |

| Date | Test | | | | | | Unwashed | Test | PASS | | | | | Unwashed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/13/2020 | Test 37 | 96.00% | 75.40% | 52.40% | 35.00% | 22.80% | 14.80% | 9.20% | 6.40% | Test 37 | PASS | FAIL | FAIL | FAIL | FAIL | 6.40% | Unwashed |
| 2/10/2020 | Test 38 | 99.60% | 75.80% | 53.50% | 35.90% | 23.00% | 14.40% | 9.40% | 5.50% | Test 38 | PASS | FAIL | FAIL | FAIL | FAIL | 5.50% | Unwashed |
| 2/7/2020 | Test 39 | 92.10% | 69.70% | 47.30% | 32.60% | 23.60% | 14.10% | 8.10% | 2.60% | Test 39 | PASS | FAIL | FAIL | FAIL | FAIL | 2.60% | Unwashed |
| 2/5/2020 | Test 40 | 90.30% | 78.30% | 54.70% | 38.10% | 23.20% | 14.10% | 8.90% | 5.80% | Test 40 | PASS | FAIL | FAIL | FAIL | FAIL | 5.80% | Unwashed |
| 2/4/2020 | Test 41 | 95.00% | 73.20% | 51.20% | 34.10% | 22.10% | 14.40% | 9.40% | 5.50% | Test 41 | PASS | FAIL | FAIL | FAIL | FAIL | 5.50% | Unwashed |
| 1/22/2020 | Test 42 | 91.70% | 69.30% | 48.70% | 34.10% | 22.60% | 14.70% | 8.94% | 2.50% | Test 42 | PASS | FAIL | FAIL | FAIL | FAIL | 2.50% | Unwashed |
| 1/16/2020 | Test 43 | 96.70% | 77.20% | 48.70% | 36.40% | 23.10% | 14.70% | 9.95% | 3.50% | Test 43 | PASS | FAIL | FAIL | FAIL | FAIL | 3.50% | Unwashed |
| 1/14/2020 | Test 44 | 95.00% | 73.50% | 51.00% | 34.30% | 22.00% | 14.10% | 9.13% | 9.20% | Test 44 | PASS | FAIL | FAIL | FAIL | FAIL | 9.20% | Unwashed |
| 1/10/2020 | Test 45 | 96.10% | 78.40% | 53.70% | 35.70% | 22.00% | 8.99% | 2.80% | Test 45 | PASS | FAIL | FAIL | FAIL | FAIL | 2.80% | Unwashed |
| 1/8/2020 | Test 46 | 96.30% | 75.10% | 53.30% | 36.00% | 15.20% | 9.02% | 7.60% | Test 46 | PASS | FAIL | FAIL | FAIL | FAIL | 7.60% | Unwashed |
| 1/7/2020 | Test 47 | 99.70% | 76.20% | 53.60% | 36.20% | 23.40% | 9.27% | 7.20% | Test 47 | PASS | FAIL | FAIL | FAIL | FAIL | 7.20% | Unwashed |
| 1/2/2020 | Test 48 | 98.30% | 55.10% | 53.60% | 36.60% | 23.10% | 9.97% | 3.70% | Test 48 | PASS | FAIL | FAIL | FAIL | FAIL | 3.70% | Unwashed |
| 12/30/2019 | Test 49 | 97.80% | 76.10% | 52.20% | 37.70% | 24.80% | 16.60% | 9.17% | 8.70% | Test 49 | PASS | FAIL | FAIL | FAIL | FAIL | 8.70% | Unwashed |
| 12/28/2019 | Test 50 | 99.60% | 83.50% | 58.40% | 40.20% | 25.80% | 16.30% | 10.62% | 3.10% | Test 50 | PASS | FAIL | FAIL | FAIL | FAIL | 3.10% | Unwashed |
| 12/10/2019 | Test 51 | 96.80% | 75.30% | 49.20% | 30.30% | 19.30% | 12.90% | 8.60% | 2.40% | Test 51 | PASS | FAIL | FAIL | FAIL | FAIL | 2.40% | Unwashed |
| 12/13/2019 | Test 52 | 95.80% | 73.50% | 52.40% | 36.30% | 22.70% | 14.70% | 9.91% | 6.10% | Test 52 | PASS | FAIL | FAIL | FAIL | FAIL | 6.10% | Unwashed |
| 12/11/2019 | Test 53 | 95.10% | 76.30% | 53.90% | 39.10% | 24.10% | 14.90% | 9.04% | 4.00% | Test 53 | PASS | FAIL | FAIL | FAIL | FAIL | 4.00% | Unwashed |
| 12/10/2019 | Test 54 | 99.80% | 74.70% | 50.80% | 33.20% | 21.30% | 13.70% | 8.61% | 2.10% | Test 54 | PASS | FAIL | FAIL | FAIL | FAIL | 2.10% | Unwashed |
| 12/4/2019 | Test 54 | 99.00% | 74.70% | 50.60% | 33.30% | 21.30% | 13.70% | 8.61% | 2.10% | Test 54 | PASS | FAIL | FAIL | FAIL | FAIL | 2.10% | Unwashed |
| 11/13/2019 | Test 55 | 99.30% | 80.20% | 56.40% | 37.70% | 23.70% | 15.10% | 9.81% | 3.50% | Test 55 | PASS | FAIL | FAIL | FAIL | FAIL | 3.50% | Unwashed |
| 11/5/2019 | Test 57 | 98.80% | 67.50% | 42.20% | 27.10% | 17.40% | 11.10% | 6.80% | 1.60% | Test 57 | PASS | FAIL | FAIL | FAIL | FAIL | 1.60% | Unwashed |
| 10/7/2019 | Test 58 | 99.40% | 87.50% | 60.00% | 40.00% | 24.70% | 15.40% | 9.97% | 5.90% | Test 58 | PASS | FAIL | FAIL | FAIL | FAIL | 5.90% | Unwashed |
| 10/15/2019 | Test 59 | 91.70% | 65.10% | 31.50% | 19.20% | 12.90% | 8.10% | 5.80% | 2.70% | Test 59 | PASS | FAIL | FAIL | FAIL | FAIL | 2.70% | Unwashed |

# Boggs Group
## 2022 Aggregate Needs & Schedule

| Plant | % | January | February | March | April | May | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lynches River | | 4,500 | 7,500 | 13,500 | 30,000 | 30,000 | 42,000 | 42,000 | 42,000 | 39,000 | 36,000 | 9,000 | 4,500 | 300,000 |
| Lugoff | | 3,750 | 6,250 | 11,250 | 25,000 | 25,000 | 35,000 | 35,000 | 35,000 | 32,500 | 30,000 | 7,500 | 3,750 | 250,000 |
| Mullins | | 750 | 1,250 | 2,250 | 5,000 | 5,000 | 7,000 | 7,000 | 7,000 | 6,500 | 6,000 | 1,500 | 750 | 50,000 |
| Monroe | | 4,500 | 7,500 | 13,500 | 30,000 | 30,000 | 42,000 | 42,000 | 42,000 | 39,000 | 36,000 | 9,000 | 4,500 | 300,000 |
| TOTAL: | | 13500 | 22500 | 40500 | 90000 | 90000 | 126000 | 126000 | 126000 | 117000 | 108000 | 27000 | 13500 | 900000 |
| Materials: | % | | | | | | | | | | | | | |
| #89's | 25% | 3,375 | 5,625 | 10,125 | 22,500 | 22,500 | 31,500 | 31,500 | 31,500 | 29,250 | 27,000 | 6,750 | 3,375 | 225,000 |
| #7's | 15% | 2,025 | 3,375 | 6,075 | 13,500 | 13,500 | 18,900 | 18,900 | 18,900 | 17,550 | 16,200 | 4,050 | 2,025 | 135,000 |
| #6's | 10% | 1,350 | 2,250 | 4,050 | 9,000 | 9,000 | 12,600 | 12,600 | 12,600 | 11,700 | 10,800 | 2,700 | 1,350 | 90,000 |
| #5's | 5% | 675 | 1,125 | 2,025 | 4,500 | 4,500 | 6,300 | 6,300 | 6,300 | 5,850 | 5,400 | 1,350 | 675 | 45,000 |
| Coarse Screenings | 15% | 2,025 | 3,375 | 6,075 | 13,500 | 13,500 | 18,900 | 18,900 | 18,900 | 17,550 | 16,200 | 4,050 | 2,025 | 135,000 |
| Asphalt Sand | 5% | 675 | 1,125 | 2,025 | 4,500 | 4,500 | 6,300 | 6,300 | 6,300 | 5,850 | 5,400 | 1,350 | 675 | 45,000 |
| AGGREGATES | 75% | 10,125 | 16,875 | 30,375 | 67,500 | 67,500 | 94,500 | 94,500 | 94,500 | 87,750 | 81,000 | 20,250 | 10,125 | 675,000 |
| RAP/RAS | 25% | 3,375 | 5,625 | 10,125 | 22,500 | 22,500 | 31,500 | 31,500 | 31,500 | 29,250 | 27,000 | 6,750 | 3,375 | 225,000 |
| ALL MATERIALS | 100% | 13,500 | 22,500 | 40,500 | 90,000 | 90,000 | 126,000 | 126,000 | 126,000 | 117,000 | 108,000 | 27,000 | 13,500 | 900,000 |

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit C



**KILPATRICK TOWNSEND**
ATTORNEYS AT LAW

KILPATRICK TOWNSEND & STOCKTON LLP
www.kilpatricktownsend.com

1001 West Fourth Street
Winston-Salem, NC 27101-2400
t 336 607 7300  f 336 607 7500

February 10, 2022

direct dial 336 607 7432
direct fax 336 734 2612
dgreene@kilpatricktownsend.com

*Via Email*

Justin G. Walden, Esq.
Georgia Stone Products
Justin.Walden@Summit-Materials.com

Re:    Audit Demand

Dear Mr. Walden:

You previously responded to our letter of January 18, 2022 as General Counsel for Georgia Stone Products, LLC ("GSP"). We read your response as sent on behalf of GSP and its affiliates Buckhorn Materials, LLC (which since merged into American Materials Company, LLC), Summit Materials, LLC, Construction Materials Group, LLC, and Hinkle Contracting Company, LLC (collectively with GSP, the "Summit Companies"). If you do not represent one or more of these companies that are parties or successors to the Aggregates Supply Agreement ("the Agreement") dated June 9, 2014, please promptly let us know so that we correspond with the proper entities. Until we hear otherwise, based on your prior response, we assume you represent all of these companies.

Boggs Materials, Inc. ("BMI") and its affiliates requested assurances that the Summit Companies would perform their contractual obligations under the Agreement. Your January 21, 2022 letter notably failed to provide any such assurances. BMI and its affiliates, particularly Boggs Contracting, Inc. and Lynches River Contracting, Inc., are therefore exercising their right to conduct an audit of the Summit Companies' compliance with the Agreement, pursuant to Section 4(f) of thereof.

BMI has retained Shawn Shapiro, CPA as the third-party auditor to conduct this audit. Mr. Shapiro is prepared to begin his audit the week of March 7, 2022. To facilitate that audit in a time and cost-efficient manner, please confirm no later than February 28, 2022 that the Summit Companies' employees will make the necessary records and information available for audit, will produce the requested records and information in electronic form to the greatest extent possible and identify the location at which any hard copy records will be made available for inspection and copying, and specify the format in which each category of documents below will be produced or made available so we can make the appropriate preparations for their download or copying. If the Summit Companies contend that any category of documents below cannot be made available by March 7th, specify the reasons those documents are not available.

US2008 19607732 1

ANCHORAGE  ATLANTA  AUGUSTA  BEIJING  CHARLOTTE  DALLAS  DENVER  HOUSTON  LOS ANGELES  NEW YORK  RALEIGH  SAN DIEGO
SAN FRANCISCO  SEATTLE  SHANGHAI  SILICON VALLEY  STOCKHOLM  TOKYO  WALNUT CREEK  WASHINGTON  WINSTON-SALEM

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

February 10, 2022
Page 2

At a minimum, the following categories of documents need to be made available for inspection and copying for the time period January 1, 2021 to the present, for both the Lynches River Quarry and the Black Creek Sand Mine:

1. All purchase orders or other requests to purchase Aggregates[1] (including Stone Aggregates and Sand Aggregates), regardless of customer or Aggregate product type/size/gradation;
2. All documents showing fulfillment of orders or other sales of Aggregates, regardless of customer or Aggregate product type/size/gradation;
3. All invoices and delivery tickets for Aggregate sales, regardless of customer;
4. Payment records showing pricing for all purchases of Aggregates, regardless of customer or Aggregate product type/size/gradation;
5. All inventory or stock reports, including but not limited to the most recent physical inventory report for the quarry and sand mine;
6. All production reports;
7. All quality control tests, such as gradation reports or other reports conducted to assure that the Aggregates meet the specifications in the Agreement;
8. All stone crushing reports;
9. All scrap or write-off reports (or other similar reports that are used to adjust inventory records);
10. All financial records for the operation of the Lynches River Quarry and the Black Creek Sand Mine, including accounts receivable sub-legers, purchase order registers, trial balances;
11. All documents showing returns or refunds to BMI and/or its affiliates for unsuitable Aggregates;
12. All records showing whether Aggregates sold to BMI and its affiliates were washed or unwashed;
13. All documents evidencing any assumption or assignment of the Agreement, and any notice to BMI of such assumption or assignment.

We are glad to work with you and the Summit Companies regarding the production format for records to be used in the audit. BMI will accept authentic and accurate electronic reports run from the Summit Companies' production reporting and ticketing software that contain the information subject to this audit (with intact metadata), subject to our ability to confirm the accuracy of the underlying information in the electronic versions (such as randomly spot-checking hard copy records for consistency). Use of electronic records, where available, will expedite and reduce the cost of the audit.

BMI reserves all rights under the Agreement, including the right to recoup from the Summit Companies the cost of the audit, plus interest, pursuant to Section 4(f) of the Supply Agreement.

---

[1] Unless otherwise defined in this letter, capitalized terms have the meaning assigned to them in the Agreement.

February 10, 2022
Page 3

Sincerely,

Dustin T. Greene

DTG:std

cc:     Drew Boggs (via email only)
        Alex Bullock, Esq. (via email only)
        Mark Boynton, Esq. (via email only)
        Shawn Shapiro, CPA (via email only)

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit D

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175



**GEORGIA STONE PRODUCTS**

February 16, 2022

**Via Email (dgreene@kilpatricktownsend.com)**

Boggs Materials, Inc.
1613 W. Roosevelt Blvd
Monroe, NC 28110

Kilpatrick Townsend & Stockton LLP
Attn: Dustin T. Greene
1001 West Fourth Street
Winston-Salem, NC 27101-2400

Re: Notice of Intent to Exercise Right to Third Party Audit
    Audit Demand

Mr. Greene,

Buckhorn Materials, LLC, Construction Materials Group LLC, Hinkle Contracting Company, LLC and Georgia Stone Products, LLC (collectively "GSP") confirm receipt of your correspondence dated January 21, 2022, and February 10, 2022.

GSP affirms it's not in default of the parties' Aggregates Supply Agreement dated June 9, 2014 (the "Agreement"). In regard to Boggs Materials Inc.'s 2022 aggregate needs, GSP notes the forecast supplied by Boggs Materials Inc. ("BMI"); #89, 225,000 tons; #7, 135,000 tons; and #6, 90,000 tons, significantly exceeds BMI's largest past annual aggregate purchases. In 2017, BMI's highest aggregate purchase year, BMI bought the following aggregate quantities; #89, 148,000 tons; #7, 85,000 tons; and #6, 60,000 tons. For the calendar year of 2022, GSP will produce and supply to BMI; #89, 140,000 tons; #7, 85,000 tons; #6, 60,000 tons; as well as fulfill the other miscellaneous aggregate quantities listed in the forecast.

As to the right of audit, Section 4(f) of the Agreement does permit BMI to periodically audit GSP's records, but only to the extent necessary to determine overcharges or underpayments by GSP (the "Purpose"). In advancement of the Purpose, GSP has already provided BMI the total tons purchased by BMI categorized by product for the period covering May 24, 2020 (the time GSP assumed control of Buckhorn) to present-day. GSP will continually work with BMI to provide the records necessary to accomplish the Purpose, but BMI's extensive request far surpasses the information required to ascertain overcharges or underpayments.

To further the parties' relationship and directly address any concerns, GSP welcomes the opportunity to have a dialogue and discuss BMI's present and future aggregate needs.

GSP reserves all rights whether now existing or hereafter arising under the Agreement, at law and in equity.

Sincerely,

Justin G. Walden, Esq.
Corporate Counsel

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

STATE OF SOUTH CAROLINA

COUNTY OF CHESTERFIELD

IN THE COURT OF COMMON PLEAS

FOURTH JUDICIAL CIRCUIT

Case No.: 2022-CP-_____

BOGGS MATERIALS, INC., BOGGS
CONTRACTING, INC., and LYNCHES
RIVER CONTRACTING, INC.,

Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN
MATERIALS COMPANY, LLC; and
GEORGIA STONE PRODUCTS, LLC,

Defendants.

MOTION FOR PRELIMINARY
INJUNCTION

COMES NOW, Plaintiffs Boggs Materials, Inc. ("BMI"), Boggs Contracting, Inc. ("BCI"),

and Lynches River Contracting, Inc. ("LRCI") (collectively, "Plaintiffs" or "Paving Contractors"),

by and though counsel, hereby move the Court for a preliminary injunction pursuant to Rule 65 of

the South Carolina Rules of Civil Procedure against Defendants Summit Materials, LLC

("Summit"), American Materials Company, LLC ("AMC"), and Georgia Stone Products, LLC

("GSP") (collectively, "Defendants" or "Suppliers"), and state as follows:

1.    This Motion seeks injunctive relief to allow an audit specifically bargained for and

agreed to by the Parties.

2.    The Parties entered into the Supply Agreement in June 2014.

3.    Despite the plain and unambiguous terms of the Supply Agreement, Suppliers have

repeatedly and consistently failed to supply aggregates to the Paving Contractors as required by

the Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

4.      Paving Contractors notified Suppliers of their breaches of the contract for failure to supply aggregates in the quantities and qualities and with the timeliness agreed to under the Agreement.

5.      With respect to quantity, Suppliers have failed to fill Purchase Orders from the Paving Contractors from April 2021 to present.

6.      Suppliers, through GSP, notified Paving Contractors, that Suppliers do not maintain, and do not intend to maintain, adequate supply of aggregates to fill Purchase Orders from the Paving Contractors for current projects and those the Paving Contractors are committed to in 2022.

7.      Suppliers are unable to fill Purchase Orders from the Paving Contractors because they have given priority to orders from third parties and have supplied third parties with aggregates despite agreeing to allocate any and all aggregates to the Paving Contractors on a first priority basis, in direct breach of the express terms of the Supply Agreement.

8.      After formal notice of its breaches, Suppliers still failed and refused to cure those breaches, and, in fact, have continued to knowingly commit repeated material breaches of the Supply Agreement. The Paving Contractors' Complaint asserts claims for these breaches.

9.      To avoid further detrimental impacts on their businesses and existing contracts, and to urge Suppliers to meet their obligations under the Supply Agreement going forward, the Paving Contractors gave further notice of breach in January 2022 and requested assurances that Suppliers would provide aggregates in the quantities and quality needed by the Paving Contractors in accordance with the terms of the Agreement.

10.     The Paving Contractors also sent a notice to Suppliers invoking their right to conduct an audit pursuant to Section 4(f) of the Supply Agreement "to determine if Supplier is in compliance with the terms of [the Supply Agreement]."

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300176

11.    Pursuant to the terms of the Supply Agreement, Plaintiffs are entitled to an audit of Suppliers records to determine compliance with the Supply Agreement's terms. (Supply Agreement § 4(f)).

12.    Without addressing any of the concerns raised in the Paving Contractors' request for assurances, Suppliers simply stated they are not in default under the Supply Agreement and refused to comply with the Paving Contractors audit notice, stating that the Supply Agreement only allows audits "to the extent necessary to determine overcharges or underpayments ...."

13.    Suppliers' attempt to limit the Paving Contractors' right to conduct the audit, and the scope of that audit, by citing a "Purpose" provision that does not exist in the Supply Agreement.

14.    Pursuant to Rule 65, Paving Contractors move the Court for an order commanding Suppliers to make available all records as requested by Paving Contractors and authorized under the Supply Agreement. Paving Contractors can show a likelihood of success on the merits, irreparable harm, and no adequate remedy at law, as set-forth in the accompanying brief in support and the supporting affidavits of Charles "Chuck" Steele and Dustin Greene.

WHEREFORE, the Paving Contractors pray unto the Court for relief as follows:

1.    That the Court grant the Paving Contractors motion for preliminary injunction;

2.    That the Court enter an order commanding Suppliers to make available all records as requested by Paving Contractors and authorized under the Supply Agreement.

3.    That the Court grant the injunction without or with minimal bond;

4.    That the Court grant such other and further relief as the Court deems just and proper.

3

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

KILPATRICK TOWNSEND & STOCKTON, LLP
607 14th Street, NW, Suite 900
Washington, DC 20005-2018
Tel:   202-508-5800
Fax:   202-508-5858
Email: abullock@kilpatricktownsend.com

/s/ Alexander McMillan Bullock
Alexander McMillan Bullock (SC #1004)

*Attorney for Plaintiffs*

Dated: March 7, 2022.
Washington, DC

4

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF CHESTERFIELD | IN THE COURT OF COMMON PLEAS<br>FOURTH JUDICIAL CIRCUIT<br>Case No.: 2022-CP-_____ |

BOGGS MATERIALS, INC., BOGGS
CONTRACTING, INC., and LYNCHES
RIVER CONTRACTING, INC.,

              Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN
MATERIALS COMPANY, LLC; and
GEORGIA STONE PRODUCTS, LLC,

              Defendants.

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

COME NOW Boggs Materials, Inc., Boggs Contracting, Inc., and Lynches River Contracting, Inc., (collectively "Paving Contractors") through counsel and submit this memorandum of law in support of their motion for preliminary injunction as to Defendants Summit Materials, LLC; American Materials Company, LLC; and Georgia Stone Products, LLC, collectively "Suppliers") and state as follows.

### STATEMENT OF FACTS

Paving Contractors' motion for preliminary injunction seeks injunctive relief to permit a third-party audit of Suppliers' records to determine compliance with the terms of the Supply Agreement between the Parties, as is expressly and unambiguously required by the Supply Agreement.

Paving Contractors are affiliated entities engaged in the business of manufacturing and sale and application of construction materials including warm and hot mix, recycled crushed concrete and construction aggregates, among other things. Compl. ¶ 10. Paving Contractors depend on sand and stone aggregates supplied by Suppliers to meet construction and paving contracts with the

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

South Carolina Department of Transportation and the North Carolina Department of Transportation, in addition to other customers. *Id.* ¶ 11. Suppliers are all affiliated entities engaged in the business of mining, producing, selling, and supplying aggregate materials from mines and quarries including, but not limited to, from the Lynches River Quarry located at or about 3410 Hwy 601 South, Jefferson, Chesterfield County, South Carolina. *Id.* ¶ 12. The property where the Lynches River Quarry is located is owned and, prior to June 2014, was operated by principals that also own the Paving Contractors. *Id.* ¶ 13.

In June of 2014, Paving Contractors and Suppliers entered into a series of agreements to lease the Lynches River Quarry to Suppliers ("Mining Lease"), and for Suppliers to supply aggregate to Paving Contractors for use in their business and to perform under their contracts with their customers ("Supply Agreement"). Affidavit of Charles "Chuck" Steele ("Steele Aff.) ¶ 3, Exhibit 1. Suppliers induced Paving Contractors and its principals to enter into the Supply Agreement with preferential supply terms that Suppliers warranted and promised to comply with in that agreement. Those terms may be at issue in future phases of this litigation, including in supplementary motions for preliminary injunctive relief, but for now it suffices to say that disputes have arisen between the Paving Contractors and Suppliers regarding Suppliers' compliance with the Supply Agreement.

Relevant to the current motion, the Supply Agreement contains the following terms:

Section 4(f) states that "Company [Boggs Materials] has the right from time to time to have a third party audit Supplier's records to determine if Supplier is in compliance with the terms of this Agreement. If any audit discloses any overcharges or underpayments by Supplier, Supplier shall promptly make restitution to Company therefor, plus interest at the rate of 1.5% per month.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

If such restitution payments are greater than the cost of the audit, Supplier shall also be liable for the cost of the audit."

Section 10(g) states that "Company [Boggs Materials] and Suppliers shall be entitled to specific performance to enforce each and every term and condition of, and obligations of Supplier and Company, respectively, hereunder."

Paving Contractors gave notice that they considered Suppliers to be in breach of the Supply Agreement in April 2021. Steele Aff. ¶ 5, Ex. 2 (April 16, 2021 Letter from Boggs Materials, Inc.). The Paving Contractors gave further notice of breach on January 18, 2022 and requested assurances that Suppliers would provide aggregates in the quantities and quality needed by the Paving Contractors in accordance with the terms of the Agreement during the upcoming 2022 paving season. Affidavit of Dustin Greene ("Greene Aff."), Ex. 1. Paving Contractors, among other things, requested Suppliers provide assurances that they would produce Aggregates in the (1) quantities; (2) quality and (3) with timeliness specified under the Supply Agreement and forecasted by Paving Contractors. *Id.*

On January 21 and February 10, 2022, having received no substantive response[1] to their January 18th letter, Paving Contractors sent notices to Suppliers of their intent to conduct an audit under the terms of the Supply Agreement and requested that Suppliers make available the documents necessary to conduct that audit. Greene Aff., Exhibits 2 and 3, respectively. The Paving Contractors requested the audit due in part to the issues set out in the January 18, 2022 letter, as well as subsequent breach of the Supply Agreement by Suppliers.

---

[1] General counsel for Suppliers a letter on January 21, 2022 that contained no substantive response to the Paving Contractors' letter. Greene Aff., Ex. 4.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Specifically, Paving Contractors' request specified that for the period between January 1, 2021 and the present, Suppliers make the following categories of documents available for inspection and audit:

1. All purchase orders or other requests to purchase Aggregates (including Stone Aggregates and Sand Aggregates), regardless of customer or Aggregate product type/size/gradation;

2. All documents showing fulfillment of orders or other sales of Aggregates, regardless of customer or Aggregate product type/size/gradation;

3. All invoices and delivery tickets for Aggregate sales, regardless of customer;

4. Payment records showing pricing for all purchases of Aggregates, regardless of customer or Aggregate product type/size/gradation;

5. All inventory or stock reports, including but not limited to the most recent physical inventory report for the quarry and sand mine;

6. All production reports;

7. All quality control tests, such as gradation reports or other reports conducted to assure that the Aggregates meet the specifications in the Agreement;

8. All stone crushing reports;

9. All scrap or write-off reports (or other similar reports that are used to adjust inventory records);

10. All financial records for the operation of the Lynches River Quarry and the Black Creek Sand Mine, including accounts receivable sub-legers, purchase order registers, trial balances;

11. All documents showing returns or refunds to BMI and/or its affiliates for unsuitable Aggregates;

12. All records showing whether Aggregates sold to BMI and its affiliates were washed or unwashed;

13. All documents evidencing any assumption or assignment of the Agreement, and any notice to BMI of such assumption or assignment.

ELECTRONICALLY FILED - 2022 Mar 07 7:28 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Greene Aff., Ex. 3. Paving Contractors stated that they would work with Suppliers regarding production format and have procured a third-party auditor to conduct the audit. *Id.*

Suppliers summarily responded to Paving Contractors' letters on February 16, 2022. Greene Aff., Ex. 5. Without addressing any of the Paving Contractors' concerns or the ongoing breaches of the Supply Agreement, Suppliers simply stated that they were "not in default of the parties' Aggregate Supply Agreement dated June 9, 2014." *Id.* Suppliers then disclaimed any obligation to meet Suppliers' needs for the upcoming paving season. *Id.*

Suppliers also rejected wholesale Paving Contractor's audit notice, stating that the Supply Agreement only allows audits "to the extent necessary to determine overcharges or underpayments ...." *Id.* Suppliers cited a "Purpose" provision that does not exist in the Supply Agreement to support their interpretation. *See id.*

As such, Paving Contractors seek injunctive relief to preserve their right to audit pursuant to Section 4(f) of the Supply Agreement which was specifically agreed to by Suppliers. Without the audit, will be without a remedy to determine Suppliers' compliance with the Supply Agreement and how that will impact business moving forward into the busy season for paving contracting.

## ARGUMENT

Paving Contractors are entitled to injunctive relief to obtain the audit. Actions for injunctive relief are equitable in nature. *Wiedemann v. Town of Hilton Head,* 344 S.C. 233, 236 (Ct. App. 2001). To obtain an injunction, a party must demonstrate a likelihood of success on the merits, irreparable harm, and the absence of an adequate remedy at law. *County of Richland v. Simpkins,* 348 S.C. 664, 669 (Ct. App. 2002).

5

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

1. **Paving Contractors Are Likely to Succeed on the Merits of Their Claim to Enforce the Supply Agreement's Audit Clause.**

A plaintiff is not required to prove an absolute legal right when seeking a preliminary injunction, but the plaintiff must present a reasonable question as to the existence of such a right. *AJG Holdings, LLC v. Dunn*, 382 S.C. 34, 51 (Ct. App. 2009). "When a *prima facie* showing has been made entitling plaintiff to injunctive relief, a temporary injunction will be granted without regard to the ultimate termination of the case on the merits." *Compton v. South Carolina Dep't of Corr.*, 392 S.C. 361, n.3 (2011). Thus, in determining whether a preliminary injunction is appropriate, the Court is not to consider the merits of the case, "except in so far as they may enable the court to determine whether a *prima facie* showing has been made." *Transcontinental Gas Pipe Line Corp. v. Porter*, 252 S.C. 478, 481 (1969). When a *prima facie* showing has been made entitling movant to injunctive relief, a Court will grant an injunction "without regard to the ultimate determination of the case on the merits." *Id.*

Here, Paving Contractors can show a likelihood of success on the merits of their claim that Suppliers have breached the Supply Agreement's audit requirement. *See Time Warner Cable v. Condo. Servs. Inc.,* 381 S.C. 275 (Ct. App. 2009) (finding that where a contract was unambiguous and that specific performance of the parties to the contract was an appropriate remedy for breach of contract). Paving Contractors and the Suppliers entered into a valid and enforceable contract. Steele Aff., Ex. 1. The terms of that agreement could not be more clear on the Paving Contractors' audit rights: "**Company [Boggs Materials] has the right from time to time to have a third party audit Supplier's records to determine if Supplier is in compliance with the terms of this Agreement.**" *Id.* § 4(f) (emphasis added). The supply Agreement also unambiguously provides that the parties are entitled to specific performance to enforce the agreements' terms. *Id.* § 10(g).

6

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

While Section 4(f) of the Supply Agreement provides for reimbursement by Suppliers if overpayments are identified and shifts the cost of the audit to Suppliers if those overpayments exceed the audit cost, it does not limit the Paving Contractors' right to conduct the audit or the audit's scope to evaluating potential overpayments. Rather, it quite plainly states the Paving Contractors can conduct the audit **"to determine if Supplier is in compliance with the terms of this Agreement."** *Id.* § 4(f) (emphasis added). The "terms of this Agreement" means all the terms, including the first priority requirements, preferential pricing requirements, non-assignment, and other issues for which the Paving Contractors have requested records to audit.

Suppliers flatly refused to comply with the audit. Their justifications for that refusal are meritless. As such, Suppliers have breached the Agreement's audit provisions, and the appropriate remedy is specific performance. Accordingly, Paving Contractors have shown a likelihood of success that Suppliers violated Section 4(f) of the Supply Agreement.

### 2. Paving Contractors Will Suffer Irreparable Harm.

Paving Contractors can show that they will suffer irreparable harm because Paving Contractors will lose their affirmative rights which they bargained for in the Supply Agreement if the audit provision is not enforced. *See Baker v. Boeing Co.*, 2021 WL 2813622 (D.S.C. 2021) (holding that where a party is prevented from access or control of valuable information to which it has a right irreparable harm exists); *see also Indus. Packaging Supplies, Inc. v. Martin*, 2012 WL 1067650 (D.S.C. 2012) (stating that loss of proprietary information constitutes irreparable harm); *Brown v. County of Berkeley*, 366 S.C. 354 (2005) (S.C. Supreme Court affirmed the County Council's right to conduct a special audit despite the clerk's attempt to prevent it.)

Here, Suppliers are improperly withholding information to which Paving Contractors have a contractual right to obtain, and which is not available to Paving Contractors from another source. Suppliers unreasonable withholding of information interferes with Paving Contractors' abilities to

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

assess performance under the Supply Agreement. Because Paving Contractors specifically bargained for this audit right, the unilateral denial of the audit in violation of the Supply Agreement's express terms constitutes irreparable harm.

If this was not enough to grant preliminary injunctive relief (and it is), Suppliers' refusal to comply with the audit provision also deprives the Paving Contractors of their ability to enforce other substantive rights under the Supply Agreement and jeopardizes Paving Contractors' business. This is additionally irreparable harm that supports immediate enforcement of the audit requirement.

The audit was bargained for by the Parties and is a necessary condition for ensuring compliance with the Supply Agreement. The purpose of the audit is to give the Paving Contractors a mechanism to ensure Suppliers' compliance with the terms of the Supply Agreement, to facilitate Paving Contractor's performance of contracts with its own clients. Suppliers' refuse to comply with the audit requirement inhibits Paving Contractors' ability to meet its own contractual requirements. This is additional irreparable harm Paving Contractors will suffer if the audit is not enforced. *See Levine v. Spartanburg Reg. Servs. Dist.*, 367 S.C. 458, 465 n.3 (Ct. App. 2005), ("the potential loss of a business satisfies the irreparable harm requirement for the issuance of an injunction" and "loss of business goodwill or loss that is not easily calculated in pecuniary terms is sufficient to show irreparable injury for purposes of obtaining a temporary injunction"); *Peek v. Spartanburg Reg. Healthcare Sys.*, 367 S.C. 450 (Ct. App. 2005) (affirming trial court's holding that physician would suffer irreparable harm if her anesthesiology privileges were revoked since such revocation would lead to the loss of her referral based and loss of her professional practice).

Here, Paving contractors can show irreparable harm in that they would be at risk of failing under their own contracts which require aggregates that Suppliers are required to provide.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Enforcement of the audit requirement is the first step for the Paving Contractors to enforce their other contractual rights and protect their business. It is also one Suppliers' expressly agreed to. As such, Paving Contractors can show that they will suffer irreparable harm if the audit is not enforced.

### 3. Paving Contractors Have No Adequate Remedy at Law to Obtain the Audit.

Paving Contractors also have no adequate remedy at law to enforce their right to audit Suppliers' records. It is well established that no adequate remedy at law exists in cases involving loss of a business opportunity, loss of business goodwill, and economic loss that could threaten the very existence of a plaintiff's business. *Levine*, 367 S.C. at 466-67. If a company loses its privilege to obtain information needed to conduct business, its practice and livelihood may be lost before claims can be finally adjudicated. *Id.* "[W]hen privileges are terminated, damages will be difficult, if not impossible, to ascertain, and... therefore [a company] shall have the right to an injunction or other equitable relief." *Id.*

Here, a Paving Contractors have no adequate remedy at law to obtain the audit that was agreed to by Suppliers. Without the audit and the ability to obtain information on whether Suppliers are honoring the Supply Agreement or will honor the Supply Agreement, Paving Contractors will suffer and their own ability to fulfill their own contracts will be compromised. As such, Paving Contractors have no adequate remedy at law to obtain such an audit to obtain necessary information from Suppliers.

Because Paving Contractors can show a likelihood of success on the merits, irreparable harm, and no adequate remedy at law, the Court should grant a temporary or preliminary injunction mandating Suppliers' compliance with the audit mandates of the Supply Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## CONCLUSION

For the foregoing reasons, Paving Contractors' Motion for Preliminary Injunction should be granted. Suppliers should be ordered to make all requested documents available for audit within two business days.

KILPATRICK TOWNSEND & STOCKTON, LLP
607 14th Street, NW, Suite 900
Washington, DC 20005-2018
Tel:   202-508-5800
Fax:   202-508-5858
Email: abullock@kilpatricktownsend.com

/s/ Alexander McMillan Bullock
Alexander McMillan Bullock (SC #1004)

*Attorney for Plaintiffs*

Dated: March 7, 2022.
Washington, DC

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

STATE OF SOUTH CAROLINA

COUNTY OF CHESTERFIELD

BOGGS MATERIALS, INC., BOGGS
CONTRACTING, INC., and LYNCHES
RIVER CONTRACTING, INC.,

                Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN
MATERIALS COMPANY, LLC; and
GEORGIA STONE PRODUCTS, LLC,

                Defendants.

IN THE COURT OF COMMON PLEAS

FOURTH JUDICIAL CIRCUIT

Case No.: 2022-CP-_____

**AFFIDAVIT OF CHARLES "CHUCK" STEELE**

COMES NOW Charles ("Chuck") Steele, and states as follows:

1.    I am a resident of the State of North Carolina, over the age of eighteen years. The statements made herein are true and based on my own personal knowledge. If called as a witness, I could and would give competent testimony to each of the matters stated herein.

2.    I am the president of Boggs Materials, Inc., one of the plaintiffs in the lawsuit and a party to the Supply Agreement at issue in this case.

3.    In June of 2014, Boggs Materials entered into a series of agreements with the Defendants named above (or their predecessors in interest) to lease the Lynches River Quarry to Defendants, and for Defendants to supply aggregate to Boggs Materials and its affiliates for use

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

in their business and to perform under their contracts with their customers ("Supply Agreement"). A true and correct copy of the Supply Agreement is attached as Exhibit 1.

4.      In the first quarter of 2021, Boggs Materials and its affiliate companies that purchase aggregates under the Supply Agreement began having problems obtaining aggregates from the Defendants in this case under the terms of the Supply Agreement.

5.      On April 16, 2021, Boggs Materials gave notice, on its own behalf and on behalf of its affiliates, that it considered Defendants to be in breach of the Supply Agreement. A true and correct copy of the April 16, 2021 Letter from Boggs Materials, Inc. is attached as Exhibit 2.

6.      As discussed in the Complaint in this matter, problems under the Supply Agreement have persisted, and have recently gotten worse.

7.      Boggs Materials recently engaged counsel to demand that Defendants comply with the terms of the Supply Agreement and to seek an audit under Section 4(f) of that agreement. Subsequent communications with Defendants regarding the Supply Agreement have occurred through counsel.

Further Affiant Sayeth Naught.

Executed on March 4, 2022

Charles ("Chuck") Steele,
President, Boggs Materials, Inc.

North Carolina; _____ Union _____ County

I, a Notary Public for said County and State, hereby certify that Charles ("Chuck") Steele personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this the 4th day of March, 2022

_____
Notary Signature

Angela S Helms
Notary Printed Name

ANGELA S. HELMS
MY COMM. EXP.
April 4, 2026
UNION COUNTY, NC
NOTARY PUBLIC

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit 1

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Execution Version

## BOGGS MATERIALS, INC.
## AGGREGATES SUPPLY AGREEMENT

THIS AGGREGATES SUPPLY AGREEMENT (this "**Agreement**") is dated as of June 9, 2014 (the "**Effective Date**"), by and among (i) **BUCKHORN MATERIALS, LLC**, a South Carolina limited liability company, with offices at 3410 Hwy 601 South, Jefferson, SC 29718 ("**Buckhorn**"), **CONSTRUCTION MATERIALS GROUP LLC**, a North Carolina limited liability company, with offices at 1357 Eddie Horton Road, Mt. Croghan, SC 29727 ("**CMG**", and together with Buckhorn, each a "**Supplier**" and collectively the "**Suppliers**") and **SUMMIT MATERIALS, LLC**, a Delaware limited liability company ("**Summit**"), and (ii) **BOGGS MATERIALS, INC.**, a North Carolina corporation, with offices at 1613 W. Roosevelt Blvd, Monroe, NC 28110 ("**BMI**").

### RECITALS

A.      BMI is engaged in the business of the manufacturing, sale and application of construction materials, including cold mix asphalt, warm mix asphalt and hot mix asphalt, recycled crushed concrete and construction aggregates.

B.      Buckhorn is engaged in the business of mining, producing and selling aggregate materials from the Lynches River Quarry located at 3410 Hwy 601 South, Jefferson, SC 29718 and surrounding properties leased by Buckhorn under the Lynches River Lease, as defined below (the "**Lynches River Quarry**"), and CMG is engaged in the business of mining, producing and selling aggregate materials from the Black Creek Sand Mine located at 1357 Eddie Horton Road, Mt. Croghan, SC 29727 (the "**Black Creek Sand Mine**" and together with the Lynches River Quarry, the "**Supplier Quarries**").

C.      Hinkle Contracting Company, LLC, a Kentucky limited liability company ("**Hinkle**"), is a wholly-owned subsidiary of Summit.

D.      BMI, A Mining Group, LLC, a Florida limited liability company ("**AMG**"), Hinkle and certain other parties thereto have entered into as of the date hereof a Membership Interest Purchase Agreement (the "**Buckhorn MIPA**"), pursuant to which Hinkle acquired ownership of Buckhorn, and Hinkle and certain other parties thereto have entered into as of the date hereof a Membership Interest Purchase Agreement (the "**CMG MIPA**" and together with the Buckhorn MIPA, the "**Membership Interest Purchase Agreements**"), pursuant to which Hinkle acquired ownership of CMG.

E.      Pursuant to the terms of the Membership Interest Purchase Agreements and as additional consideration for the purchase and sale of the membership interests of Suppliers thereunder, the Suppliers have agreed to sell Aggregates to BMI, and BMI has agreed to purchase Aggregates from Suppliers, on and subject to the terms and conditions of this Agreement.

F.      The execution and delivery of this Agreement by BMI and Suppliers are conditions precedent to and form an essential part of the transactions consummated in the Membership Interest Purchase Agreements. The parties acknowledge and agree that BMI was only willing to enter into and perform under the Membership Interest Purchase Agreements based on the commitments of Suppliers under this Agreement and that the Suppliers and Summit were only willing to enter into and perform under the Membership Interest Purchase Agreements based on the commitments of BMI under this Agreement.

G.      On the date hereof and also as a condition precedent to the consummation of the transactions under the Membership Interest Purchase Agreements, Affiliates of BMI are entering into that certain Mining Lease Agreement to lease mining rights to the Lynches River Quarry and related

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

properties to Buckhorn (the **"Lynches River Lease"**) and that certain Mining Lease Agreement to lease mining rights to the Black Creek Sand Mine to CMG (the **"Black Creek Sand Mine Lease"** and together with the Lynches River Lease, the **"Mining Leases"**).

## AGREEMENTS

NOW, THEREFORE, in consideration of the Membership Interest Purchase Agreements, the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1. **DEFINITIONS**. For purposes of this Agreement:

**"Affiliate"** when used with respect to any Person, means (i) if such Person is a corporation, any officer or director thereof and any Person which is, directly or indirectly, the beneficial owner (by itself or as part of any group) of more than fifty percent (50%) of any class of any equity security (within the meaning of the Securities Exchange Act, as amended) thereof, and, if such beneficial owner is a partnership, any partner thereof, or if such beneficial owner is a corporation, any Person controlling, controlled by or under common control with such beneficial owner, or any officer or director of any such beneficial owner or of any corporation occupying any such control relationship, (ii) if such Person is a partnership, any partner thereof, and (iii) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person. For purposes of this definition, "control" (including the correlative terms "controlling," "controlled by" and "under common control with"), with respect to any Person, shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by agreement or otherwise.

**"Aggregates"** means Sand Aggregates and Stone Aggregates.

**"Applicable Law"** means all provisions of any constitution, statute, law, rule, regulation, decision, order, decree, judgment, ruling, release, license, permit, stipulation, or other official pronouncement enacted, promulgated, or issued by any governmental authority, court of competent jurisdiction or arbitrator or arbitration panel.

**"Asphalt Plants"** means any and all asphalt plants owned or operated by any of BMI or its Affiliates, as such asphalt plants may be altered, modified, reconditioned or expanded, and any asphalt plants, in replacement thereof, including without limitation, the BMI asphalt plants located at Lugoff, SC, Lynches River, SC, Mullins, SC, Monroe, NC and Rock Hill, SC.

**"Bona Fide Market Price"** means a market price that is offered by a third-party source regularly engaged in the business of selling Aggregates in the applicable local market in which Company desires to purchase Aggregates and capable of supplying the quantities and qualities of Aggregates desired by the Company. A Bona Fide Market Price must be verifiable in a manner mutually agreed to by Supplier and Company (*e.g.* copy of paid invoice or purchase order between Company and such third party), such agreement not to be unreasonably withheld.

**"Company"** means BMI or any Affiliate of BMI that purchases Aggregates pursuant to this Agreement.

"**Person**" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity (or any department, agency, or political subdivision thereof) or any other entity.

"**Sand Aggregates**" means sand, coarse and fine, meeting the requirements of the Departments of Transportation of the states of North Carolina and South Carolina.

"**Stone Aggregates**" means those granite and lime stone products (but excluding recycled crushed concrete), meeting the requirements of the Departments of Transportation of the states of North Carolina and South Carolina.

     **2.**     **TERM**.  The initial period of this Agreement will begin on the Effective Date and shall continue for a minimum of ten (10) years (the "**Initial Term**"), unless earlier terminated as provided herein; provided that such Initial Term shall automatically renew for successive one (1) year periods (each one (1) year extension a "**Renewal Term**" and the Initial Term and each Renewal Term collectively the "**Term**"), unless the Suppliers and BMI mutually agree not to renew this Agreement at least one (1) year prior to the end of the applicable Term; provided further, that this Agreement shall terminate (i) upon the expiration or termination of the Lynches River Lease (unless the basis for such termination is the acquisition of the Lynches River Quarry or the assumption of the lessor's interest in the Lynches River Lease by Supplier or its Affiliate) and (ii) solely with respect to CMG's supply of Aggregates under this Agreement, upon the expiration or termination of the Black Creek Sand Mine Lease (unless the basis for such termination is the acquisition of the Black Creek Sand Mine or the assumption of the lessor's interest in the Black Creek Sand Mine by Supplier or its Affiliate).

     **3.**     **SALE AND PURCHASE OF AGGREGATES**.

     (a)     Purchase Orders.  During the Term, Company may order and Supplier shall, subject to the terms hereof, supply, the quantities and specifications of Aggregates that Company may specify in written purchase orders delivered to Supplier (each a "**Purchase Order**").  In the event of any conflict between the terms and conditions of this Agreement and those in Company's Purchase Order, the terms and conditions of this Agreement will govern; *provided, however*, if any terms in Company's Purchase Order are in addition to, but do not conflict with, the terms of this Agreement, then such additional terms will apply.  A list of purchase orders submitted by Company to Supplier that are outstanding as of the date hereof, including the prices and volume by product and reference numbers relating to such purchase orders, is set forth on Exhibit A.

     (b)     Requirements.  Subject to Supplier's ability to supply the Aggregates in the quantities, quality and timeliness required by Company at the prices under this Agreement and upon the other terms and conditions in this Agreement, including the Specifications (as defined below) (the "**Requirements Conditions**") and to the extent permitted by Applicable Law, Company agrees to purchase one hundred (100%) percent of BMI's and its Affiliates' requirements for Aggregates from Supplier during the Term.  Upon receipt of each Purchase Order, Supplier shall make available and supply to Company the Aggregates according to the Requirements Conditions.  If Supplier is unable to supply the Aggregates to fulfill a Purchase Order according to the Requirements Conditions, Supplier shall promptly notify Company and Company may rescind all or any part of its Purchase Order and may purchase Aggregates, of similar type or quantity, from another producer without cost or liability to Supplier.  Without limiting Company's rights or remedies, if the purchase price paid by Company for Aggregates to such third party (including the delivered haul cost to Company's Asphalt Plant) exceeds the delivered purchase price provided herein, the excess of the amount actually paid by Company to the third party for such Aggregates (taking into account the delivered haul cost to Company's Asphalt Plant) over the amount that Company would have paid to Supplier for such Aggregates under this Agreement shall be paid by

Supplier to Company within 10 days after written notice from Company; provided, that the third party price for such Replacement Aggregates must be a Bona Fide Market Price. Except as set forth above, neither Company nor BMI is guaranteeing any specific quantities of Aggregates that Company may need from time to time during the Term and Company shall only become obligated to purchase Aggregates, and Supplier shall, subject to the terms hereof, only become committed to supply such Aggregates, upon Company's submission of a Purchase Order. For the avoidance of doubt and without limiting Section 3(d) below, Supplier shall accept and fulfill each and every Company Purchase Order provided that such Purchase Order is provided by such Company within a commercially reasonable notice period for the production of the Aggregates required, consistent with past practices, and in quantities customarily ordered by such Company (or as otherwise may be commercially reasonable); provided, that, for the avoidance of doubt, Supplier reserves the right not to accept a Purchase Order during a Force Majeure Event. Except as otherwise expressly provided for in this Agreement, Company shall not purchase Aggregates from a third party source.

(c)    Delivery. Supplier will inspect and test the Aggregates prior to delivery to ensure they comply with the Specifications. Company shall purchase Sand Aggregates hereunder at the Black Creek Sand Mine and Stone Aggregates at the Lynches River Quarry, or such other locations as specified in the Purchase Order. Supplier will deliver, at times reasonably requested by Company to maximize availability of Company's trucks, the Aggregates into top loading industry standard trucks at its load-out facilities. Company is responsible for arranging and scheduling of suitable delivery vehicles to the delivery point and for their safe operation while at Supplier's facilities. All such vehicles must comply with all safety and operating rules and requirements imposed by Supplier for operations at its plants and provided to Company in advance. Deliveries will be considered "on time" and "timely" if the subject Aggregates are available and ready for top loading at the designated facility no later than the delivery date specified in the Purchase Order (the "**Delivery Date**"). Time is of the essence with respect to deliveries, and Company may suffer financial loss if Supplier fails to maintain a service level ensuring that Aggregates are timely delivered by Supplier to Company (i) within Supplier's applicable lead times and (ii) in proper condition (proper quality, quantity and type). Failure on the part of Supplier to fill Purchase Orders on a timely basis, or failure on the part of Company to accept the Aggregates, will give rise to any remedies provided by law or in equity, including the right to cancel such unfilled Purchase Orders.

(d)    Aggregate Availability. Supplier shall maintain sufficient manufacturing capabilities to supply Aggregates to Company in accordance with Purchase Orders that Company may issue from time to time, all in accordance with the terms of this Agreement. Supplier shall allocate any and all Aggregates to Company on a first priority basis with respect to any third party purchase order received by Supplier after receipt of a Company Purchase Order. In the event of a Force Majeure Event, Supplier shall assist Company in locating reliable alternate sources and suppliers of Aggregates to ensure a continued supply during such difficulties. If such difficulties obligate Company to purchase Replacement Aggregates from a third party, then solely with respect to Replacement Aggregates for unfilled Purchase Orders, Company may deduct any excess of the purchase price of such Replacement Aggregates over the prices provided for in this Agreement from future Supplier invoices (in each case taking into account the delivered haul cost to Company's Asphalt Plant); provided, that the third party price for such Replacement Aggregates must be a Bona Fide Market Price. For purposes hereof, "Replacement Aggregates" shall mean the complete quantity of Aggregates subject to the Purchase Order, regardless of whether Supplier is willing or able to partially fulfill such Purchase Order.

(e)    Calculations of Shipped Aggregates. The quantity of Aggregates delivered to Company each month ("**Shipped Aggregates**") will be determined by the weight tickets of shipped Aggregates at Supplier's truck scales located at the load-out point at its quarry, and Supplier will furnish such calculation, and a copy of such weight tickets, on or before the seventh (7th) business day following the Delivery Date. Supplier will be responsible, at its cost, for the maintenance and calibration of the scales

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

and will ensure such scales are calibrated and inspected by the Department of Agriculture on at least a semi-annual basis.

### 4. **PURCHASE PRICE AND PAYMENT**.

(a)    Pricing.  Prices of the Aggregates for Purchase Orders in place as of the Effective Date are set forth on Exhibit A.  The purchase price of any Aggregates supplied pursuant to Section 3 shall be no greater than the lesser of (i) the prevailing best third party customer price per ton commensurate with such product and volume sold by Supplier, and (ii) the prevailing market price for such Aggregates.  All prices shall be F.O.B. at the applicable Supplier Quarry or the other applicable supply location designated by Company.

(b)    Price Adjustments.  The parties will meet on a calendar-quarter basis, or shall meet at the request of Company or Supplier, to review the prices for the Aggregates.  In determining prevailing market prices for the Aggregates to be supplied to any Asphalt Plant, the Supplier shall take into account the delivered haul cost to such Asphalt Plant.  Supplier acknowledges that competitive Aggregates pricing is necessary for BMI and its Affiliates to successfully bid and acquire asphalt volume, while BMI acknowledges that its asphalt mix sales, from which its Aggregates requirements are derived, drive a substantial portion of Supplier's total sales volume; as such, both parties agree to use all commercially reasonable efforts, including but not limited to job-specific pricing of Aggregates, to maximize the sale or purchase, as the case may be, of Aggregates for each party.  During the first fifteen (15) years of the Term, any increase in the prices for Aggregates shall not exceed the greater of (i) (A) during the first five years of the Term, 4% per calendar year, (B) during the sixth through tenth years of the Term, 5% per calendar year and (C) during the eleventh through fifteenth years of the Term, 6% per calendar year, and (ii) the percentage change of Supplier's operating costs per ton (including all direct production and or selling costs incurred in the ordinary course of business by Buckhorn or CMG, as the case may be).  All costs supporting the percentage changes pursuant to subsection 4(b)(ii) shall be included and allocated in accordance with generally accepted accounting principles applied consistently and subject to audit by Company if requested.  For purposes of measuring such percentage changes, the baseline pricing as of the Effective Date will be the calendar year 2013 pricing between Supplier and Company applicable to Aggregate type and job type.

(c)    Price Warranty.  Notwithstanding anything herein to the contrary, Supplier warrants that the prices for the Aggregates sold to Company hereunder (taking into account the delivered haul cost to each Asphalt Plant) are no less favorable than those prices Supplier is extending to any other customer (taking into account the delivered haul cost to such other customer's facility) for the same or similar products from the Supplier Quarries.  If Supplier subsequently grants another customer pricing on terms more favorable than those being provided to Company at such time in violation of the foregoing warranty, Supplier shall notify Company and adjust the prices charged to Company accordingly (with such modified pricing to take effect as of the date such pricing was granted to the other customer).  In addition, if another supplier offers Company more favorable pricing for aggregates similar to the Aggregates prior to Company's submission of a Purchase Order to Supplier, then Company must notify Supplier thereof and afford Supplier a reasonable opportunity to confirm such pricing and reconsider and amend its pricing to meet the lower pricing offered by the other supplier; provided, that such lower pricing must be a Bona Fide Market Price.  If Supplier elects not to amend its pricing, Company is relieved of its requirement to purchase any quantity of Aggregates offered by Supplier at a price higher than such lower pricing and Company may then purchase such Aggregates from that third-party source at a price no higher than such lower pricing.  If, at Company's request, Supplier quotes prices and quantities for Aggregates to Company in connection with Company's submission of a bid for a project (or has quoted such prices prior to the Effective Date), and Company uses (or used) such quote in a bid for a project and is awarded such bid, then (i) Supplier shall reserve availability of such Aggregates for Company, and (ii)  Company shall

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

submit a Purchase Order to Supplier for the Aggregates subject to such quote to be used in such bid, and Supplier shall sell such Aggregates to Company at no higher than the price set forth in the quote.

(d)    Payment.  Supplier shall invoice Company for the price of the Aggregates at the time of shipment or as otherwise mutually agreed.  Company shall pay all conforming invoices in full within 45 days after the receipt of the invoice, except no invoices shall be paid unless title and risk of loss to the applicable Aggregates has passed to Company under Section 5(b).  All nonconforming invoices shall be paid in full within 45 days of the date of final resolution.

(e)    Taxes.  All prices for the Aggregates shall include sales, use, excise or similar taxes or duties based on the sale of the Aggregates (excluding such taxes or duties based on Supplier's gross receipts or business operations).  If Supplier is required to collect any such taxes from Company, Supplier shall separately detail such taxes on the invoice to Company.  If Company is required to pay such taxes under Applicable Law, Company will pay such invoiced amounts to Supplier, and upon receipt of same, Supplier shall be solely responsible for timely remitting such taxes to the proper taxing authority.  Company reserves the right to pay such taxes directly to the proper taxing authority (and promptly informs Supplier of such), or provide Supplier with a valid tax exemption certificate.

(f)    Audit.  Company has the right from time to time to have a third party audit Supplier's records to determine if Supplier is in compliance with the terms of this Agreement.  If any audit discloses any overcharges or underpayments by Supplier, Supplier shall promptly make restitution to Company therefor, plus interest at the rate of 1.5% per month.  If such restitution payments are greater than the cost of the audit, Supplier shall also be liable for the cost of the audit.

(g)    Financial Condition.  At all times during the Term, each of Supplier and Company must satisfy the reasonable financial requirements established or modified by the other party.  Upon reasonable request made by Supplier or Company during the term hereof, Company or Supplier, respectively, shall submit to Supplier or Company, respectively, within 30 days from the date of request sufficient financial information (on a confidential basis and only to the extent not publicly available) to demonstrate Company's or Supplier's respective compliance with such financial requirements.

## 5.    ACCEPTANCE; TITLE AND RISK OF LOSS.

(a)    Acceptance and Shortage Claims.   All Aggregates shall be received subject to Company's inspection (which inspection shall not affect the warranties under this Agreement).  Company may reject any delivery or cancel all or any part of any Purchase Order if Supplier fails to make delivery in conformity with the terms and conditions hereof or any Purchase Order.  Company's acceptance of any non-conforming delivery will not constitute a waiver of its right to reject future deliveries.  In the event that Company does not accept some or all Aggregates in a given shipment, at Company's option, (i) Supplier shall provide a comparable quality substitute (for which substitution Supplier must assume any expense and price differential) or (ii) if Supplier cannot provide such comparable quality substitute within 48 hours of notice from Company, Company may purchase Aggregates from another supplier as an alternate source as Company, in its sole discretion, deems necessary, in which case Supplier shall reimburse Company for any additional reasonable costs and expenses incurred by Company in purchasing Aggregates from such other supplier as an alternate source.  At any time upon identification and notification of defective Aggregates or nonconforming shipments, Supplier shall, at Company's option and at Supplier's sole cost and expense, reimburse Company for any amounts paid or cure such defective Aggregates or nonconforming shipments.  Payment for or passage of title to Aggregates shipped prior to Company's inspection will not constitute an acceptance thereof.  Supplier shall correct shortages at no additional cost to Company.

(b)    Risk of Loss. Title and risk of loss of the Aggregates sold by Supplier and purchased by Company will pass to Company when the Aggregates are loaded into Company's carrier vehicles at the applicable Quarry or other supply location designated by Company.

## 6.    WARRANTY.

(a)    General. Supplier represents and warrants to Company that (i) it has the requisite power, authority and authorization to enter into this Agreement and carry out the terms hereof, (ii) the execution, delivery and performance of this Agreement are not prohibited or impaired by any judgment or other agreement to which Supplier is a party or by which it is bound, (iii) Supplier is and at all times during the Term shall be in possession of all approvals, licenses and permits necessary to mine, manufacture, render, process, deliver and sell Aggregates; (v) Supplier has and will have the right to render, sell and deliver all Aggregates free and clear of all liens and encumbrances, and (vi) Supplier shall at all times comply with Applicable Laws.

(b)    Aggregates. Supplier warrants good and marketable title with respect to the Aggregates sold by it to Company under this Agreement and further warrants that:

(i)    Aggregates will be free of debris and other physical contaminants, subject to general standards in the aggregates industry and as specified by the then-prevailing Department of Transportation of North or South Carolina (as applicable, the "**DOT**");

(ii)    All Aggregates sold to Company Asphalt Plants for use in asphalt shall be produced unwashed and sized according to the ranges specified on Exhibit B and all other requirements outlined in the applicable DOT's respective codes and specifications for road based materials, with the exception of gradation;

(iii)    Aggregates, other than those used in asphalt, sold as sized products for use on DOT projects, or any other projects requiring compliance with DOT specifications, shall conform to the governing DOT's standard specifications; and

(iv)    All Aggregates shall (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the "**Specifications**").

Supplier and Company acknowledge and agree that market demand, competitive cost and/or supply dynamics may require amendments to the definition of "Specifications" and the Supplier's warranties set forth in Section 6(b) which amendments shall be mutually agreed upon in writing by the parties. Subject to the foregoing, Supplier reserves the right to replace, upgrade and modify its processing plant capabilities, and following the first fifteen (15) years of the Term, Supplier and Company shall mutually amend the definition of "Specifications" and the Supplier's warranties in Section 6(b) as necessary to satisfy the requirements of both parties; *provided, that,* the definition of "Specifications" shall always include the specifications set forth in Section 6(b)(i), (iii) and (iv)(x) and Supplier's warranties under this Section 6(b) shall always include the warranty in Section 6(b)(i), (iii) and (iv)(x).

(c)    Company's Remedy. If any Aggregates fail to meet the warranties set forth above, Company may elect, in addition to its other rights and remedies, at Supplier's expense to take one or more of the following actions:  (A) reject a portion of the, or the entire, shipment or lot, as Company deems appropriate, and return the same to Supplier at Supplier's expense; (B) cancel any outstanding portion of the Purchase Order; (C) elect that Supplier shall replace the nonconforming Aggregates with Aggregates that comply with the requirements of this Agreement, at Supplier's cost; (D) retain the Aggregates and

recover damages from the Supplier for breach of warranty; and (E) elect that Supplier shall refund any purchase price paid with respect thereto and all other amounts, including shipping and transport charges, incurred by Company for such nonconforming Aggregates.  Supplier shall take any remedial action elected by Company under this Section.

(d)    Disclaimer.  Without limiting the foregoing, and notwithstanding any other provision of this Agreement to the contrary, neither party will be liable for lost profits, lost revenues, lost opportunity costs, costs of financing, consequential, punitive, special, or incidental damages arising from Supplier's failure to deliver Aggregates required hereunder, or from the termination of this Agreement; provided, that the foregoing shall not apply to indemnification of third party claims, intentional or willful breaches or gross negligence.

**7.    TERMINATION**.  In addition to any other rights it may have, each party shall have the right at its option to terminate this Agreement upon thirty (30) days written notice to the other party if an Event of Default has occurred with respect to the other party as described in Section 8 below.  Upon expiration or any termination of this Agreement by either party as provided in this Section 7, all rights and obligations of the parties under this Agreement shall cease except any right or obligation which accrued prior to the effective date of such expiration or termination.

**8.    EVENTS OF DEFAULT**.  The occurrence or existence of any one or more of the events or conditions described below shall constitute an **"Event of Default"** under the Agreement with respect to the defaulting or affected party:

(a)    Payment Default.  The failure of a party to make any undisputed payments under this Agreement when due and such failure continues unremedied for fifteen (15) business days after notice of such breach or non-compliance from the non-defaulting party (except that the failure to make a payment or portion thereof that is the subject of a bona fide dispute being resolved pursuant to Section 10 will not constitute a default under this subsection until three (3) business days after resolution of such dispute resulting in a determination of the relevant payments owed); or

(b)    Other Default.  (i) The breach of or noncompliance with a material provision of this Agreement (other than a payment default described in Section 8(a) above) which remains uncured within thirty (30) days after notice of such breach or noncompliance is given to the breaching or noncomplying party; provided, however, that if it is not practicable to correct the default within the thirty (30) day period and the defaulting party has commenced corrective action and is taking all good faith, commercially reasonable efforts to correct same, then such cure period will be extended for so long as it reasonably required to correct the default undertaking such good faith, commercially reasonable efforts, or (ii) a successive breach of or noncompliance with such material provision within twelve (12) months thereafter; or

(c)    Insolvency.  By either party, upon written notice to the other party, if the other party becomes insolvent, fails to pay its debts as they come due or makes any assignment for the benefit of creditors or becomes subject to any federal or state receivership, liquidation or bankruptcy or insolvency case or proceeding (voluntary or involuntary), but if involuntary, only if such case or proceeding is not dismissed within 90 days from the date instituted.

**9.    EFFECT OF TERMINATION; REMEDIES**.  Upon expiration or termination of this Agreement for any reason, at Company's option, Supplier shall complete all Purchase Orders submitted to Supplier by Company prior to the effective date of termination and Company shall pay for such orders upon acceptance of the Aggregates by Company, subject to any set-offs.  Company may set off any damages, losses or expenses that Company incurs which arise out of or are connected to breach of this

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Agreement from amounts owed to Supplier. Expiration or termination of this Agreement for any reason shall not affect any liabilities or obligations of either party that have accrued at the date of expiration or termination or which by their nature survive expiration or termination. Following the occurrence and during the continuance of an Event of Default, the non-defaulting party may terminate this Agreement as contemplated in Section 7 (in which event the parties shall only be liable for amounts due and owing as of the date of termination) or may pursue such other remedies as expressly provided herein or otherwise provided by law.

**10.    GENERAL PROVISIONS**.

(a)    Notices. Any notice or other communication provided for hereunder shall be in writing and may be (i) served by personal delivery, (ii) made by facsimile transmission, or (iii) sent by overnight courier service (with all fees prepaid) to the receiving party as follows:

If to BMI:

Boggs Materials, Inc.
P.O. Box 1609
Monroe, NC 28111
Attention: Drew Boggs
Facsimile: 866-554-3442

*with a copy to:*

K&L Gates LLP
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina 28202
Attn: C. Chad Warpula, Esq.
Fax: 704-353-3210

If to a Supplier:

Buckhorn Materials LLC
3410 Hwy 601 South
Jefferson, SC 29718
Attn: Richard Moses
Facsimile No.: _843-672-3579

Construction Materials Group LLC
1357 Eddie Horton Road
Mt. Croghan, SC 29727
Attn: Richard Moses
Facsimile No.: 843-672-3579

Hinkle Contracting Company, LLC
P.O. Box 200
395 North Middletown Road
Paris, Kentucky 40362-0200
Attention: Thomas Hinkle
            Steve Hullett
            Warren Hawkridge
Facsimile No.: (859) 987-0727

Summit Materials, LLC
3550 Wynkoop, 3rd Floor
Denver, CO 80202

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Attn: Thomas Hill
    Anne Benedict
Facsimile No.: (303) 893-6993

*with a copy to:*    Gibson, Dunn & Crutcher
200 Park Avenue
New York, New York 10166-0193
Attention: Steven R. Shoemate
Facsimile No.: (212) 351-5316

Any such notice or communication shall be deemed to be given, if delivered in person, on the date delivered, if made by facsimile transmission, on the date transmitted, or, if sent by overnight courier service, on the date sent as evidenced by the bill of lading; and shall be deemed received, if delivered in person, on the date of personal delivery, if made by facsimile transmission, upon confirmation of receipt (including electronic confirmation), or if sent by overnight courier, on the first business day after the day sent. Any party sending a notice or other communication by facsimile transmission shall also send a hard copy of such notice or other communication by one of the other means of providing notice set forth in this Section 10(a). Any notice or other communication shall be given to such other representative or at such other address as a party to this Agreement may furnish to the other party pursuant to this Section 10(a).

(b)    <u>Indemnification</u>. Each party (the "**Indemnifying Party**") shall indemnify, defend, and save the other party, its Affiliates, officers, and employees (the "**Indemnified Parties**") harmless only from such claims, litigation, liabilities, and expenses that result from, arise out of, or are caused by the Indemnifying party's acts or omissions or the acts or omissions of the Indemnifying Party's affiliates, subcontractors or agents. The indemnification obligation of the Indemnifying Party under this Agreement shall extend only to the Indemnified Parties and no other person or entity. The obligations of indemnification shall survive termination or expiration of this Agreement.

(c)    <u>Insurance</u>. Each party (the "**Covenant Party**") shall maintain (i) worker's compensation and employer's liability insurance to fully protect against loss from personal injury, including death, to any of its employees; and (ii) comprehensive automobile liability, general liability, and property damage insurance. All such insurance shall be written by insurers acceptable to the other Party, having minimum coverage of $2,000,000 combined single limit, on an "<u>occurrence</u>" basis and not on a "<u>claims made</u>" basis. All general liability policies shall provide minimum coverage of $2,000,000 per occurrence and provide a minimum aggregate limit of $3,000,000 per occurrence. All policies, except for worker's compensation policies, shall name the other Party as an additional insured with primary coverage (with any other third-party coverage provided for the other Party to be deemed as excess only) and shall indemnify, defend, and protect the other party from all claims, expenses, and liabilities related with any act or omission of the Covenant Party, its invitees, or any person performing work directly or indirectly on behalf of the Covenant Party. All insurance shall expressly provide that all rights of subrogation against the other Party are waived and that no amendment or cancellation of any policy shall be effective until 30 days' written notice to the other Party. Before entering onto the other party's property or premises, the Covenant Party shall furnish certificates satisfactory to the other party evidencing the required insurance.

(d)    <u>Relationship</u>. Each party hereto will act as an independent contractor, and nothing contained in or arising out of this Agreement will be construed to imply or create any joint venture, partnership, agency, or other relationship. The parties agree that no fiduciary relationship is created by this Agreement. No persons other than the parties hereto or their permitted assigns shall be deemed to have any interest under this Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

(e)    Assignment.  No party may assign this Agreement or delegate any duties hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that, each party shall have the right to assign this Agreement to an Affiliate with the same or better ability to perform the obligations in all respects hereunder, without the prior written consent of the other parties.  No rights shall inure to the benefit of any assignee of any party hereto as to which the other parties' consent is required hereunder, unless such other parties have consented in writing to the assignment to such assignee.  A change of control of Supplier or BMI or Boggs Paving, Inc.  shall be deemed an assignment under this Agreement (other than a change of control of BMI, Boggs Paving, Inc. or Supplier occurring after compliance by such party with the terms of Section 10(f) below).  For the purposes of the foregoing, a "**change of control**" means any sale or transfer, by any person or persons directly or indirectly controlling the Supplier or Company, as applicable, on the date hereof, of such control to a person or persons not controlling the Supplier or Company, as applicable, on the date hereof, or any sale or transfer of all or a substantial portion of all of Supplier's or Company's, as applicable, business or assets, whether consummated pursuant to a voluntary or involuntary levy, sale, execution or other legal process, transfer, gift, assignment or sale in bankruptcy, insolvency or any compulsory procedure; provided, that, such sales or transfers shall not constitute a "change of control" if they are made to an Affiliate.  For purposes hereof, each of the following shall not be deemed an assignment under this Agreement: (i) any transfer of direct or indirect ownership in Supplier or Company resulting from an initial public offering of the stock of Supplier or Company, or any direct or indirect owner of Supplier or Company, on a national exchange in the United States of America, and (ii) if Supplier's or Company's, or any direct or indirect owner of Supplier's or Company's, stock is publicly traded on a national exchange in the United States of America, transfers of stock in Supplier or Company, or such direct or indirect owner of Supplier or Company, as applicable.  No assignment will be valid unless the assignee shall execute and deliver to the other parties hereto an assumption agreement in form satisfactory to the other parties hereto, including an assumption by the assignee of all of the obligations of the assignor and the assignee's ratification of and agreement to be bound by all of the provisions of this Agreement. This Agreement shall be binding upon the parties hereto and their successors and assigns, and shall inure to the benefit of the parties hereto and their permitted successors and assigns.

(f)    Sale of Business.  If, at any time prior to the fifth (5th) anniversary of the Effective Date of this Agreement, Company (which shall, for the purposes of Section 10(f), be deemed to include Boggs Paving, Inc. and Boggs Transport, Inc.) or Supplier (including their respective successors and assigns, the "**ROFR Seller**") wishes to effect a sale of all or any part of its business or assets (other than sales of assets in the ordinary course of business), in the case of Company, to a third party with asphalt and/or paving operations in South Carolina or North Carolina (which shall include Affiliates of Company), and in the case of Supplier, to a third party with aggregates operations in South Carolina or North Carolina (but which shall not include Affiliates of Supplier) pursuant to a bona fide offer from an independent third party purchaser, then the ROFR Seller shall first deliver to Supplier or Company, as applicable (the "**ROFR Buyer**"), a notice of offer from such third party purchaser, which shall include (i) a description of the business or assets being offered (the "**Offered Assets**"), (ii) the name of the third party purchaser, (iii) the purchase price, all other material terms of the proposed sale and, if applicable, the negotiated purchase agreement between the ROFR Seller and the third party purchaser (the "**Third Party Agreement**") and (iv) an offer to sell the Offered Assets to the ROFR Buyer at the same price, upon the same material terms and, if applicable, in accordance with a purchase agreement substantially in the form of the Third Party Agreement.  The ROFR Buyer may deliver to the ROFR Seller an acceptance notice on or before the tenth (10th) business day after the ROFR Seller's delivery of the offer notice described above.  The ROFR Buyer's acceptance of the ROFR Seller's offer shall be subject to the execution and delivery of a purchase and sale agreement in a form reasonably satisfactory to the ROFR Buyer and ROFR Seller and in accordance with the terms herein, which execution and delivery shall occur within sixty (60) days of the delivery of such acceptance notice; *provided, that,* if the notice of offer includes a

Third Party Agreement, the ROFR Buyer's acceptance of the ROFR Seller's offer shall be subject to the execution and delivery of a purchase agreement substantially in the form of such Third Party Agreement, which execution and delivery shall occur within thirty (30) days of the delivery of such acceptance notice. If the ROFR Buyer fails to deliver an acceptance notice within the ten (10) day exercise period, the ROFR Seller may sell the Offered Assets upon the terms and conditions set forth in the offer notice. If a ROFR Seller, after complying with this Section 10(f), consummates a transaction with a third party purchaser by purchase, merger or otherwise, this Section 10(f) shall no longer apply to such ROFR Seller, the third party purchaser or the surviving entity, as applicable, following such transaction.

(g)    No Waiver; Remedies.  The failure by any party hereto to insist upon strict performance of any term or condition of this Agreement or failure or delay to exercise any right or remedy provided herein or by applicable law, or failure to notify properly the other party upon a breach, or the acceptance of or payments for any Aggregates hereunder will not release any party from any of the obligations of this Agreement and will not be deemed a waiver of any right of any party to insist upon strict performance hereof or any of its rights or remedies as to any prior or subsequent default hereunder.  Time shall be of the essence in the performance of this Agreement.  All remedies hereunder are cumulative and without limitation to any other rights or remedies available at law, in equity or otherwise.  Suppliers and Company specifically acknowledge and agree that failure to comply with the terms of this Agreement may result in irreparable harm to Company and its Affiliates and to Suppliers and its Affiliates, respectively, and that Company and Suppliers shall be entitled to specific performance to enforce each and every term and condition of, and obligation of Supplier and Company, respectively, under, this Agreement.

(h)    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of South Carolina, without regard to conflicts of laws principles.

(i)    Headings.  The headings in this Agreement are for convenience of reference only and will not limit or otherwise affect any of the terms hereof.

(j)    Entire Agreement.  This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, promises, covenants, arrangements, or communications, whether oral or written, by any officer, employee, or representative of any party hereto with respect thereto.

(k)    Amendments.  No amendment hereto will be valid unless made in writing and signed by the parties hereto.

(l)    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be an original.  It shall not be necessary in making proof of the contents of this Agreement to produce or account for more than one such counterpart.

(m)    Severability.  If any provision of this Agreement is found to be unenforceable, the balance of this Agreement shall continue to be in full force and effect.

(n)    Force Majeure Event.  Neither party will be considered in default of its performance of any obligation hereunder (other than an obligation to make any payment due hereunder) to the extent that (i) performance of such obligation is prevented or delayed by acts of God; war (declared or undeclared); terrorism or other criminal conduct; fire; flood; sabotage; strikes, or labor or civil disturbances (other than contributed to by the affected party); governmental requests, restrictions, laws, regulations, orders; unavailability of, or delays in, utilities or transportation; embargoes, or unforeseen circumstances or any other similar or dissimilar events or causes beyond party's reasonable control, and (ii) only to the extent such event could not have been avoided or overcome through the exercise of commercially reasonable

efforts (each, a "**Force Majeure Event**"). If any Force Majeure Event does arise, occur, or result, the party subject thereto shall use commercially reasonable efforts to minimize the consequences of such event and to overcome such event as soon as reasonably possible. A party desiring to rely upon any Force Majeure Event as an excuse for failure, default, or delay in performance shall provide the other party with prompt written notice of the facts giving rise to said event when it arises, the commercially reasonable efforts taken by such party to overcome such event and of the cessation of said event when it ceases to exist.

      **11.    JOINDER BY SUMMIT AND UNCONDITIONAL GUARANTY**. Summit, being financially interested in Suppliers and as an inducement to BMI to enter into this Agreement, hereby joins this Agreement for the purposes of acknowledging and agreeing to the obligations and duties herein imposed on Suppliers and hereby unconditionally guarantees the prompt payment and performance of all obligations of Suppliers hereunder and likewise agrees to be responsible for any damages to which any Supplier may, at any time, be entitled by reason of a breach of such obligations. Summit further hereby agrees that BMI has full authority to make any changes, modifications and alterations in this Agreement which shall be agreeable to the Suppliers and that such changes, modifications and alterations will not relieve Summit from any responsibility hereunder. Summit also agrees that it shall not be released from the obligations of this Agreement, nor shall said obligations be diminished or otherwise affected by any extension of time or other indulgence granted to any Supplier, by release from liability of any other guarantor of this matters guaranteed hereunder or by any waiver with respect to the terms or conditions of the Agreement, or with respect to the performance and observance of any of the other obligations of any Supplier under this Agreement, it being the intent hereof that Summit shall, at all times, be and remain liable to BMI to the same extent as if the Guarantor were jointly and severally liable with the Suppliers to BMI for the performance of all the obligations of Suppliers under this Agreement. Summit hereby waives (a) all notices of any kind whatsoever with respect to this Agreement and all other obligations of any Supplier to BMI relating to the Agreement, including but not limited to notice of the acceptance of this guaranty and reliance thereon, of any default under this Agreement of presentment, of protest, of demand, of notice of non-payment, of notice of dishonor, and notice of protest; (b) the right to require, and the benefit of any law which may require, the enforcement of any other rights before enforcing the liability of Summit; (c) all defenses whatever to Summit's liability under this Section 11 except the defense of confirmed payment or confirmed performance; and (d) any and all claims to subrogation to the rights of BMI should Summit be required to make any payment or perform any obligation hereunder until all of the obligations of all Suppliers to BMI shall have been satisfied in full. Summit agrees that BMI may proceed against Summit directly and independently of any Supplier. Summit agrees to pay, in addition to all other sums due, all costs and expenses of enforcing the obligations of Suppliers and Summit under this Agreement, including a reasonable attorney's fee at the time of enforcement, should this Agreement be placed in the hands of an attorney for enforcement, or if enforced through bankruptcy, probate, or other judicial proceedings..

      **12.    MONROE PROJECT**. For the avoidance of doubt, notwithstanding anything herein to the contrary, the purchase and sale of Aggregates by Customer and Supplier, respectively, with respect to the construction of the Design-Build Monroe Connector/Bypass TIP R-3329/R-2553, generally described as US 74 near I-485 in Mecklenburg County to US 74 between the towns of Wingate and Marshville in Union County, N.C. shall be in all respects pursuant to and in accordance with that certain Monroe Bypass Aggregate Supply Agreement, dated as of June 9, 2014, among Buckhorn, CMG, Monroe Bypass Constructors, LLC, Boggs Paving, Inc. and Anderson Columbia Co., Inc.

*Signatures on Following Page*

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**IN WITNESS WHEREOF**, the parties hereto have caused this Aggregates Supply Agreement to be executed on the date indicated below, effective as of the date first above written.

**Buckhorn Materials, LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Vice President

Date: 06/09/14

**Construction Materials Group LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Manager

Date: 06/09/14

**Summit Materials, LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Executive Vice President

Date: 06/09/14

**Boggs Materials, Inc.**

By: _____

Name: _____

Title: _____

Date: _____

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**IN WITNESS WHEREOF,** the parties hereto have caused this Aggregates Supply Agreement to be executed on the date indicated below, effective as of the date first above written.

**Buckhorn Materials, LLC**

By:_____

Name:_____

Title:_____

Date: _____

**Construction Materials Group LLC**

By:_____

Name:_____

Title:_____

Date: _____

**Summit Materials, LLC**

By:_____

Name:_____

Title:_____

Date: _____

**Boggs Materials, Inc.**

By: _Carl A. Boggs III_____

Name: _CARL A. BOGGS, III_____

Title: _President_____

Date: _6-6-14_____

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## EXHIBIT A

### PURCHASE ORDERS

See attached.

ELECTRONICALLY FILED - 2022 ... CHESTERFIELD - COMMON PLEAS ... CASE#2022CP1300175

## Related Party Purchase Order Summary - Buckhorn Materials LLC

| Date | From: | To: | Order # | Project | Material | P/O Quantity (tons) | Delivered Quantity to Date (tons) | Remaining Tons to Deliver (tons) | FOB Material Price | Haul Price [1] | Total Unit Price | P/O Amount | Remaining Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27-Feb-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3278 | 175 Bramblewood Plantation Road | MBC | 6,200 | 5,785 | 415 | $7.00 | $7.25 | $14.25 | $88,350.00 | $5,913.xx |
| 30-Aug-12 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3302 | SC File # 29.130B | MBC | 500 | | 500 | $7.50 | $4.50 | $12.00 | $6,000.00 | $6,000.00 |
| | | | | | Class A&B Rip Rap | 35 | | 35 | $14.00 | $4.50 | $18.50 | $647.50 | $647.xx |
| | | | | | Clean Stone (#5) | 30 | | 30 | $11.50 | $4.50 | $16.00 | $480.00 | $480.xx |
| 22-Apr-03 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3364 | Idlewild Road Widening | #57 Stone | 100 | 18 | 82 | $14.00 | $7.80 | $21.80 | $2,180.00 | $1,787.xx |
| | | | | | ABC | 200 | 75 | 125 | $8.00 | $5.00 | $13.00 | $2,600.00 | $1,625.xx |
| | | | | | Ballast | 60 | | 60 | $15.00 | $10.80 | $25.80 | $1,554.00 | $1,554.xx |
| | | | | | Pit Gravel | 986 | | 986 | $4.50 | $7.80 | $12.30 | $12,127.80 | $12,127.xx |
| | | | | | #57 Stone | 23 | 146 | | $14.00 | $7.80 | $21.80 | $501.40 | $0.xx |
| 31-Jul-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3370 | SC File # 29.130B, FAP No. 5a29(001) | Class A&B Rip Rap | 500 | 40 | 460 | $14.00 | $10.90 | $24.90 | $12,450.00 | $11,454.xx |
| | | | | | ASB | 200 | 4,032 | | $50.50 | Hourly | TBD | TBD | |
| | | | | | ABC | 80 | 13 | 67 | $8.00 | $8.00 | $16.00 | $1,280.00 | $1,072.xx |
| | | | | | Class B Rip Rap | 44 | 13 | 31 | $15.00 | $7.50 | $22.50 | $990.00 | $697.xx |
| | | | | | Ballast | 70 | | 70 | $15.00 | $4.50 | $19.50 | $1,365.00 | $1,365.xx |
| 22-Oct-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3376 | SC File # 46.042287, FAP No. MR13 (154) | MBC | 20 | | 20 | $7.50 | $10.00 | $17.50 | $350.00 | $350.xx |
| 9-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3381 | SC File # 28.04187, Etc. DT12(004) | MBC | 20 | | 20 | $7.50 | $8.75 | $16.25 | $325.00 | $325.xx |
| | | | | | #89 | 300 | 359 | | $12.00 | $7.80 | $19.80 | $5,940.00 | $0.xx |
| 18-Sep-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3385 | 2013 Road Paving Program #1104-5 | Rip Rap | 50 | 200 | | $14.00 | $9.60 | $23.60 | $1,180.00 | $0.xx |
| | | | | | #57 | 70 | 395 | | $10.00 | $5.15 | $15.15 | $1,060.50 | $0.xx |
| | | | | | #89 | 450 | 577 | | $12.00 | $5.50 | $17.50 | $7,875.00 | $0.xx |
| | | | | | #6 | 20 | 107 | | $11.00 | $5.25 | $16.25 | $325.00 | $0.xx |
| | | | | | MBC | 1,400 | 1,281 | 119 | $8.00 | $6.50 | $14.50 | $20,300.00 | $1,725.xx |
| 30-Oct-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3385 | 2013 Road Paving Program #1104-5 | Pit Gravel / Processed Fines | 100 | 446 | | $3.50 | $5.15 | $8.65 | $865.00 | $0.xx |
| 1-Aug-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3388 | SC File # 29.042358, St. Proj No. C-42358 | #89 | 186 | 232 | | $12.00 | $8.00 | $20.00 | $3,720.00 | $0.xx |
| 16-Jun-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3404 | Wal-Mart #4148 | #5 | 87 | 936 | | $11.00 | $8.75 | $19.75 | $1,718.25 | $0.xx |
| | | | | | Class B Rip Rap | 10 | 82 | | $14.00 | $11.00 | $25.00 | $250.00 | $0.xx |
| | | | | | Screenings (Sand) | 252 | 175 | 77 | $7.00 | $8.75 | $15.75 | $3,969.00 | $1,212.xx |
| | | | | | Coarse Screenings | 2,268 | 151 | 2,117 | $7.00 | $8.75 | $15.75 | $35,721.00 | $33,342.xx |
| | | | | | Concrete Sand | 2,205 | | 2,205 | $7.50 | $8.75 | $16.25 | $35,831.25 | $35,831.xx |
| | | | | | Screenings (Sand) | 79 | | 79 | $7.00 | $8.75 | $15.75 | $1,244.25 | $1,244.xx |
| 3-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3407 | SC File # 12.10.404 Etc. | #89M | 600 | | 600 | $12.00 | $7.85 | $19.85 | $9,510.00 | $9,510.xx |
| | | | | | Rip Rap | 100 | | 100 | $14.00 | $7.00 | $21.00 | $2,100.00 | $2,100.xx |
| 1-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3413 | SC File # 29.042819 | #89M | 150 | | 150 | $12.00 | $5.00 | $17.00 | $2,550.00 | $2,550.xx |
| 28-Feb-14 | Buckhorn Materials, Inc. / KMD Construction | Boggs Paving, Inc. / KMD Construction | 3416 | Wal-Mart #4148 | #57 | TBD | | n/a | $11.00 | $8.75 | $19.75 | n/a | n/a |
| 28-Feb-14 | Buckhorn Materials, Inc. / KMD Construction | Boggs Paving, Inc. / KMD Construction | 3416 | Wal-Mart #4148 | Quarry Overburden | TBD | | n/a | $1.00 | $9.00 | $10.00 | n/a | n/a |
| **Subtotal: Non-JV Intercompany Purchase Orders** | | | | | | 17,395 | 15,053 | 8,348 | | | $15.92 | $265,359.95 | $132,916.xx |
| 2-Jun-14 | Buckhorn Materials, Inc. | Boggs Paving, Inc. | 3400 | SC File 932.03B170 - I-26 Design Build Project | #5 | 78 | | 78 | $12.50 | $7.50 | $20.00 | $1,560.00 | $1,560.xx |
| | | | | | #6 | 24,798 | | 24,798 | $12.50 | $7.50 | $20.00 | $495,960.00 | $495,960.xx |
| | | | | | #7 | 72,485 | | 72,485 | $12.50 | $7.50 | $20.00 | $1,449,700.00 | $1,449,700.xx |
| | | | | | #89 | 62,195 | | 62,195 | $13.00 | $7.50 | $20.50 | $1,274,997.50 | $1,274,997.xx |
| | | | | | Coarse Screenings | 50,605 | | 50,605 | $8.00 | $7.50 | $15.50 | $784,377.50 | $784,377.xx |
| | | | | | Washed Screenings | 10,000 | | 10,000 | $8.00 | $7.50 | $15.50 | $155,000.00 | $155,000.xx |
| | | | | | Fine Screenings | As Needed | | n/a | $4.00 | $7.50 | $11.50 | n/a | n/a |
| **Subtotal: I-26 Project** | | | | | | 220,161 | | 220,161 | | | $18.90 | $4,161,595.00 | $4,161,595.xx |
| **Total Buckhorn Materials, LLC (Excluding Monroe Bypass)** | | | | | | 237,556 | 15,053 | 228,509 | | | $18.64 | $4,426,954.95 | $4,294,510.xx |

1. All material FOB to jobsite, therefore stated haul prices are representative of estimated cost. Actual cost is currently passed through to Boggs Paving as incurred without mark-up.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**Related Party Purchase Order Summary - Construction Materials Group, LLC**

| Date | From: | To | Order # | Project | Material | P/O Quantity (tons) | Delivered Quantity to Date (tons) | Remainin g Tons to Deliver | FOB Material Price | Haul Price in | Total Unit Price | P/O Amount | Remaining Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6-May-13 | Construction Materials Group, LLC | Boggs Paving, Inc. | B-3300 | CMC Union Women's Center | Fill Sand | 4,000 | - | 4,000 | $3.50 | $5.30 | $8.80 | $35,200.00 | $35,200.00 |
| 1-Jul-13 | Construction Materials Group, LLC | Boggs Paving, Inc. | 3370 | SC File 29.1088, FAP No. SA29(031) | Sand | 441 | - | 441 | $3.00 | $8.50 | $11.50 | $5,071.50 | $5,071.50 |
| **Total Construction Materials Group, LLC** | | | | | | **4,441** | **-** | **4,441** | **—** | **—** | **$9.07** | **$40,271.50** | **$40,271.50** |

1. All material FOB to jobsite, therefore stated haul prices are representative of estimated cost. Actual cost is currently passed through to Boggs Paving as incurred without mark-up.

## EXHIBIT B

### AGGREGATES PRODUCTS AND SPECIFICATIONS

| | | | | |
|---|---|---|---|---|
| 0 - 5% | 0 - 15% | 25-45% | 90 - 100% | |
| | 0-5% | 0-10% | 15 - 35% | 90 - 100% |
| | | 0-5% | 0 - 10% | 45 - 65% |
| | | | 0 - 5% | 15 - 35% |
| | | | | 10 - 25% |
| | | | | 8 - 15% |
| | | | | 5 - 10% |
| 0 - .6% | 0 - .6% | 0 - .6% | 0 - 1% | 3 - 6% |

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit 2

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**Boggs Materials, Inc.**
**P.O. Box 1609**
**Monroe, NC 28111-1609**

April 16, 2021

Buckhorn Materials LLC
3410 Hwy 601 South
Jefferson, SC 29718
Attn: Richard Moses
Facsimile No.: 843-672-3579

Hinkle Contracting Company, LLC
P.O. Box 200
395 North Middletown Road
Paris, Kentucky 40362-0200
Attention: Thomas Hinkle, Steve Hullett, Warren Hawkridge
Facsimile No.: (859) 987-0727

Summit Materials, LLC
3550 Wynkoop, 3rd Floor
Denver, CO 80202
Attn: Thomas Hill, Anne Benedict
Facsimile No.: (303) 893-6993

*[BMI understands that many, if not all, of the individuals listed above who were named to receive notices in the referenced supply agreement are no longer with the companies; therefore, I am emailing this notice to known contacts who are employed by Summit at this time]:*

*Via Email to:*   *Bart Boyd:*       *bart.boyd@georgiastoneproducts.com*
                *Ab Boxley:*       *ab.boxley@boxley.com*
                *Anne Noonan:*   *anne.noonan@summit-materials.com*

**Re:   Aggregates Supply Agreement between Boggs Materials, Inc., Buckhorn Materials, LLC and Summit Materials, LLC, dated June 9, 2014**

Dear Bart/Ab/Anne:

In accordance with the above referenced Aggregates Supply Agreement, Paragraph 10(a) Notices, Boggs Materials, Inc. (BMI) is hereby notifying Buckhorn/Summit of the following breaches to the agreement, and is requesting that the following breaches be cured by immediate actions:

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

1. **Paragraph 3 SALE AND PURCHASE OF AGGREGATES**
   a. 3(c) <u>Delivery</u>: "Supplier will inspect and test the Aggregates prior to delivery to ensure they comply with the Specifications."
   b. 3(d) <u>Aggregate Availability</u>: "Supplier shall maintain sufficient manufacturing capabilities to supply Aggregates to Company….." and "Time is of the essence with respect to deliveries, and Company may suffer financial loss if Supplier fails to maintain a service level ensuring that Aggregates are timely delivered by Supplier to Company.

2. **Paragraph 6 WARRANTY**
   a. 6(b)(ii) "All Aggregates sold to Company Asphalt Plants for use in asphalt shall be produced unwashed and sized according to the ranges specified on Exhibit B and all other requirements outlined in the applicable DOT's respective codes and specifications for road based materials, with the exception of gradation;"
   b. 6(b)(iv) All Aggregates shall (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the "Specifications").

BMI views these issues as breaches and noncompliance with material provisions of the Aggregates Supply Agreement referenced herein, and is therefore notifying Buckhorn/Summit as such in accordance with the Agreement. BMI demands that Buckhorn/Summit take immediate corrective action and take all good faith, commercially reasonable efforts to correct these material breaches in order to mitigate further financial damages to BMI. BMI is and will continue to suffer material financial damages which could rise to consequential damages if these defaults are not cured without further delay.

As a reminder, BMI has been in constant contact with Buckhorn/Summit local staff over the past year and has communicated many of these and other concerns, which always seem to 'fall on deaf ears'. These issues have progressively grown worse instead of better. BMI sincerely desires to meet with Senior Level Executive Management of Summit Materials in order to receive assurances that Summit takes these issues seriously and will take any and all necessary steps to to correct these issues. Please accept this letter as a notice to cure and TIME IS OF THE ESSENCE.

Please contact me via mobile phone number (843) 855-0274 to schedule a time that we can meet to discuss these most important issues.

Sincerely,

BOGGS MATERIALS, INC.

*Drew Boggs*

Drew Boggs

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

STATE OF SOUTH CAROLINA
COUNTY OF CHESTERFIELD

IN THE COURT OF COMMON PLEAS
FOURTH JUDICIAL CIRCUIT
Case No.: 2022-CP-_____

BOGGS MATERIALS, INC., BOGGS
CONTRACTING, INC., and LYNCHES
RIVER CONTRACTING, INC.,

        Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN
MATERIALS COMPANY, LLC; and
GEORGIA STONE PRODUCTS, LLC,

        Defendants.

**AFFIDAVIT OF DUSTIN T. GREENE**

COMES NOW the affiant Dustin T. Greene, Esq., and states as follows:

1.    The facts set forth in this affidavit are made upon personal knowledge or when indicated upon information and belief.

2.    I am over eighteen (18) years of age and am competent to testify to the matters stated herein.

3.    I am a duly licensed attorney in the state of North Carolina.

4.    Attached hereto as **Exhibits 1-5** are true and accurate copies of correspondence sent to and received from Defendants and their counsel.

Further Affiant Sayeth Naught.

[Signature on Separate Page]

Executed on March 4, 2022

Dustin T. Greene

North Carolina
Forsyth County

I, a Notary Public for said County and State, hereby certify that Dustin T. Greene personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this the ___4ᵗʰ___ day of March, 2022

Notary Signature

Richard H. Reich
Notary Printed Name

My commission expires: February 11, 2027

RICHARD H. REICH
Notary Public
Forsyth County, NC
My Commission Expires February 11, 2027

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit 1



**KILPATRICK**
**TOWNSEND**
ATTORNEYS AT LAW

KILPATRICK TOWNSEND & STOCKTON LLP
www.kilpatricktownsend.com

1001 West Fourth Street
Winston-Salem, NC 27101-2400
t 336 607 7300  f 336 607 7500

January 18, 2022

direct dial 336 607 7432
direct fax 336 734 2612
dgreene@kilpatricktownsend.com

*Via Email and Federal Express Overnight Delivery*

Buckhorn Materials, LLC
3410 Hwy 601 South
Jefferson, SC 29718
Attn: Richard Moses

Construction Materials Group LLC
1357 Eddie Horton Rd.
Mt. Croghan, SC 29727
Attn: Richard Moses

Hinkle Contracting Company, LLC
395 North Middletown Rd.
Paris, KY 40362-0200
Attn: Thomas Hinkle, Steve Hullett, Warren Hawkridge

Summit Materials, LLC
3550 Wynkoop
3rd Floor
Denver, CO 80202
Attn: Thomas Hill, Anne Benedict

Georgia Stone Products
Attn: Bart Boyd
4870 Leland Dr.
Cumming, GA 30041
Bart.Boyd@georgiastoneproducts.com

      Re:    Notice of Default and Demand for Assurances of Performance under Aggregate
            Supply Agreement

Dear Mr. Moses, Mr. Hinkle, Mr. Hullett, Mr. Hawkridge, Mr. Hill, Ms. Benedict, and Mr.
Boyd,

      This firm represents Boggs Materials, Inc. and its affiliates. This letter serves as follow up
to Drew Boggs's April 16, 2021 letter regarding Buckhorn's breaches of the Aggregates Supply

US2008 19522541 2

ANCHORAGE ATLANTA AUGUSTA BEIJING CHARLOTTE DALLAS DENVER HOUSTON LOS ANGELES NEW YORK RALEIGH SAN DIEGO
SAN FRANCISCO SEATTLE SHANGHAI SILICON VALLEY STOCKHOLM TOKYO WALNUT CREEK WASHINGTON WINSTON-SALEM

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

January 18, 2022
Page 2

Agreement ("the Agreement") dated June 9, 2014, with respect to the operation of the Lynches River Quarry ("Quarry"), and also provides a projection for the 2022 Aggregate needs of Boggs Materials, Inc. ("BMI") in order to avoid further breaches of the Agreement by the Suppliers and their affiliates. A copy of the Agreement is enclosed for your reference.

First, as conveyed in the April 16, 2021 letter to Buckhorn Materials, LLC, Hinkle Contracting Company, LLC, and Summit Materials, LLC (collectively, "the Suppliers"[1]) (letter enclosed herewith), Buckhorn and the Suppliers have been and continue to be in breach of the Agreement for failure to supply Aggregates[2] in the quantities, quality and timeliness required by BMI pursuant to the terms of the Agreement. Section 3(a) of the Agreement requires the Suppliers to supply "the quantities and specifications of Aggregates that [BMI] may specify in written purchase orders delivered to Supplier." Suppliers have repeatedly and consistently breached this provision by failing to fill BMI purchase orders over the last year. As recently as this week, Suppliers and their affiliate Georgia Stone informed Chuck Steele of BMI that they did not have stone to fill BMI's purchase orders for current projects. BMI has been forced to purchase Aggregates from other suppliers at significantly increased costs, and Suppliers are liable for those and other damages incurred by BMI and its affiliates for Suppliers' breaches of the Agreement.

Georgia Stone has further breached the Agreement by violating Section 6(b)(ii), which requires Suppliers to provide BMI Aggregates "for use in asphalt [to] be produced unwashed and sized according to the ranges specified on Exhibit B" of the Agreement, and Section 6(b)(iv), which requires "[a]ll Aggregates [to] (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the 'Specifications')." And, Georgia Stone recently communicated that it intends to cease complying with the Agreement's requirement that it supply unwashed Aggregates.

Specifically, Suppliers have repeatedly supplied Aggregates that do not comply with purchase orders and the Specifications. Enclosed herewith is a spreadsheet showing the results of BMI's testing of Aggregates from Suppliers for Specification compliance. As you can see, Suppliers' Aggregates fail to comply more than 96% of the time. At the formation and execution of the Agreement, Suppliers understood and agreed that a primary and significant inducement to BMI to enter into the Agreement was BMI's own aggregate needs to fulfill its own contractual obligations to its customers, including certain state DOT contracts. Those DOT contracts include aggregate specifications BMI must meet and that were expressly referenced in the Agreement. Suppliers' repeated and pervasive non-compliance and failures have caused and continue to cause significant financial harm and serious detrimental impacts on BMI's ability to meets its own contractual requirements.

---

[1] We understand that the Quarry is currently being operated to Georgia Stone Supply ("Georgia Stone"), which is another Summit subsidiary. Under Section 10(e) of the Agreement Georgia Stone and the other Suppliers are bound by the Agreement and jointly responsible for breaches thereof.
[2] Capitalized terms used herein have the meaning assigned to them in the Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

January 18, 2022
Page 3

Additionally, Georgia Stone has informed BMI that it will only be providing washed Aggregates and has begun to supply washed instead of unwashed Aggregates in response to BMI's purchase orders. This is unacceptable as washed Aggregates significantly increase BMI's cost to produce asphalt due to increased moisture content and since it is a different material than the 'Course Screenings' us of this material requires all new Asphalt Mix Designs at a significant cost. The Agreement is explicit that Suppliers are to meet BMI's purchase orders by providing unwashed Aggregates, and BMI expects Suppliers, including Georgia Stone to comply with the Agreement.

As noted, these numerous failures have caused, and continue to cause, BMI and its affiliates significant damages. BMI and its affiliates reserve all rights with respect to these breaches, including, but not limited to, the remedies outlined in Section 6(c) of the Agreement. In an effort to avoid further breaches of the Agreement and mitigate its damages, and without waiving any of its rights to recover for damages already incurred as a result of Suppliers' breaches, BMI hereby requests that Suppliers provide assurances in writing that Suppliers will provide BMI Aggregates in response to its purchase orders that comply with the Agreement's requirements, and that all Aggregates from the Quarry will be made available to BMI and its affiliates on a **first priority** basis as required by Section 3(d) of the Agreement.

To facilitate Suppliers' compliance with the Agreement, enclosed herewith is BMI's 2022 Aggregate Needs & Schedule. Pursuant to Section 3(b) of the Agreement, Buckhorn and its Suppliers "shall accept and fulfill each and every [BMI] Purchase Order provided that such Purchase Order is provided by [BMI] within a commercially reasonable notice period." Further, Section 3(d) of the Agreement requires Buckhorn and its Suppliers to "maintain sufficient manufacturing capabilities to supply Aggregates to [BMI] in accordance with Purchase Orders." In addition to the quantities and timing provided under the 2022 Schedule, all Aggregates supplied for use in asphalt "shall be produced unwashed and sized according to the ranges specified" in the Agreement, pursuant to Section 6(b)(ii) of the Agreement. Failure to supply Aggregates in the quantities, quality and timeliness of the proposed 2022 Aggregate Needs & Schedule, and in accordance with the specifications in Sections 6(b)(i)-(iii) of the Agreement, will constitute further events of default under Section 8 of the Agreement.

Please provide your written assurances that you will be able to comply with the quantities, specifications, and timing provided under the 2022 Aggregate Needs & Schedule no later than 5:00 pm on January 21, 2022. BMI is specifically concerned about the availability of 6 stone, 7 stone, and 89's, following correspondence with Georgia Stone on January 12, 2022, in which Georgia Stone conveyed a shortage of these Aggregates. BMI seeks assurances that Suppliers are able to fulfill its 2022 Aggregate Needs and comply with its 2022 Schedule, including, but not limited to, the ability to provide 6 stone, 7 stone, and 89's to BMI.

The above breaches of the Agreement are material and constitute events of default pursuant to section 8(b) of the Agreement. BMI gave formal notice of these breaches in its April 16, 2021 letter, but Suppliers failed to cure those breaches, and, in fact, have continued to commit material breaches of the Agreement. This letter is further notice that BMI considers Suppliers to be in

January 18, 2022
Page 4

default if the above breaches are not promptly and fully cured. BMI reserves all rights under the
Agreement.

Sincerely,

Dustin T. Greene

DTG:kef
Encl.
cc:    Gibson, Dunn & Crutcher
        200 Park Ave.
        New York, NY 10166-0193
        Attn: Steven R. Shoemate

        Drew Boggs

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Execution Version

# BOGGS MATERIALS, INC.
## AGGREGATES SUPPLY AGREEMENT

THIS AGGREGATES SUPPLY AGREEMENT (this "**Agreement**") is dated as of June 9, 2014 (the "**Effective Date**"), by and among (i) **BUCKHORN MATERIALS, LLC**, a South Carolina limited liability company, with offices at 3410 Hwy 601 South, Jefferson, SC 29718 ("**Buckhorn**"), **CONSTRUCTION MATERIALS GROUP LLC**, a North Carolina limited liability company, with offices at 1357 Eddie Horton Road, Mt. Croghan, SC 29727 ("**CMG**", and together with Buckhorn, each a "**Supplier**" and collectively the "**Suppliers**") and **SUMMIT MATERIALS, LLC**, a Delaware limited liability company ("**Summit**"), and (ii) **BOGGS MATERIALS, INC.**, a North Carolina corporation, with offices at 1613 W. Roosevelt Blvd, Monroe, NC 28110 ("**BMI**").

## RECITALS

A.      BMI is engaged in the business of the manufacturing, sale and application of construction materials, including cold mix asphalt, warm mix asphalt and hot mix asphalt, recycled crushed concrete and construction aggregates.

B.      Buckhorn is engaged in the business of mining, producing and selling aggregate materials from the Lynches River Quarry located at 3410 Hwy 601 South, Jefferson, SC 29718 and surrounding properties leased by Buckhorn under the Lynches River Lease, as defined below (the "**Lynches River Quarry**"), and CMG is engaged in the business of mining, producing and selling aggregate materials from the Black Creek Sand Mine located at 1357 Eddie Horton Road, Mt. Croghan, SC 29727 (the "**Black Creek Sand Mine**" and together with the Lynches River Quarry, the "**Supplier Quarries**").

C.      Hinkle Contracting Company, LLC, a Kentucky limited liability company ("**Hinkle**"), is a wholly-owned subsidiary of Summit.

D.      BMI, A Mining Group, LLC, a Florida limited liability company ("**AMG**"), Hinkle and certain other parties thereto have entered into as of the date hereof a Membership Interest Purchase Agreement (the "**Buckhorn MIPA**"), pursuant to which Hinkle acquired ownership of Buckhorn, and Hinkle and certain other parties thereto have entered into as of the date hereof a Membership Interest Purchase Agreement (the "**CMG MIPA**" and together with the Buckhorn MIPA, the "**Membership Interest Purchase Agreements**"), pursuant to which Hinkle acquired ownership of CMG.

E.      Pursuant to the terms of the Membership Interest Purchase Agreements and as additional consideration for the purchase and sale of the membership interests of Suppliers thereunder, the Suppliers have agreed to sell Aggregates to BMI, and BMI has agreed to purchase Aggregates from Suppliers, on and subject to the terms and conditions of this Agreement.

F.      The execution and delivery of this Agreement by BMI and Suppliers are conditions precedent to and form an essential part of the transactions consummated in the Membership Interest Purchase Agreements. The parties acknowledge and agree that BMI was only willing to enter into and perform under the Membership Interest Purchase Agreements based on the commitments of Suppliers under this Agreement and that the Suppliers and Summit were only willing to enter into and perform under the Membership Interest Purchase Agreements based on the commitments of BMI under this Agreement.

G.      On the date hereof and also as a condition precedent to the consummation of the transactions under the Membership Interest Purchase Agreements, Affiliates of BMI are entering into that certain Mining Lease Agreement to lease mining rights to the Lynches River Quarry and related

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP130017S

properties to Buckhorn (the "**Lynches River Lease**") and that certain Mining Lease Agreement to lease mining rights to the Black Creek Sand Mine to CMG (the "**Black Creek Sand Mine Lease**" and together with the Lynches River Lease, the "**Mining Leases**").

### AGREEMENTS

NOW, THEREFORE, in consideration of the Membership Interest Purchase Agreements, the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, hereby agree as follows:

    **1.**    **DEFINITIONS.** For purposes of this Agreement:

"**Affiliate**" when used with respect to any Person, means (i) if such Person is a corporation, any officer or director thereof and any Person which is, directly or indirectly, the beneficial owner (by itself or as part of any group) of more than fifty percent (50%) of any class of any equity security (within the meaning of the Securities Exchange Act, as amended) thereof, and, if such beneficial owner is a partnership, any partner thereof, or if such beneficial owner is a corporation, any Person controlling, controlled by or under common control with such beneficial owner, or any officer or director of any such beneficial owner or of any corporation occupying any such control relationship, (ii) if such Person is a partnership, any partner thereof, and (iii) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person. For purposes of this definition, "control" (including the correlative terms "controlling," "controlled by" and "under common control with"), with respect to any Person, shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by agreement or otherwise.

"**Aggregates**" means Sand Aggregates and Stone Aggregates.

"**Applicable Law**" means all provisions of any constitution, statute, law, rule, regulation, decision, order, decree, judgment, ruling, release, license, permit, stipulation, or other official pronouncement enacted, promulgated, or issued by any governmental authority, court of competent jurisdiction or arbitrator or arbitration panel.

"**Asphalt Plants**" means any and all asphalt plants owned or operated by any of BMI or its Affiliates, as such asphalt plants may be altered, modified, reconditioned or expanded, and any asphalt plants, in replacement thereof, including without limitation, the BMI asphalt plants located at Lugoff, SC, Lynches River, SC, Mullins, SC, Monroe, NC and Rock Hill, SC.

"**Bona Fide Market Price**" means a market price that is offered by a third-party source regularly engaged in the business of selling Aggregates in the applicable local market in which Company desires to purchase Aggregates and capable of supplying the quantities and qualities of Aggregates desired by the Company. A Bona Fide Market Price must be verifiable in a manner mutually agreed to by Supplier and Company (*e.g.* copy of paid invoice or purchase order between Company and such third party), such agreement not to be unreasonably withheld.

"**Company**" means BMI or any Affiliate of BMI that purchases Aggregates pursuant to this Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:28 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

"**Person**" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity (or any department, agency, or political subdivision thereof) or any other entity.

"**Sand Aggregates**" means sand, coarse and fine, meeting the requirements of the Departments of Transportation of the states of North Carolina and South Carolina.

"**Stone Aggregates**" means those granite and lime stone products (but excluding recycled crushed concrete), meeting the requirements of the Departments of Transportation of the states of North Carolina and South Carolina.

      **2.**    **TERM**. The initial period of this Agreement will begin on the Effective Date and shall continue for a minimum of ten (10) years (the "**Initial Term**"), unless earlier terminated as provided herein; provided that such Initial Term shall automatically renew for successive one (1) year periods (each one (1) year extension a "**Renewal Term**" and the Initial Term and each Renewal Term collectively the "**Term**"), unless the Suppliers and BMI mutually agree not to renew this Agreement at least one (1) year prior to the end of the applicable Term; provided further, that this Agreement shall terminate (i) upon the expiration or termination of the Lynches River Lease (unless the basis for such termination is the acquisition of the Lynches River Quarry or the assumption of the lessor's interest in the Lynches River Lease by Supplier or its Affiliate) and (ii) solely with respect to CMG's supply of Aggregates under this Agreement, upon the expiration or termination of the Black Creek Sand Mine Lease (unless the basis for such termination is the acquisition of the Black Creek Sand Mine or the assumption of the lessor's interest in the Black Creek Sand Mine by Supplier or its Affiliate).

      **3.**    **SALE AND PURCHASE OF AGGREGATES**.

      (a)    Purchase Orders. During the Term, Company may order and Supplier shall, subject to the terms hereof, supply, the quantities and specifications of Aggregates that Company may specify in written purchase orders delivered to Supplier (each a "**Purchase Order**"). In the event of any conflict between the terms and conditions of this Agreement and those in Company's Purchase Order, the terms and conditions of this Agreement will govern; *provided, however*, if any terms in Company's Purchase Order are in addition to, but do not conflict with, the terms of this Agreement, then such additional terms will apply. A list of purchase orders submitted by Company to Supplier that are outstanding as of the date hereof, including the prices and volume by product and reference numbers relating to such purchase orders, is set forth on Exhibit A.

      (b)    Requirements. Subject to Supplier's ability to supply the Aggregates in the quantities, quality and timeliness required by Company at the prices under this Agreement and upon the other terms and conditions in this Agreement, including the Specifications (as defined below) (the "**Requirements Conditions**") and to the extent permitted by Applicable Law, Company agrees to purchase one hundred (100%) percent of BMI's and its Affiliates' requirements for Aggregates from Supplier during the Term. Upon receipt of each Purchase Order, Supplier shall make available and supply to Company the Aggregates according to the Requirements Conditions. If Supplier is unable to supply the Aggregates to fulfill a Purchase Order according to the Requirements Conditions, Supplier shall promptly notify Company and Company may rescind all or any part of its Purchase Order and may purchase Aggregates, of similar type or quantity, from another producer without cost or liability to Supplier. Without limiting Company's rights or remedies, if the purchase price paid by Company for Aggregates to such third party (including the delivered haul cost to Company's Asphalt Plant) exceeds the delivered purchase price provided herein, the excess of the amount actually paid by Company to the third party for such Aggregates (taking into account the delivered haul cost to Company's Asphalt Plant) over the amount that Company would have paid to Supplier for such Aggregates under this Agreement shall be paid by

Supplier to Company within 10 days after written notice from Company; provided, that the third party price for such Replacement Aggregates must be a Bona Fide Market Price. Except as set forth above, neither Company nor BMI is guaranteeing any specific quantities of Aggregates that Company may need from time to time during the Term and Company shall only become obligated to purchase Aggregates, and Supplier shall, subject to the terms hereof, only become committed to supply such Aggregates, upon Company's submission of a Purchase Order. For the avoidance of doubt, Supplier shall accept and fulfill each and every Company Purchase Order provided that such Purchase Order is provided by such Company within a commercially reasonable notice period for the production of the Aggregates required, consistent with past practices, and in quantities customarily ordered by such Company (or as otherwise may be commercially reasonable); provided, that, for the avoidance of doubt, Supplier reserves the right not to accept a Purchase Order during a Force Majeure Event. Except as otherwise expressly provided for in this Agreement, Company shall not purchase Aggregates from a third party source.

(c)     Delivery. Supplier will inspect and test the Aggregates prior to delivery to ensure they comply with the Specifications. Company shall purchase Sand Aggregates hereunder at the Black Creek Sand Mine and Stone Aggregates at the Lynches River Quarry, or such other locations as specified in the Purchase Order. Supplier will deliver, at times reasonably requested by Company to maximize availability of Company's trucks, the Aggregates into top loading industry standard trucks at its load-out facilities. Company is responsible for arranging and scheduling of suitable delivery vehicles to the delivery point and for their safe operation while at Supplier's facilities. All such vehicles must comply with all safety and operating rules and requirements imposed by Supplier for operations at its plants and provided to Company in advance. Deliveries will be considered "on time" and "timely" if the subject Aggregates are available and ready for top loading at the designated facility no later than the delivery date specified in the Purchase Order (the "**Delivery Date**"). Time is of the essence with respect to deliveries, and Company may suffer financial loss if Supplier fails to maintain a service level ensuring that Aggregates are timely delivered by Supplier to Company (i) within Supplier's applicable lead times and (ii) in proper condition (proper quality, quantity and type). Failure on the part of Supplier to fill Purchase Orders on a timely basis, or failure on the part of Company to accept the Aggregates, will give rise to any remedies provided by law or in equity, including the right to cancel such unfilled Purchase Orders.

(d)     Aggregate Availability. Supplier shall maintain sufficient manufacturing capabilities to supply Aggregates to Company in accordance with Purchase Orders that Company may issue from time to time, all in accordance with the terms of this Agreement. Supplier shall allocate any and all Aggregates to Company on a first priority basis with respect to any third party purchase order received by Supplier after receipt of a Company Purchase Order. In the event of a Force Majeure Event, Supplier shall assist Company in locating reliable alternate sources and suppliers of Aggregates to ensure a continued supply during such difficulties. If such difficulties obligate Company to purchase Replacement Aggregates from a third party, then solely with respect to Replacement Aggregates for unfilled Purchase Orders, Company may deduct any excess of the purchase price of such Replacement Aggregates over the prices provided for in this Agreement from future Supplier invoices (in each case taking into account the delivered haul cost to Company's Asphalt Plant); provided, that the third party price for such Replacement Aggregates must be a Bona Fide Market Price. For purposes hereof, "Replacement Aggregates" shall mean the complete quantity of Aggregates subject to the Purchase Order, regardless of whether Supplier is willing or able to partially fulfill such Purchase Order.

(e)     Calculations of Shipped Aggregates. The quantity of Aggregates delivered to Company each month ("**Shipped Aggregates**") will be determined by the weight tickets of shipped Aggregates at Supplier's truck scales located at the load-out point at its quarry, and Supplier will furnish such calculation, and a copy of such weight tickets, on or before the seventh (7th) business day following the Delivery Date. Supplier will be responsible, at its cost, for the maintenance and calibration of the scales

and will ensure such scales are calibrated and inspected by the Department of Agriculture on at least a semi-annual basis.

4.    **PURCHASE PRICE AND PAYMENT**.

(a)    Pricing. Prices of the Aggregates for Purchase Orders in place as of the Effective Date are set forth on Exhibit A. The purchase price of any Aggregates supplied pursuant to Section 3 shall be no greater than the lesser of (i) the prevailing best third party customer price per ton commensurate with such product and volume sold by Supplier, and (ii) the prevailing market price for such Aggregates. All prices shall be F.O.B. at the applicable Supplier Quarry or the other applicable supply location designated by Company.

(b)    Price Adjustments. The parties will meet on a calendar-quarter basis, or shall meet at the request of Company or Supplier, to review the prices for the Aggregates. In determining prevailing market prices for the Aggregates to be supplied to any Asphalt Plant, the Supplier shall take into account the delivered haul cost to such Asphalt Plant. Supplier acknowledges that competitive Aggregates pricing is necessary for BMI and its Affiliates to successfully bid and acquire asphalt volume, while BMI acknowledges that its asphalt mix sales, from which its Aggregates requirements are derived, drive a substantial portion of Supplier's total sales volume; as such, both parties agree to use all commercially reasonable efforts, including but not limited to job-specific pricing of Aggregates, to maximize the sale or purchase, as the case may be, of Aggregates for each party. During the first fifteen (15) years of the Term, any increase in the prices for Aggregates shall not exceed the greater of (i) (A) during the first five years of the Term, 4% per calendar year, (B) during the sixth through tenth years of the Term, 5% per calendar year and (C) during the eleventh through fifteenth years of the Term, 6% per calendar year, and (ii) the percentage change of Supplier's operating costs per ton (including all direct production and or selling costs incurred in the ordinary course of business by Buckhorn or CMG, as the case may be). All costs supporting the percentage changes pursuant to subsection 4(b)(ii) shall be included and allocated in accordance with generally accepted accounting principles applied consistently and subject to audit by Company if requested. For purposes of measuring such percentage changes, the baseline pricing as of the Effective Date will be the calendar year 2013 pricing between Supplier and Company applicable to Aggregate type and job type.

(c)    Price Warranty. Notwithstanding anything herein to the contrary, Supplier warrants that the prices for the Aggregates sold to Company hereunder (taking into account the delivered haul cost to each Asphalt Plant) are no less favorable than those prices Supplier is extending to any other customer (taking into account the delivered haul cost to such other customer's facility) for the same or similar products from the Supplier Quarries. If Supplier subsequently grants another customer pricing on terms more favorable than those being provided to Company at such time in violation of the foregoing warranty, Supplier shall notify Company and adjust the prices charged to Company accordingly (with such modified pricing to take effect as of the date such pricing was granted to the other customer). In addition, if another supplier offers Company more favorable pricing for aggregates similar to the Aggregates prior to Company's submission of a Purchase Order to Supplier, then Company must notify Supplier thereof and afford Supplier a reasonable opportunity to confirm such pricing and reconsider and amend its pricing to meet the lower pricing offered by the other supplier; provided, that such lower pricing must be a Bona Fide Market Price. If Supplier elects not to amend its pricing, Company is relieved of its requirement to purchase any quantity of Aggregates offered by Supplier at a price higher than such lower pricing and Company may then purchase such Aggregates from that third-party source at a price no higher than such lower pricing. If, at Company's request, Supplier quotes prices and quantities for Aggregates to Company in connection with Company's submission of a bid for a project (or has quoted such prices prior to the Effective Date), and Company uses (or used) such quote in a bid for a project and is awarded such bid, then (i) Supplier shall reserve availability of such Aggregates for Company, and (ii) Company shall

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

submit a Purchase Order to Supplier for the Aggregates subject to such quote to be used in such bid, and Supplier shall sell such Aggregates to Company at no higher than the price set forth in the quote.

(d)    Payment. Supplier shall invoice Company for the price of the Aggregates at the time of shipment or as otherwise mutually agreed. Company shall pay all conforming invoices in full within 45 days after the receipt of the invoice, except no invoices shall be paid unless title and risk of loss to the applicable Aggregates has passed to Company under Section 5(b). All nonconforming invoices shall be paid in full within 45 days of the date of final resolution.

(e)    Taxes. All prices for the Aggregates shall include sales, use, excise or similar taxes or duties based on the sale of the Aggregates (excluding such taxes or duties based on Supplier's gross receipts or business operations). If Supplier is required to collect any such taxes from Company, Supplier shall separately detail such taxes on the invoice to Company. If Company is required to pay such taxes under Applicable Law, Company will pay such invoiced amounts to Supplier, and upon receipt of same, Supplier shall be solely responsible for timely remitting such taxes to the proper taxing authority. Company reserves the right to pay such taxes directly to the proper taxing authority (and promptly informs Supplier of such), or provide Supplier with a valid tax exemption certificate.

(f)    Audit. Company has the right from time to time to have a third party audit Supplier's records to determine if Supplier is in compliance with the terms of this Agreement. If any audit discloses any overcharges or underpayments by Supplier, Supplier shall promptly make restitution to Company therefor, plus interest at the rate of 1.5% per month. If such restitution payments are greater than the cost of the audit, Supplier shall also be liable for the cost of the audit.

(g)    Financial Condition. At all times during the Term, each of Supplier and Company must satisfy the reasonable financial requirements established or modified by the other party. Upon reasonable request made by Supplier or Company during the term hereof, Company or Supplier, respectively, shall submit to Supplier or Company, respectively, within 30 days from the date of request sufficient financial information (on a confidential basis and only to the extent not publicly available) to demonstrate Company's or Supplier's respective compliance with such financial requirements.

## 5.    ACCEPTANCE; TITLE AND RISK OF LOSS.

(a)    Acceptance and Shortage Claims. All Aggregates shall be received subject to Company's inspection (which inspection shall not affect the warranties under this Agreement). Company may reject any delivery or cancel all or any part of any Purchase Order if Supplier fails to make delivery in conformity with the terms and conditions hereof or any Purchase Order. Company's acceptance of any non-conforming delivery will not constitute a waiver of its right to reject future deliveries. In the event that Company does not accept some or all Aggregates in a given shipment, at Company's option, (i) Supplier shall provide a comparable quality substitute (for which substitution Supplier must assume any expense and price differential) or (ii) if Supplier cannot provide such comparable quality substitute within 48 hours of notice from Company, Company may purchase Aggregates from another supplier as an alternate source as Company, in its sole discretion, deems necessary, in which case Supplier shall reimburse Company for any additional reasonable costs and expenses incurred by Company in purchasing Aggregates from such other supplier as an alternate source. At any time upon identification and notification of defective Aggregates or nonconforming shipments, Supplier shall, at Company's option and at Supplier's sole cost and expense, reimburse Company for any amounts paid or cure such defective Aggregates or nonconforming shipments. Payment for or passage of title to Aggregates shipped prior to Company's inspection will not constitute an acceptance thereof. Supplier shall correct shortages at no additional cost to Company.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

(b)     Risk of Loss.  Title and risk of loss of the Aggregates sold by Supplier and purchased by Company will pass to Company when the Aggregates are loaded into Company's carrier vehicles at the applicable Quarry or other supply location designated by Company.

## 6.     WARRANTY.

(a)     General.  Supplier represents and warrants to Company that (i) it has the requisite power, authority and authorization to enter into this Agreement and carry out the terms hereof, (ii) the execution, delivery and performance of this Agreement are not prohibited or impaired by any judgment or other agreement to which Supplier is a party or by which it is bound, (iii) Supplier is and at all times during the Term shall be in possession of all approvals, licenses and permits necessary to mine, manufacture, render, process, deliver and sell Aggregates; (v) Supplier has and will have the right to render, sell and deliver all Aggregates free and clear of all liens and encumbrances, and (vi) Supplier shall at all times comply with Applicable Laws.

(b)     Aggregates.  Supplier warrants good and marketable title with respect to the Aggregates sold by it to Company under this Agreement and further warrants that:

(i)     Aggregates will be free of debris and other physical contaminants, subject to general standards in the aggregates industry and as specified by the then-prevailing Department of Transportation of North or South Carolina (as applicable, the "**DOT**");

(ii)    All Aggregates sold to Company Asphalt Plants for use in asphalt shall be produced unwashed and sized according to the ranges specified on Exhibit B and all other requirements outlined in the applicable DOT's respective codes and specifications for road based materials, with the exception of gradation;

(iii)   Aggregates, other than those used in asphalt, sold as sized products for use on DOT projects, or any other projects requiring compliance with DOT specifications, shall conform to the governing DOT's standard specifications; and

(iv)    All Aggregates shall (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the "**Specifications**").

Supplier and Company acknowledge and agree that market demand, competitive cost and/or supply dynamics may require amendments to the definition of "Specifications" and the Supplier's warranties set forth in Section 6(b) which amendments shall be mutually agreed upon in writing by the parties.  Subject to the foregoing, Supplier reserves the right to replace, upgrade and modify its processing plant capabilities, and following the first fifteen (15) years of the Term, Supplier and Company shall mutually amend the definition of "Specifications" and the Supplier's warranties set forth in Section 6(b) as necessary to satisfy the requirements of both parties; *provided, that,* the definition of "Specifications" shall always include the specifications set forth in Section 6(b)(i), (iii) and (iv)(x) and Supplier's warranties under this Section 6(b) shall always include the warranty in Section 6(b)(i), (iii) and (iv)(x).

(c)     Company's Remedy.  If any Aggregates fail to meet the warranties set forth above, Company may elect, in addition to its other rights and remedies, at Supplier's expense to take one or more of the following actions:  (A) reject a portion of the, or the entire, shipment or lot, as Company deems appropriate, and return the same to Supplier at Supplier's expense; (B) cancel any outstanding portion of the Purchase Order; (C) elect that Supplier shall replace the nonconforming Aggregates with Aggregates that comply with the requirements of this Agreement, at Supplier's cost; (D) retain the Aggregates and

recover damages from the Supplier for breach of warranty; and (E) elect that Supplier shall refund any purchase price paid with respect thereto and all other amounts, including shipping and transport charges, incurred by Company for such nonconforming Aggregates. Supplier shall take any remedial action elected by Company under this Section.

(d)     Disclaimer. Without limiting the foregoing, and notwithstanding any other provision of this Agreement to the contrary, neither party will be liable for lost profits, lost revenues, lost opportunity costs, costs of financing, consequential, punitive, special, or incidental damages arising from Supplier's failure to deliver Aggregates required hereunder, or from the termination of this Agreement; provided, that the foregoing shall not apply to indemnification of third party claims, intentional or willful breaches or gross negligence.

**7.     TERMINATION**. In addition to any other rights it may have, each party shall have the right at its option to terminate this Agreement upon thirty (30) days written notice to the other party if an Event of Default has occurred with respect to the other party as described in Section 8 below. Upon expiration or any termination of this Agreement by either party as provided in this Section 7, all rights and obligations of the parties under this Agreement shall cease except any right or obligation which accrued prior to the effective date of such expiration or termination.

**8.     EVENTS OF DEFAULT**. The occurrence or existence of any one or more of the events or conditions described below shall constitute an **"Event of Default"** under the Agreement with respect to the defaulting or affected party:

(a)     Payment Default. The failure of a party to make any undisputed payments under this Agreement when due and such failure continues unremedied for fifteen (15) business days after notice of such breach or non-compliance from the non-defaulting party (except that the failure to make a payment or portion thereof that is the subject of a bona fide dispute being resolved pursuant to Section 10 will not constitute a default under this subsection until three (3) business days after resolution of such dispute resulting in a determination of the relevant payments owed); or

(b)     Other Default. (i) The breach of or noncompliance with a material provision of this Agreement (other than a payment default described in Section 8(a) above) which remains uncured within thirty (30) days after notice of such breach or noncompliance is given to the breaching or noncomplying party; *provided, however,* that if it is not practicable to correct the default within the thirty (30) day period and the defaulting party has commenced corrective action and is taking all good faith, commercially reasonable efforts to correct same, then such cure period will be extended for so long as it reasonably required to correct the default undertaking such good faith, commercially reasonable efforts, or (ii) a successive breach of or noncompliance with such material provision within twelve (12) months thereafter; or

(c)     Insolvency. By either party, upon written notice to the other party, if the other party becomes insolvent, fails to pay its debts as they come due or makes any assignment for the benefit of creditors or becomes subject to any federal or state receivership, liquidation or bankruptcy or insolvency case or proceeding (voluntary or involuntary), but if involuntary, only if such case or proceeding is not dismissed within 90 days from the date instituted.

**9.     EFFECT OF TERMINATION; REMEDIES**. Upon expiration or termination of this Agreement for any reason, at Company's option, Supplier shall complete all Purchase Orders submitted to Supplier by Company prior to the effective date of termination and Company shall pay for such orders upon acceptance of the Aggregates by Company, subject to any set-offs. Company may set off any damages, losses or expenses that Company incurs which arise out of or are connected to breach of this

Agreement from amounts owed to Supplier. Expiration or termination of this Agreement for any reason shall not affect any liabilities or obligations of either party that have accrued at the date of expiration or termination or which by their nature survive expiration or termination. Following the occurrence and during the continuance of an Event of Default, the non-defaulting party may terminate this Agreement as contemplated in Section 7 (in which event the parties shall only be liable for amounts due and owing as of the date of termination) or may pursue such other remedies as expressly provided herein or otherwise provided by law.

**10.    GENERAL PROVISIONS**.

(a)    Notices.  Any notice or other communication provided for hereunder shall be in writing and may be (i) served by personal delivery, (ii) made by facsimile transmission, or (iii) sent by overnight courier service (with all fees prepaid) to the receiving party as follows:

| | |
|---|---|
| If to BMI: | Boggs Materials, Inc.<br>P.O. Box 1609<br>Monroe, NC 28111<br>Attention: Drew Boggs<br>Facsimile: 866-554-3442 |
| *with a copy to:* | K&L Gates LLP<br>Hearst Tower, 47th Floor<br>214 North Tryon Street<br>Charlotte, North Carolina 28202<br>Attn: C. Chad Warpula, Esq.<br>Fax: 704-353-3210 |
| If to a Supplier: | Buckhorn Materials LLC<br>3410 Hwy 601 South<br>Jefferson, SC 29718<br>Attn: Richard Moses<br>Facsimile No.: _843-672-3579 |
| | Construction Materials Group LLC<br>1357 Eddie Horton Road<br>Mt. Croghan, SC 29727<br>Attn: Richard Moses<br>Facsimile No.: 843-672-3579 |
| | Hinkle Contracting Company, LLC<br>P.O. Box 200<br>395 North Middletown Road<br>Paris, Kentucky 40362-0200<br>Attention: Thomas Hinkle<br>            Steve Hullett<br>            Warren Hawkridge<br>Facsimile No.: (859) 987-0727 |
| | Summit Materials, LLC<br>3550 Wynkoop, 3rd Floor<br>Denver, CO 80202 |

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Attn: Thomas Hill
Anne Benedict
Facsimile No.: (303) 893-6993

*with a copy to:*      Gibson, Dunn & Crutcher
200 Park Avenue
New York, New York 10166-0193
Attention: Steven R. Shoemate
Facsimile No.: (212) 351-5316

Any such notice or communication shall be deemed to be given, if delivered in person, on the date delivered, if made by facsimile transmission, on the date transmitted, or, if sent by overnight courier service, on the date sent as evidenced by the bill of lading; and shall be deemed received, if delivered in person, on the date of personal delivery, if made by facsimile transmission, upon confirmation of receipt (including electronic confirmation), or if sent by overnight courier, on the first business day after the day sent. Any party sending a notice or other communication by facsimile transmission shall also send a hard copy of such notice or other communication by one of the other means of providing notice set forth in this Section 10(a). Any notice or other communication shall be given to such other representative or at such other address as a party to this Agreement may furnish to the other party pursuant to this Section 10(a).

(b)    Indemnification. Each party (the **"Indemnifying Party"**) shall indemnify, defend, and save the other party, its Affiliates, officers, and employees (the **"Indemnified Parties"**) harmless only from such claims, litigation, liabilities, and expenses that result from, arise out of, or are caused by the Indemnifying party's acts or omissions or the acts or omissions of the Indemnifying Party's affiliates, subcontractors or agents. The indemnification obligation of the Indemnifying Party under this Agreement shall extend only to the Indemnified Parties and no other person or entity. The obligations of indemnification shall survive termination or expiration of this Agreement.

(c)    Insurance. Each party (the **"Covenant Party"**) shall maintain (i) worker's compensation and employer's liability insurance to fully protect against loss from personal injury, including death, to any of its employees; and (ii) comprehensive automobile liability, general liability, and property damage insurance. All such insurance shall be written by insurers acceptable to the other Party, having minimum coverage of $2,000,000 combined single limit, on an "occurrence" basis and not on a "claims made" basis. All general liability policies shall provide minimum coverage of $2,000,000 per occurrence and provide a minimum aggregate limit of $3,000,000 per occurrence. All policies, except for worker's compensation policies, shall name the other Party as an additional insured with primary coverage (with any other third-party coverage provided for the other Party to be deemed as excess only) and shall indemnify, defend, and protect the other party from all claims, expenses, and liabilities related with any act or omission of the Covenant Party, its invitees, or any person performing work directly or indirectly on behalf of the Covenant Party. All insurance shall expressly provide that all rights of subrogation against the other Party are waived and that no amendment or cancellation of any policy shall be effective until 30 days' written notice to the other Party. Before entering onto the other party's property or premises, the Covenant Party shall furnish certificates satisfactory to the other party evidencing the required insurance.

(d)    Relationship. Each party hereto will act as an independent contractor, and nothing contained in or arising out of this Agreement will be construed to imply or create any joint venture, partnership, agency, or other relationship. The parties agree that no fiduciary relationship is created by this Agreement. No persons other than the parties hereto or their permitted assigns shall be deemed to have any interest under this Agreement.

(e)      Assignment.  No party may assign this Agreement or delegate any duties hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that, each party shall have the right to assign this Agreement to an Affiliate with the same or better ability to perform the obligations in all respects hereunder, without the prior written consent of the other parties.  No rights shall inure to the benefit of any assignee of any party hereto as to which the other parties' consent is required hereunder, unless such other parties have consented in writing to the assignment to such assignee.  A change of control of Supplier or BMI or Boggs Paving, Inc.  shall be deemed an assignment under this Agreement (other than a change of control of BMI, Boggs Paving, Inc. or Supplier occurring after compliance by such party with the terms of Section 10(f) below).  For the purposes of the foregoing, a "**change of control**" means any sale or transfer, by any person or persons directly or indirectly controlling the Supplier or Company, as applicable, on the date hereof, of such control to a person or persons not controlling the Supplier or Company, as applicable, on the date hereof, or any sale or transfer of all or a substantial portion of all of Supplier's or Company's, as applicable, business or assets, whether consummated pursuant to a voluntary or involuntary levy, sale, execution or other legal process, transfer, gift, assignment or sale in bankruptcy, insolvency or any compulsory procedure; provided, that, such sales or transfers shall not constitute a "change of control" if they are made to an Affiliate.  For purposes hereof, each of the following shall not be deemed an assignment under this Agreement: (i) any transfer of direct or indirect ownership in Supplier or Company resulting from an initial public offering of the stock of Supplier or Company, or any direct or indirect owner of Supplier or Company, on a national exchange in the United States of America, and (ii) if Supplier's or Company's, or any direct or indirect owner of Supplier's or Company's, stock is publicly traded on a national exchange in the United States of America, transfers of stock in Supplier or Company, or such direct or indirect owner of Supplier or Company, as applicable. No assignment will be valid unless the assignee shall execute and deliver to the other parties hereto an assumption agreement in form satisfactory to the other parties hereto, including an assumption by the assignee of all of the obligations of the assignor and the assignee's ratification of and agreement to be bound by all of the provisions of this Agreement. This Agreement shall be binding upon the parties hereto and their successors and assigns, and shall inure to the benefit of the parties hereto and their permitted successors and assigns.

(f)      Sale of Business.  If, at any time prior to the fifth (5th) anniversary of the Effective Date of this Agreement, Company (which shall, for the purposes of Section 10(f), be deemed to include Boggs Paving, Inc. and Boggs Transport, Inc.) or Supplier (including their respective successors and assigns, the "**ROFR Seller**") wishes to effect a sale of all or any part of its business or assets (other than sales of assets in the ordinary course of business), in the case of Company, to a third party with asphalt and/or paving operations in South Carolina or North Carolina (which shall include Affiliates of Company), and in the case of Supplier, to a third party with aggregates operations in South Carolina or North Carolina (but which shall not include Affiliates of Supplier) pursuant to a bona fide offer from an independent third party purchaser, then the ROFR Seller shall first deliver to Supplier or Company, as applicable (the "**ROFR Buyer**"), a notice of offer from such third party purchaser, which shall include (i) a description of the business or assets being offered (the "**Offered Assets**"), (ii) the name of the third party purchaser, (iii) the purchase price, all other material terms of the proposed sale and, if applicable, the negotiated purchase agreement between the ROFR Seller and the third party purchaser (the "**Third Party Agreement**") and (iv) an offer to sell the Offered Assets to the ROFR Buyer at the same price, upon the same material terms and, if applicable, in accordance with a purchase agreement substantially in the form of the Third Party Agreement.  The ROFR Buyer may deliver to the ROFR Seller an acceptance notice on or before the tenth (10th) business day after the ROFR Seller's delivery of the offer notice described above. The ROFR Buyer's acceptance of the ROFR Seller's offer shall be subject to the execution and delivery of a purchase and sale agreement in a form reasonably satisfactory to the ROFR Buyer and ROFR Seller and in accordance with the terms herein, which execution and delivery shall occur within sixty (60) days of the delivery of such acceptance notice; *provided, that*, if the notice of offer includes a

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Third Party Agreement, the ROFR Buyer's acceptance of the ROFR Seller's offer shall be subject to the execution and delivery of a purchase agreement substantially in the form of such Third Party Agreement, which execution and delivery shall occur within thirty (30) days of the delivery of such acceptance notice. If the ROFR Buyer fails to deliver an acceptance notice within the ten (10) day exercise period, the ROFR Seller may sell the Offered Assets upon the terms and conditions set forth in the offer notice. If a ROFR Seller, after complying with this Section 10(f), consummates a transaction with a third party purchaser by purchase, merger or otherwise, this Section 10(f) shall no longer apply to such ROFR Seller, the third party purchaser or the surviving entity, as applicable, following such transaction.

(g)    No Waiver; Remedies.  The failure by any party hereto to insist upon strict performance of any term or condition of this Agreement or failure or delay to exercise any right or remedy provided herein or by applicable law, or failure to notify properly the other party upon a breach, or the acceptance of or payments for any Aggregates hereunder will not release any party from any of the obligations of this Agreement and will not be deemed a waiver of any right of any party to insist upon strict performance hereof or any of its rights or remedies as to any prior or subsequent default hereunder.  Time shall be of the essence in the performance of this Agreement.  All remedies hereunder are cumulative and without limitation to any other rights or remedies available at law, in equity or otherwise.  Suppliers and Company specifically acknowledge and agree that failure to comply with the terms of this Agreement may result in irreparable harm to Company and its Affiliates and to Suppliers and its Affiliates, respectively, and that Company and Suppliers shall be entitled to specific performance to enforce each and every term and condition of, and obligation of Supplier and Company, respectively, under, this Agreement.

(h)    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of South Carolina, without regard to conflicts of laws principles.

(i)    Headings.  The headings in this Agreement are for convenience of reference only and will not limit or otherwise affect any of the terms hereof.

(j)    Entire Agreement.  This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, promises, covenants, arrangements, or communications, whether oral or written, by any officer, employee, or representative of any party hereto with respect thereto.

(k)    Amendments.  No amendment hereto will be valid unless made in writing and signed by the parties hereto.

(l)    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be an original.  It shall not be necessary in making proof of the contents of this Agreement to produce or account for more than one such counterpart.

(m)    Severability.  If any provision of this Agreement is found to be unenforceable, the balance of this Agreement shall continue to be in full force and effect.

(n)    Force Majeure Event.  Neither party will be considered in default of its performance of any obligation hereunder (other than an obligation to make any payment due hereunder) to the extent that (i) performance of such obligation is prevented or delayed by acts of God; war (declared or undeclared); terrorism or other criminal conduct; fire; flood; sabotage; strikes, or labor or civil disturbances (other than contributed to by the affected party); governmental requests, restrictions, laws, regulations, orders; unavailability of, or delays in, utilities or transportation; embargoes, or unforeseen circumstances or any other similar or dissimilar events or causes beyond party's reasonable control, and (ii) only to the extent such event could not have been avoided or overcome through the exercise of commercially reasonable

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

efforts (each, a "**Force Majeure Event**"). If any Force Majeure Event does arise, occur, or result, the party subject thereto shall use commercially reasonable efforts to minimize the consequences of such event and to overcome such event as soon as reasonably possible. A party desiring to rely upon any Force Majeure Event as an excuse for failure, default, or delay in performance shall provide the other party with prompt written notice of the facts giving rise to said event when it arises, the commercially reasonable efforts taken by such party to overcome such event and of the cessation of said event when it ceases to exist.

11.    **JOINDER BY SUMMIT AND UNCONDITIONAL GUARANTY**. Summit, being financially interested in Suppliers and as an inducement to BMI to enter into this Agreement, hereby joins this Agreement for the purposes of acknowledging and agreeing to the obligations and duties herein imposed on Suppliers and hereby unconditionally guarantees the prompt payment and performance of all obligations of Suppliers hereunder and likewise agrees to be responsible for any damages to which any Supplier may, at any time, be entitled by reason of a breach of such obligations. Summit further hereby agrees that BMI has full authority to make any changes, modifications and alterations in this Agreement which shall be agreeable to the Suppliers and that such changes, modifications and alterations will not relieve Summit from any responsibility hereunder. Summit also agrees that it shall not be released from the obligations of this Agreement, nor shall said obligations be diminished or otherwise affected by any extension of time or other indulgence granted to any Supplier, by release from liability of any other guarantor of this matters guaranteed hereunder or by any waiver with respect to the terms or conditions of the Agreement, or with respect to the performance and observance of any of the other obligations of any Supplier under this Agreement, it being the intent hereof that Summit shall, at all times, be and remain liable to BMI to the same extent as if the Guarantor were jointly and severally liable with the Suppliers to BMI for the performance of all the obligations of Suppliers under this Agreement. Summit hereby waives (a) all notices of any kind whatsoever with respect to this Agreement and all other obligations of any Supplier to BMI relating to the Agreement, including but not limited to notice of the acceptance of this guaranty and reliance thereon, of any default under this Agreement of presentment, of protest, of demand, of notice of non-payment, of notice of dishonor, and notice of protest; (b) the right to require, and the benefit of any law which may require, the enforcement of any other rights before enforcing the liability of Summit; (c) all defenses whatever to Summit's liability under this Section 11 except the defense of confirmed payment or confirmed performance; and (d) any and all claims to subrogation to the rights of BMI should Summit be required to make any payment or perform any obligation hereunder until all of the obligations of all Suppliers to BMI shall have been satisfied in full. Summit agrees that BMI may proceed against Summit directly and independently of any Supplier. Summit agrees to pay, in addition to all other sums due, all costs and expenses of enforcing the obligations of Suppliers and Summit under this Agreement, including a reasonable attorney's fee at the time of enforcement, should this Agreement be placed in the hands of an attorney for enforcement, or if enforced through bankruptcy, probate, or other judicial proceedings..

12.    **MONROE PROJECT**. For the avoidance of doubt, notwithstanding anything herein to the contrary, the purchase and sale of Aggregates by Customer and Supplier, respectively, with respect to the construction of the Design-Build Monroe Connector/Bypass TIP R-3329/R-2553, generally described as US 74 near I-485 in Mecklenburg County to US 74 between the towns of Wingate and Marshville in Union County, N.C. shall be in all respects pursuant to and in accordance with that certain Monroe Bypass Aggregate Supply Agreement, dated as of June 9, 2014, among Buckhorn, CMG, Monroe Bypass Constructors, LLC, Boggs Paving, Inc. and Anderson Columbia Co., Inc.

*Signatures on Following Page*

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**IN WITNESS WHEREOF**, the parties hereto have caused this Aggregates Supply Agreement to be executed on the date indicated below, effective as of the date first above written.

**Buckhorn Materials, LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Vice President

Date: 06/09/14

**Construction Materials Group LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Manager

Date: 06/09/14

**Summit Materials, LLC**

By: _Michael Brady_

Name: Michael Brady

Title: Executive Vice President

Date: 06/09/14

**Boggs Materials, Inc.**

By: _____

Name: _____

Title: _____

Date: _____

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**IN WITNESS WHEREOF,** the parties hereto have caused this Aggregates Supply Agreement to be executed on the date indicated below, effective as of the date first above written.

**Buckhorn Materials, LLC**

By:_____

Name:_____

Title:_____

Date: _____


**Construction Materials Group LLC**

By:_____

Name:_____

Title:_____

Date: _____


**Summit Materials, LLC**

By:_____

Name:_____

Title:_____

Date: _____


**Boggs Materials, Inc.**

By: _Carl A. Boggs III_____

Name: _CARL A. BOGGS, III_____

Title: _President_____

Date: _6-6-14_____

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**EXHIBIT A**

**PURCHASE ORDERS**

See attached.

**Related Party Purchase Order Summary - Buckhorn Materials LLC**

| Date | From: | To: | Order # | Project | Material | P/O Quantity (tons) | Delivered Quantity to Date (tons) | Remaining Tons to Deliver | FOB Material Price | Haul Price[11] | Total Unit Price | P/O Amount | Remaining Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27-Feb-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3278 | 175 Branchewood Plantation Road | MBC | 6,200 | 5,785 | 415 | $7.00 | $7.25 | $14.25 | $88,350.00 | $5,913.75 |
| 30-Aug-12 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3302 | SC File # 29.1308 | Class A&B Rip Rap | 500 | | 500 | $7.50 | $4.50 | $12.00 | $6,000.00 | $6,000.00 |
| | | | | | Clean Stone (#5) | 35 | | 35 | $14.00 | $4.50 | $18.50 | $647.50 | $647.50 |
| | | | | | #67 Stone | 30 | | 30 | $14.00 | $7.50 | $21.50 | $480.00 | $480.00 |
| 22-Apr-03 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3364 | Idlewild Road Widening | ABC | 200 | 75 | 125 | $8.00 | $5.00 | $13.00 | $2,600.00 | $1,625.00 |
| | | | | | Ballast | 100 | 18 | | $15.00 | $4.50 | $19.50 | | |
| | | | | | Pit Gravel | 60 | | 60 | $15.00 | $10.90 | $25.90 | $1,554.00 | $1,554.00 |
| | | | | | #57 Stone | 986 | | 986 | $4.50 | $7.80 | $12.30 | $12,127.80 | $12,127.80 |
| | | | | | Class A&B Rip Rap | 23 | | 23 | $14.00 | $7.80 | $21.80 | $501.40 | $501.40 |
| 31-Jul-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3370 | SC File # 29.1308, FAP No. SA290(001) | ASB | 503 | 43 | 460 | $14.00 | $10.90 | $24.90 | $12,450.00 | $11,454.00 |
| | | | | | ABC | 200 | 13 | | $0.50 | $8.03 | Hourly | TBD | TBD |
| | | | | | Class B Rip Rap | 80 | 13 | 67 | $8.00 | $6.00 | $15.00 | $1,280.00 | $1,072.00 |
| | | | | | Ballast | 44 | 31 | 13 | $15.00 | $4.50 | $19.50 | $660.00 | |
| | | | | | MBC | 70 | | 20 | $7.50 | $13.50 | | | |
| 22-Oct-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3376 | SC File # 46.042287, FAP No. MR13(1154) | MBC | 20 | | 20 | $7.50 | $10.00 | $17.50 | $350.00 | $350.00 |
| 9-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3381 | SC File # 28.04187, Etc. DT12(0/41) | MBC | 20 | | 20 | $7.50 | $8.75 | $16.25 | $325.00 | $325.00 |
| 18-Sep-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3385 | 2013 Road Paving Program #1104-5 | #89 | 300 | 359 | | $12.00 | $7.80 | $19.80 | $5,940.00 | |
| | | | | | Rip Rap | 50 | 200 | | $14.00 | $9.60 | $23.60 | $1,180.00 | |
| | | | | | #57 | 70 | 395 | | $12.00 | $7.80 | $19.80 | $1,060.50 | |
| | | | | | #89 | 450 | 577 | | $12.00 | $5.15 | $15.15 | $7,875.00 | |
| | | | | | #6 | 20 | 107 | | $11.00 | $5.25 | $16.25 | $325.00 | |
| 30-Oct-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3385 | 2013 Road Paving Program #1104-5 | MBC | 1,400 | 1,281 | 119 | $11.00 | $7.50 | $16.50 | $20,300.00 | $1,737.00 |
| 1-Aug-13 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3388 | SC File # 29.042358, St. Proj No. C-4235 | Pit Gravel / Processed Fines | 100 | 448 | | $3.50 | $5.15 | $8.65 | $865.00 | |
| 16-Jan-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3404 | Wal-Mart #4148 | #5 | 186 | 232 | | $12.00 | $8.00 | $20.00 | $3,720.00 | |
| | | | | | Class B Rip Rap | 87 | 936 | | $11.00 | $8.75 | $19.75 | $1,718.25 | |
| | | | | | Screenings (Sand) | 10 | 82 | | $14.00 | $11.00 | $25.00 | $250.00 | |
| | | | | | Coarse Screenings | 252 | 175 | 77 | $7.00 | $8.75 | $15.75 | $3,969.00 | $1,212.75 |
| | | | | | Coarse Sand | 2,268 | 151 | 2,117 | $7.00 | $8.75 | $15.75 | $35,721.00 | $33,342.75 |
| | | | | | Concrete Sand | 2,205 | | 2,205 | $7.50 | $8.75 | $16.25 | $35,831.25 | $35,831.25 |
| | | | | | Screenings (Sand) | 79 | | 79 | $7.00 | $8.75 | $15.75 | $1,244.25 | $1,244.25 |
| 9-Mar-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3407 | SC File # 12.101404 Etc. | #89M | 620 | | 620 | $12.00 | $3.85 | $15.85 | $9,510.00 | $9,510.00 |
| 1-Apr-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. / KMO Construction | 3413 | SC File # 26.042819 | Rip Rap | 100 | | 100 | $16.00 | $5.00 | $21.00 | $2,100.00 | $2,100.00 |
| 28-Feb-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. / KMO Construction | 3416 | Wal-Mart #4148 | #89M | 150 | | 150 | $12.00 | $5.00 | $17.00 | $2,550.00 | $2,550.00 |
| 28-Feb-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. / KMO Construction | 3416 | Wal-Mart #4148 | #57 | TBD | n/a | n/a | $11.00 | $8.75 | $19.75 | n/a | n/a |
| | | | | | Quarry Overburden | TBD | | n/a | $1.00 | $9.00 | $10.00 | n/a | n/a |
| **Subtotal: Non-IV Intercompany Purchase Orders** | | | | | | **17,395** | **15,053** | **8,348** | **$8.03** | **$7.83** | **$15.92** | **$266,359.95** | **$132,916...** |
| 2-Jun-14 | Buckhorn Materials, LLC | Boggs Paving, Inc. | 3400 | SC File 932.D38170 - I-26 Design Build Project | #5 | 78 | | 78 | $12.50 | $7.50 | $20.00 | $1,560.00 | $1,560.00 |
| | | | | | #6 | 24,798 | | 24,798 | $12.50 | $7.50 | $20.00 | $495,960.00 | $495,960.00 |
| | | | | | #7 | 72,485 | | 72,485 | $12.50 | $7.50 | $20.00 | $1,449,700.00 | $1,449,700.00 |
| | | | | | #89 | 63,195 | | 63,195 | $13.00 | $7.50 | $20.50 | $1,274,997.50 | $1,274,997.50 |
| | | | | | Coarse Screenings | 90,605 | | 90,605 | $8.00 | $7.50 | $15.50 | $784,377.50 | $784,377.50 |
| | | | | | Washed Screenings | 10,000 | | 10,000 | $7.50 | $7.50 | $15.00 | $135,000.00 | $135,000.00 |
| | | | | | Fine Screenings | As Needed | | n/a | $4.00 | $7.50 | $11.50 | n/a | n/a |
| | | | | | Quarry Overburden | TBD | | n/a | $1.00 | $9.00 | $10.00 | n/a | n/a |
| **Subtotal: I-26 Project** | | | | | | **220,161** | | **220,161** | | | | | |
| **Total Buckhorn Materials, LLC (Excluding Monroe Bypass)** | | | | | | **237,556** | **15,053** | **228,509** | **--** | **--** | **$18.64** | **$4,426,954.35** | **$4,161,595.00** |

1. All material FOB to jobsite, therefore stated haul prices are representative of estimated cost. Actual cost is currently passed through to Boggs Paving as incurred without mark-up.

ELECTRONICALLY FILED - 2022 ... COMMON PLEAS — 2CCP1300175

## Related Party Purchase Order Summary - Construction Materials Group, LLC

| Date | From: | To: | Order # | Project | Material | P/O Quantity (tons) | Delivered Quantity to Date (tons) | Remaining Tons to Deliver | FOB Material Price | Haul Price [1] | Total Unit Price | P/O Amount | Remaining Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6-May-13 | Construction Materials Group, LLC | Boggs Paving, Inc. | B-3300 | CMC Union Womens' Center | Fill Sand | 4,000 | - | 4,000 | $3.50 | $5.30 | $8.80 | $35,200.00 | $35,200.00 |
| 1-Jul-13 | Construction Materials Group, LLC | Boggs Paving, Inc. | 3370 | SC File 29.1088, FAP No. SAC9(001) | Sand | 441 | - | 441 | $3.00 | $8.50 | $11.50 | $5,071.50 | $5,071.50 |
| **Total Construction Materials Group, LLC** | | | | | | **4,441** | **-** | **4,441** | **-** | **-** | **$9.07** | **$40,271.50** | **$40,271.50** |

1. All material FOB to jobsite, therefore stated haul prices are representative of estimated cost. Actual cost is currently passed through to Boggs Paving as incurred without mark-up.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## EXHIBIT B

## AGGREGATES PRODUCTS AND SPECIFICATIONS

| | | | | |
|---|---|---|---|---|
| 0 - 5% | 0 - 15% | 25-45% | 90 - 100% | |
| | 0-5% | 0-10% | 15 - 35% | 90 - 100% |
| | | 0-5% | 0 - 10% | 45 - 65% |
| | | | 0 - 5% | 15 - 35% |
| | | | | 10 - 25% |
| | | | | 8 - 15% |
| | | | | 5 - 10% |
| 0 - .6% | 0 - .6% | 0 - .6% | 0 - 1% | 3 - 6% |

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**Boggs Materials, Inc.**
**P.O. Box 1609**
**Monroe, NC 28111-1609**

April 16, 2021

Buckhorn Materials LLC
3410 Hwy 601 South
Jefferson, SC 29718
Attn: Richard Moses
Facsimile No.: 843-672-3579

Hinkle Contracting Company, LLC
P.O. Box 200
395 North Middletown Road
Paris, Kentucky 40362-0200
Attention: Thomas Hinkle, Steve Hullett, Warren Hawkridge
Facsimile No.: (859) 987-0727

Summit Materials, LLC
3550 Wynkoop, 3rd Floor
Denver, CO 80202
Attn: Thomas Hill, Anne Benedict
Facsimile No.: (303) 893-6993

*[BMI understands that many, if not all, of the individuals listed above who were named to receive notices in the referenced supply agreement are no longer with the companies; therefore, I am emailing this notice to known contacts who are employed by Summit at this time]:*

*Via Email to:*   *Bart Boyd:*        *bart.boyd@georgiastoneproducts.com*
                  *Ab Boxley:*         *ab.boxley@boxley.com*
                  *Anne Noonan:*    *anne.noonan@summit-materials.com*

**Re:**    **Aggregates Supply Agreement between Boggs Materials, Inc., Buckhorn**
        **Materials, LLC and Summit Materials, LLC, dated June 9, 2014**

Dear Bart/Ab/Anne:

In accordance with the above referenced Aggregates Supply Agreement, Paragraph 10(a) Notices, Boggs Materials, Inc. (BMI) is hereby notifying Buckhorn/Summit of the following breaches to the agreement, and is requesting that the following breaches be cured by immediate actions:

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

1. **Paragraph 3 SALE AND PURCHASE OF AGGREGATES**
   a. 3(c) <u>Delivery</u>: "Supplier will inspect and test the Aggregates prior to delivery to ensure they comply with the Specifications."
   b. 3(d) <u>Aggregate Availability</u>: "Supplier shall maintain sufficient manufacturing capabilities to supply Aggregates to Company….." and "Time is of the essence with respect to deliveries, and Company may suffer financial loss if Supplier fails to maintain a service level ensuring that Aggregates are timely delivered by Supplier to Company.

2. **Paragraph 6 WARRANTY**
   a. 6(b)(ii) "All Aggregates sold to Company Asphalt Plants for use in asphalt shall be produced unwashed and sized according to the ranges specified on Exhibit B and all other requirements outlined in the applicable DOT's respective codes and specifications for road based materials, with the exception of gradation;"
   b. 6(b)(iv) All Aggregates shall (x) comply with and be delivered in accordance with each Purchase Order and (y) comply with all applicable specifications set forth in Sections 6(b)(i) through (iii) (collectively, the "Specifications").

BMI views these issues as breaches and noncompliance with material provisions of the Aggregates Supply Agreement referenced herein, and is therefore notifying Buckhorn/Summit as such in accordance with the Agreement. BMI demands that Buckhorn/Summit take immediate corrective action and take all good faith, commercially reasonable efforts to correct these material breaches in order to mitigate further financial damages to BMI. BMI is and will continue to suffer material financial damages which could rise to consequential damages if these defaults are not cured without further delay.

As a reminder, BMI has been in constant contact with Buckhorn/Summit local staff over the past year and has communicated many of these and other concerns, which always seem to 'fall on deaf ears'. These issues have progressively grown worse instead of better. BMI sincerely desires to meet with Senior Level Executive Management of Summit Materials in order to receive assurances that Summit takes these issues seriously and will take any and all necessary steps to to correct these issues. Please accept this letter as a notice to cure and TIME IS OF THE ESSENCE.

Please contact me via mobile phone number (843) 855-0274 to schedule a time that we can meet to discuss these most important issues.

Sincerely,

BOGGS MATERIALS, INC.

*Drew Boggs*

Drew Boggs

**SUPPLY AGREEMENT REQUIREMENT**

| Sieve Size | minimum % passing | maximum % passing | ACTUAL GRADATION % passing | IN/OUT |
|---|---|---|---|---|
| #4 | 90.0% | 100.0% | 53.6% | IN |
| #8 | 45.0% | 65.0% | 34.2% | IN |
| #16 | 18.0% | 35.0% | 38.1% | IN |
| #30 | 10.0% | 25.0% | 25.6% | OUT |
| #50 | 8.0% | 16.0% | 23.6% | OUT |
| #100 | 5.0% | 10.0% | 8.7% | IN |
| #200 | 3.0% | 6.0% | 3.2% | IN |

1. Table above for reference and formulas only... do not adjust
2. Please insert gradation data in table below, grey fields only

**ACTUAL GRADATION**

| Date | Test | #4 | #8 | #16 | #30 | #50 | #100 | #200 | Moisture % | Washed/Unwashed |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/26/2020 | Test 1 | 93.60% | 54.20% | 38.10% | 29.60% | 12.10% | 8.70% | 3.20% | 4.90% | Unwashed |
| 8/26/2020 | Test 2 | 92.30% | 59.90% | 37.50% | 23.20% | 13.60% | 7.40% | 3.40% | 4.70% | Washed |
| 8/18/2020 | Test 3 | 91.80% | 56.00% | 34.60% | 23.20% | 11.40% | 5.90% | 2.70% | 8.50% | Washed |
| 8/13/2020 | Test 4 | 93.10% | 92.50% | 40.00% | 25.00% | 11.80% | 7.60% | 2.20% | 3.80% | Washed |
| 8/3/2020 | Test 5 | 93.30% | 64.30% | 41.00% | 25.00% | 13.00% | 5.90% | 2.20% | 8.00% | Washed |
| 7/30/2020 | Test 6 | 94.60% | 63.50% | 35.00% | 28.60% | 9.90% | 5.20% | 2.10% | 7.80% | Washed |
| 7/20/2020 | Test 7 | 92.70% | 51.20% | 28.60% | 17.50% | 11.00% | 7.30% | 3.90% | 0.80% | Unwashed |
| 6/25/2020 | Test 8 | 92.90% | 65.80% | 45.10% | 27.90% | 13.40% | 5.70% | 4.60% | 14.20% | Unwashed |
| 6/19/2020 | Test 9 | 100.00% | 94.50% | 75.30% | 28.20% | 10.50% | 3.07% | 4.00% | 6.00% | Unwashed |
| 6/11/2020 | Test 10 | 100.00% | 71.10% | 48.10% | 27.00% | 13.00% | 7.70% | 1.20% | 14.30% | Unwashed |
| 6/8/2020 | Test 11 | 90.80% | 39.60% | 22.00% | 14.00% | 12.50% | 6.30% | 4.80% | 7.20% | Washed |
| 6/8/2020 | Test 12 | 94.40% | 38.40% | 21.40% | 12.60% | 6.30% | 2.50% | 8.40% | 6.40% | Washed |
| 5/28/2020 | Test 13 | 87.80% | 33.40% | 21.00% | 12.00% | 10.70% | 3.60% | 10.90% | Washed |
| 5/18/2020 | Test 14 | 94.70% | 54.40% | 29.30% | 16.30% | 7.60% | 3.70% | 4.30% | 4.30% | Washed |
| 5/18/2020 | Test 15 | 94.70% | 44.80% | 28.30% | 20.80% | 7.60% | 3.60% | 4.20% | 3.80% | Washed |
| 5/12/2020 | Test 16 | 99.70% | 60.70% | 39.70% | 21.80% | 8.60% | 4.70% | 3.90% | 4.70% | Washed |
| 5/7/2020 | Test 17 | 96.50% | 70.80% | 46.80% | 29.20% | 16.00% | 8.30% | 7.00% | 7.00% | Washed |
| 5/4/2020 | Test 18 | 96.00% | 43.40% | 29.80% | 18.00% | 4.40% | 2.80% | 4.00% | Washed |
| 5/1/2020 | Test 19 | 94.70% | 61.60% | 33.60% | 18.00% | 15.20% | 8.00% | 6.10% | 6.10% | Washed |
| 4/30/2020 | Test 20 | 96.70% | 55.90% | 37.50% | 23.50% | 8.30% | 5.50% | 6.30% | Unwashed |
| 4/29/2020 | Test 21 | 96.40% | 50.30% | 31.00% | 17.00% | 8.30% | 5.60% | 5.60% | Washed |
| 4/27/2020 | Test 22 | 97.80% | 53.90% | 38.30% | 18.80% | 8.60% | 4.70% | 5.70% | Washed |
| 4/23/2020 | Test 23 | 97.20% | 52.30% | 32.10% | 17.00% | 8.90% | 3.70% | 10.10% | Unwashed |
| 4/22/2020 | Test 24 | 97.20% | 55.90% | 36.60% | 19.80% | 9.00% | 4.00% | 6.30% | Washed |
| 4/17/2020 | Test 25 | 98.00% | 52.40% | 34.00% | 19.80% | 4.14% | 4.10% | 6.60% | Washed |
| 4/14/2020 | Test 26 | 98.40% | 79.00% | 38.20% | 20.60% | 4.65% | 5.50% | 7.30% | Washed |
| 4/9/2020 | Test 27 | 98.60% | 43.00% | 25.70% | 15.00% | 4.90% | 10.50% | 7.30% | Washed |
| 4/7/2020 | Test 28 | 97.20% | 54.10% | 28.90% | 19.10% | 12.90% | 8.15% | 1.70% | Unwashed |
| 3/26/2020 | Test 29 | 96.50% | 49.80% | 30.00% | 16.70% | 7.90% | 4.09% | 6.10% | Unwashed |
| 3/23/2020 | Test 30 | 99.10% | 55.40% | 36.20% | 21.10% | 9.70% | 4.29% | 12.60% | Washed |
| 3/13/2020 | Test 31 | 78.60% | 50.80% | 34.40% | 23.00% | 9.20% | 4.31% | 4.60% | Unwashed |
| 3/10/2020 | Test 32 | 99.90% | 50.50% | 33.00% | 21.60% | 13.90% | 4.80% | 2.00% | Unwashed |
| 3/5/2020 | Test 33 | 94.60% | 69.20% | 31.00% | 20.20% | 8.44% | 2.00% | 7.10% | Unwashed |
| 2/27/2020 | Test 34 | 94.90% | 72.10% | 34.00% | 22.20% | 9.62% | 3.30% | 3.30% | Unwashed |
| 2/19/2020 | Test 35 | 91.30% | 50.00% | 39.20% | 20.20% | 14.50% | 3.30% | 3.90% | Unwashed |
| 2/17/2020 | Test 36 | 73.70% | 53.90% | 35.20% | 22.20% | 14.10% | 8.70% | 5.79% | Unwashed |

**Spec Averages / Gradation Pass/Fail**

| | Spec Averages | #4 (90%-100%) | #8 (45%-65%) | #16 (15%-35%) | #30 (10%-25%) | #50 (8%-15%) | #100 (5%-10%) | #200 (3%-6%) | Moisture % |
|---|---|---|---|---|---|---|---|---|---|
| ALL | 97.0% | | | | | | | | |
| Washed | 98.1% | | | | | | | | |
| | | 73.0% | 50.9% | 91.9% | 84.7% | 81.5% | 55.0% | 97.6% | |
| | | 97.0% | 74.6% | 82.1% | 34.3% | 21.7% | 13.3% | 8.3% | |

Total Failed Tests
Total Tests 57
Failed Sieves
% Failed 95.6%
# of Failed Tests / # of Unwashed Tests: 22 / 37 / 59

| Test | #4 | #8 | #16 | #30 | #50 | #100 | #200 |
|---|---|---|---|---|---|---|---|
| Test 1 | PASS | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 2 | PASS | PASS | FAIL | FAIL | PASS | PASS | PASS |
| Test 3 | PASS | PASS | PASS | FAIL | PASS | PASS | PASS |
| Test 4 | PASS | FAIL | FAIL | FAIL | PASS | PASS | FAIL |
| Test 5 | PASS | PASS | FAIL | FAIL | PASS | PASS | FAIL |
| Test 6 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | FAIL |
| Test 7 | PASS | FAIL | PASS | PASS | PASS | PASS | FAIL |
| Test 8 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | FAIL |
| Test 9 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS |
| Test 10 | PASS | FAIL | FAIL | FAIL | PASS | PASS | FAIL |
| Test 11 | PASS | PASS | PASS | PASS | PASS | PASS | PASS |
| Test 12 | FAIL | FAIL | PASS | PASS | FAIL | PASS | FAIL |
| Test 13 | FAIL | FAIL | PASS | PASS | PASS | PASS | FAIL |
| Test 14 | PASS | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 15 | PASS | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 16 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 17 | FAIL | FAIL | FAIL | FAIL | FAIL | PASS | FAIL |
| Test 18 | FAIL | PASS | FAIL | FAIL | PASS | PASS | PASS |
| Test 19 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | FAIL |
| Test 20 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | FAIL |
| Test 21 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 22 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 23 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | FAIL |
| Test 24 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 25 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 26 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 27 | FAIL | PASS | FAIL | FAIL | PASS | FAIL | PASS |
| Test 28 | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | PASS |
| Test 29 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | FAIL |
| Test 30 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | FAIL |
| Test 31 | PASS | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 32 | FAIL | FAIL | FAIL | FAIL | FAIL | PASS | PASS |
| Test 33 | FAIL | FAIL | FAIL | FAIL | FAIL | PASS | PASS |
| Test 34 | FAIL | FAIL | FAIL | FAIL | PASS | PASS | PASS |
| Test 35 | PASS | FAIL | FAIL | FAIL | FAIL | PASS | PASS |
| Test 36 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL |

| Date | Test | | | | | | | | | Test | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/13/2020 | Test 37 | 96.00% | 76.40% | 52.40% | 36.00% | 22.80% | 14.50% | 6.40% | Unreached | Test 37 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 6.40% | Unreached |
| 2/10/2020 | Test 38 | 99.80% | 77.30% | 53.60% | 38.60% | 23.00% | 14.80% | 6.30% | Unreached | Test 38 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 6.30% | Unreached |
| 2/7/2020 | Test 39 | 92.10% | 69.70% | 47.00% | 32.60% | 21.90% | 14.10% | 9.10% | Unreached | Test 39 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 2.80% | Unreached |
| 2/5/2020 | Test 40 | 99.30% | 78.50% | 54.70% | 36.10% | 22.70% | 14.10% | 8.90% | Unreached | Test 40 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 8.90% | Unreached |
| 2/4/2020 | Test 41 | 98.90% | 73.20% | 51.20% | 34.10% | 22.10% | 14.90% | 9.48% | Unreached | Test 41 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 5.50% | Unreached |
| 1/22/2020 | Test 42 | 91.70% | 68.30% | 48.70% | 34.10% | 22.60% | 9.94% | 9.94% | Unreached | Test 42 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 2.50% | Unreached |
| 1/16/2020 | Test 43 | 96.70% | 77.20% | 54.40% | 39.40% | 23.10% | 14.10% | 9.95% | Unreached | Test 43 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 3.50% | Unreached |
| 1/14/2020 | Test 44 | 96.90% | 73.50% | 51.80% | 34.30% | 22.20% | 14.10% | 9.20% | Unreached | Test 44 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 9.20% | Unreached |
| 1/10/2020 | Test 45 | 96.10% | 78.40% | 53.70% | 38.00% | 22.00% | 14.10% | 8.89% | Unreached | Test 45 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 2.80% | Unreached |
| 1/8/2020 | Test 46 | 99.30% | 73.10% | 53.30% | 38.00% | 23.40% | 15.20% | 9.92% | Unreached | Test 46 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 7.80% | Unreached |
| 1/7/2020 | Test 47 | 96.70% | 75.20% | 38.20% | 23.40% | 15.20% | 9.92% | 7.99% | Unreached | Test 47 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 7.20% | Unreached |
| 1/3/2020 | Test 48 | 99.20% | 80.80% | 58.10% | 36.60% | 23.10% | 14.70% | 9.92% | Unreached | Test 48 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 3.70% | Unreached |
| 12/30/2019 | Test 49 | 97.60% | 76.30% | 58.20% | 37.70% | 24.30% | 15.60% | 10.17% | Unreached | Test 49 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 8.70% | Unreached |
| 12/26/2019 | Test 50 | 98.50% | 83.30% | 59.40% | 40.20% | 26.80% | 16.90% | 10.02% | Unreached | Test 50 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 3.10% | Unreached |
| 12/18/2019 | Test 51 | 96.60% | 69.30% | 49.20% | 30.30% | 19.30% | 12.80% | 8.68% | Unreached | Test 51 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 2.40% | Unreached |
| 12/13/2019 | Test 52 | 96.80% | 73.90% | 52.40% | 35.30% | 27.20% | 14.70% | 9.91% | Unreached | Test 52 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 6.10% | Unreached |
| 12/10/2019 | Test 53 | 96.10% | 76.30% | 36.10% | 23.10% | 14.90% | 9.64% | 4.00% | Unreached | Test 53 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 4.00% | Unreached |
| 12/4/2019 | Test 54 | 99.80% | 74.70% | 50.80% | 33.20% | 21.30% | 13.70% | 8.81% | Unreached | Test 54 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 2.10% | Unreached |
| 12/4/2019 | Test 54 | 99.60% | 74.70% | 50.80% | 33.30% | 21.30% | 13.70% | 8.81% | Unreached | Test 54 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 2.10% | Unreached |
| 11/13/2019 | Test 55 | 99.60% | 80.20% | 56.40% | 37.70% | 23.30% | 13.70% | 9.91% | Unreached | Test 55 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 3.90% | Unreached |
| 11/6/2019 | Test 56 | 97.30% | 67.30% | 42.20% | 27.10% | 17.40% | 11.10% | 6.89% | Unreached | Test 56 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 1.80% | Unreached |
| 11/5/2019 | Test 57 | 99.60% | 82.20% | 56.40% | 23.30% | 15.10% | 15.10% | 9.91% | Unreached | Test 57 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 3.80% | Unreached |
| 10/21/2019 | Test 57 | 96.40% | 64.50% | 40.00% | 24.70% | 15.40% | 9.35% | 5.60% | Unreached | Test 57 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 5.60% | Unreached |
| 10/17/2019 | Test 58 | 98.40% | 69.00% | 42.20% | 27.10% | 15.40% | 9.50% | 5.60% | Unreached | Test 58 | PASS | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | 5.60% | Unreached |
| 10/15/2019 | Test 58 | 91.70% | 65.10% | 31.90% | 19.20% | 12.30% | 8.10% | 5.30% | Unreached | Test 58 | PASS | PASS | PASS | PASS | PASS | PASS | PASS | 2.70% | Unreached |

# Boggs Group
## 2022 Aggregate Needs & Schedule

| Plant | % | January | February | March | April | May | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lynches River | | 4,500 | 7,500 | 13,500 | 30,000 | 30,000 | 42,000 | 42,000 | 42,000 | 39,000 | 36,000 | 9,000 | 4,500 | 300,000 |
| Lugoff | | 3,750 | 6,250 | 11,250 | 25,000 | 25,000 | 35,000 | 35,000 | 35,000 | 32,500 | 30,000 | 7,500 | 3,750 | 250,000 |
| Mullins | | 750 | 1,250 | 2,250 | 5,000 | 5,000 | 7,000 | 7,000 | 7,000 | 6,500 | 6,000 | 1,500 | 750 | 50,000 |
| Monroe | | 4,500 | 7,500 | 13,500 | 30,000 | 30,000 | 42,000 | 42,000 | 42,000 | 39,000 | 36,000 | 8,000 | 4,500 | 300,000 |
| TOTAL: | | 13500 | 22500 | 40500 | 90000 | 90000 | 126000 | 126000 | 126000 | 117000 | 108000 | 27000 | 13500 | 900000 |
| **Materials:** | | | | | | | | | | | | | | |
| #89's | 25% | 3,375 | 5,625 | 10,125 | 22,500 | 22,500 | 31,500 | 31,500 | 31,500 | 29,250 | 27,000 | 6,750 | 3,375 | 225,000 |
| #7's | 15% | 2,025 | 3,375 | 6,075 | 13,500 | 13,500 | 18,900 | 18,900 | 18,900 | 17,550 | 16,200 | 4,050 | 2,025 | 135,000 |
| #6's | 10% | 1,350 | 2,250 | 4,050 | 9,000 | 9,000 | 12,600 | 12,600 | 12,600 | 11,700 | 10,800 | 2,700 | 1,350 | 90,000 |
| #5's | 5% | 675 | 1,125 | 2,025 | 4,500 | 4,500 | 6,300 | 6,300 | 6,300 | 5,850 | 5,400 | 1,350 | 675 | 45,000 |
| Coarse Screenings | 15% | 2,025 | 3,375 | 6,075 | 13,500 | 13,500 | 18,900 | 18,900 | 18,900 | 17,550 | 16,200 | 4,050 | 2,025 | 135,000 |
| Asphalt Sand | 5% | 675 | 1,125 | 2,025 | 4,500 | 4,500 | 6,300 | 6,300 | 6,300 | 5,850 | 5,400 | 1,350 | 675 | 45,000 |
| **AGGREGATES** | 75% | 10,125 | 16,875 | 30,375 | 67,500 | 67,500 | 94,500 | 94,500 | 94,500 | 87,750 | 81,000 | 20,250 | 10,125 | 675,000 |
| RAP/RAS | 25% | 3,375 | 5,625 | 10,125 | 22,500 | 22,500 | 31,500 | 31,500 | 31,500 | 29,250 | 27,000 | 6,750 | 3,375 | 225,000 |
| **ALL MATERIALS** | 100% | 13,500 | 22,500 | 40,500 | 90,000 | 90,000 | 126,000 | 126,000 | 126,000 | 117,000 | 108,000 | 27,000 | 13,500 | 900,000 |

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit 2


**KILPATRICK
TOWNSEND**
ATTORNEYS AT LAW

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

KILPATRICK TOWNSEND & STOCKTON LLP
www.kilpatricktownsend.com

1001 West Fourth Street
Winston-Salem, NC 27101-2400
t 336 607 7300  f 336 607 7500

January 21, 2022

direct dial 336 607 7432
direct fax 336 734 2612
dgreene@kilpatricktownsend.com

***Via Email and Federal Express Overnight Delivery***

Buckhorn Materials, LLC
3410 Hwy 601 South
Jefferson, SC 29718
Attn: Richard Moses

Construction Materials Group LLC
1357 Eddie Horton Rd.
Mt. Croghan, SC 29727
Attn: Richard Moses

Hinkle Contracting Company, LLC
395 North Middletown Rd.
Paris, KY 40362-0200
Attn: Thomas Hinkle, Steve Hullett, Warren Hawkridge

Summit Materials, LLC
3550 Wynkoop
3rd Floor
Denver, CO 80202
Attn: Thomas Hill, Anne Benedict

Georgia Stone Products
Attn: Bart Boyd
4870 Leland Dr.
Cumming, GA 30041
Bart.Boyd@georgiastoneproducts.com

Re:    Notice of Intent to Exercise Right to Third Party Audit

Dear Ms. Benedict and Gentlemen:

As indicated in the January 18, 2021 Notice and Demand for Assurances of Performance, this firm represents Boggs Materials, Inc. ("BMI") and its affiliates. We hereby notify you of BMI's intent to exercise its rights under Section 4(f) of the Aggregates Supply Agreement ("the Agreement") to conduct a third-party audit of the records of Buckhorn Materials, LLC, Hinkle

US2008 19549957 2

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

January 21, 2022
Page 2

Contracting Company, LLC, Summit Materials, LLC, Georgia Stone Products, and any other entities that are operating or have operated the Lynches River Quarry and/or the Black Creek Sand Mine (collectively, "the Suppliers") in the past three years, relating to their conduct under the Agreement.

Pursuant to Section 4(f) of the Agreement, BMI and its affiliates "ha[ve] the right from time to time to have a third-party audit Supplier's records to determine if Supplier is in compliance with the terms of this Agreement." Due, in part, to the issues set out in our letter of January 18, as well as the Suppliers' recent expression of its intent not to meet the obligations of the Agreement, BMI now exercises its right to conduct a third-party audit of the Supplier's records. BMI will identify and retain a third-party auditor and we will follow up with you in the near future to identify the third-party auditor, to identify the records requested and the scope of the initial audit, to set the deadline and format for the production of the records and to set the dates for the audit itself.

Based upon this letter and BMI's intent to exercise its audit right, the Suppliers are hereby advised to preserve all records related to the Suppliers' mining, production, and/or sale of Aggregates, sand, or other materials covered by the Supply Agreement. This includes all documents, however maintained by Suppliers, however produced or reproduced, of any kind or description, whether sent or received or neither, including the original and all non-identical copies thereof, whether different from the originals by reason of any notation made on such copies or otherwise, regardless of whether designated "confidential", "privileged", or otherwise, including, without limitation: purchase orders, invoices, agendas, bills, contracts, leases, assignments, letters of intent, agreements, contracts, reports of any sort, summaries, correspondence, memoranda, e-mails, intra-office and inter-office communications (including email, text, video, or voicemail communications), offers, notations of any sort, diaries, performance evaluations, appointment books or calendars, teletype, telefax, confirmations, computer files, disks and data (including e-mail and all other information or programs stored in the computer whether or not ever printed or displayed), checks, check stubs, metadata, statistics, graphs, lists, telegrams, books, accounts, objects, records, recordings, transcripts, minutes, studies, notes, notations, working papers, charts, index sheets, plans, specifications, and other writings and papers of every kind and nature, recordings of telephone or other conversations, interviews, conferences, or any other written, recorded, transcribed, punched, tabled, filmed or graphic matter of any kind, including, without limitation, photographs, microfilm, videotape records, motion pictures and electronic, mechanical or electric records or representations of any kind including, without limitation, tapes, cassettes, discs, disk drives, thumb (USB) drives, magnetic cards and recordings, and all drafts, alterations, modifications, changes and amendments of any of the foregoing; to which Suppliers or their have access or of which Suppliers or their agents have knowledge. Failure to preserve these documents may result in sanctions for spoliation if litigation results regarding Suppliers' failure to comply with the terms of the Supply Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

January 21, 2022
Page 3

Sincerely,

Dustin T. Greene

DTG:kef
cc:    Gibson, Dunn & Crutcher
200 Park Ave.
New York, NY 10166-0193
Attn: Steven R. Shoemate

Drew Boggs (via email only)
Alex Bullock, Esq. (via email only)
Mark Boynton, Esq. (via email only)

US2008 19549957 2

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit 3


**KILPATRICK TOWNSEND**
ATTORNEYS AT LAW

KILPATRICK TOWNSEND & STOCKTON LLP
www.kilpatricktownsend.com

1001 West Fourth Street
Winston-Salem, NC 27101-2400
t 336 607 7300   f 336 607 7500

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

February 10, 2022

direct dial 336 607 7432
direct fax 336 734 2612
dgreene@kilpatricktownsend.com

*Via Email*

Justin G. Walden, Esq.
Georgia Stone Products
Justin.Walden@Summit-Materials.com

      Re:   Audit Demand

Dear Mr. Walden:

      You previously responded to our letter of January 18, 2022 as General Counsel for Georgia Stone Products, LLC ("GSP"). We read your response as sent on behalf of GSP and its affiliates Buckhorn Materials, LLC (which since merged into American Materials Company, LLC), Summit Materials, LLC, Construction Materials Group, LLC, and Hinkle Contracting Company, LLC (collectively with GSP, the "Summit Companies"). If you do not represent one or more of these companies that are parties or successors to the Aggregates Supply Agreement ("the Agreement") dated June 9, 2014, please promptly let us know so that we correspond with the proper entities. Until we hear otherwise, based on your prior response, we assume you represent all of these companies.

      Boggs Materials, Inc. ("BMI") and its affiliates requested assurances that the Summit Companies would perform their contractual obligations under the Agreement. Your January 21, 2022 letter notably failed to provide any such assurances. BMI and its affiliates, particularly Boggs Contracting, Inc. and Lynches River Contracting, Inc., are therefore exercising their right to conduct an audit of the Summit Companies' compliance with the Agreement, pursuant to Section 4(f) of thereof.

      BMI has retained Shawn Shapiro, CPA as the third-party auditor to conduct this audit. Mr. Shapiro is prepared to begin his audit the week of March 7, 2022. To facilitate that audit in a time and cost-efficient manner, please confirm no later than February 28, 2022 that the Summit Companies' employees will make the necessary records and information available for audit, will produce the requested records and information in electronic form to the greatest extent possible and identify the location at which any hard copy records will be made available for inspection and copying, and specify the format in which each category of documents below will be produced or made available so we can make the appropriate preparations for their download or copying. If the Summit Companies contend that any category of documents below cannot be made available by March 7th, specify the reasons those documents are not available.

US2008 19607732 1

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

February 10, 2022
Page 2

At a minimum, the following categories of documents need to be made available for inspection and copying for the time period January 1, 2021 to the present, for both the Lynches River Quarry and the Black Creek Sand Mine:

1. All purchase orders or other requests to purchase Aggregates[1] (including Stone Aggregates and Sand Aggregates), regardless of customer or Aggregate product type/size/gradation;
2. All documents showing fulfillment of orders or other sales of Aggregates, regardless of customer or Aggregate product type/size/gradation;
3. All invoices and delivery tickets for Aggregate sales, regardless of customer;
4. Payment records showing pricing for all purchases of Aggregates, regardless of customer or Aggregate product type/size/gradation;
5. All inventory or stock reports, including but not limited to the most recent physical inventory report for the quarry and sand mine;
6. All production reports;
7. All quality control tests, such as gradation reports or other reports conducted to assure that the Aggregates meet the specifications in the Agreement;
8. All stone crushing reports;
9. All scrap or write-off reports (or other similar reports that are used to adjust inventory records);
10. All financial records for the operation of the Lynches River Quarry and the Black Creek Sand Mine, including accounts receivable sub-legers, purchase order registers, trial balances;
11. All documents showing returns or refunds to BMI and/or its affiliates for unsuitable Aggregates;
12. All records showing whether Aggregates sold to BMI and its affiliates were washed or unwashed;
13. All documents evidencing any assumption or assignment of the Agreement, and any notice to BMI of such assumption or assignment.

We are glad to work with you and the Summit Companies regarding the production format for records to be used in the audit. BMI will accept authentic and accurate electronic reports run from the Summit Companies' production reporting and ticketing software that contain the information subject to this audit (with intact metadata), subject to our ability to confirm the accuracy of the underlying information in the electronic versions (such as randomly spot-checking hard copy records for consistency). Use of electronic records, where available, will expedite and reduce the cost of the audit.

BMI reserves all rights under the Agreement, including the right to recoup from the Summit Companies the cost of the audit, plus interest, pursuant to Section 4(f) of the Supply Agreement.

---

[1] Unless otherwise defined in this letter, capitalized terms have the meaning assigned to them in the Agreement.

US2008 19607732 1

February 10, 2022
Page 3

Sincerely,

Dustin T. Greene

DTG:std
cc:    Drew Boggs (via email only)
       Alex Bullock, Esq. (via email only)
       Mark Boynton, Esq. (via email only)
       Shawn Shapiro, CPA (via email only)

US2008 19607732 1

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit 4



**GEORGIA STONE PRODUCTS**

January 21, 2022

**Via Email (dgreene@kilpatricktownsend.com)**

Boggs Materials, Inc.
1613 W. Roosevelt Blvd
Monroe, NC 28110

Kilpatrick Townsend & Stockton LLP
Attn: Dustin T. Greene
1001 West Fourth Street
Winston-Salem, NC 27101-2400

Re:  Notice of Default and Demand for Assurances of Performance under Aggregate
Supply Agreement

Mr. Greene,

Buckhorn Materials, LLC, Construction Materials Group LLC, Hinkle Contracting Company, LLC and
Georgia Stone Products, LLC (collectively "GSP") are in receipt of your correspondence dated January
18, 2022.  GSP appreciates Boggs Materials, Inc. ("BMI") bringing its concerns to our attention. Please
know we take the issues identified seriously and are currently reviewing internally.

In the coming days, the GSP business team will schedule a meeting between the parties' respective
representatives to discuss the matters noted in your letter and BMI's 2022 aggregate needs.  GSP's
representatives will reach out to BMI to inquire about its availability.

In the interim should you have any further questions or concerns, please feel free to contact me directly.  I
can be reached via email at justin.walden@summit-materials.com or by phone at 217.714.6655.

Sincerely,

Justin G. Walden, Esq.
Corporate Counsel

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# Exhibit 5

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175



**GEORGIA STONE PRODUCTS**

February 16, 2022

**Via Email (dgreene@kilpatricktownsend.com)**

Boggs Materials, Inc.
1613 W. Roosevelt Blvd
Monroe, NC 28110

Kilpatrick Townsend & Stockton LLP
Attn: Dustin T. Greene
1001 West Fourth Street
Winston-Salem, NC 27101-2400

Re: Notice of Intent to Exercise Right to Third Party Audit
    Audit Demand

Mr. Greene,

Buckhorn Materials, LLC, Construction Materials Group LLC, Hinkle Contracting Company,
LLC and Georgia Stone Products, LLC (collectively "GSP") confirm receipt of your
correspondence dated January 21, 2022, and February 10, 2022.

GSP affirms it's not in default of the parties' Aggregates Supply Agreement dated June 9, 2014
(the "Agreement"). In regard to Boggs Materials Inc.'s 2022 aggregate needs, GSP notes the
forecast supplied by Boggs Materials Inc. ("BMI"); #89, 225,000 tons; #7, 135,000 tons; and #6,
90,000 tons, significantly exceeds BMI's largest past annual aggregate purchases. In 2017,
BMI's highest aggregate purchase year, BMI bought the following aggregate quantities;
#89, 148,000 tons; #7, 85,000 tons; and #6, 60,000 tons.  For the calendar year of 2022, GSP
will produce and supply to BMI; #89, 140,000 tons; #7, 85,000 tons; #6, 60,000 tons; as well as
fulfill the other miscellaneous aggregate quantities listed in the forecast.

As to the right of audit, Section 4(f) of the Agreement does permit BMI to periodically audit
GSP's records, but only to the extent necessary to determine overcharges or underpayments by
GSP (the "Purpose"). In advancement of the Purpose, GSP has already provided BMI the total
tons purchased by BMI categorized by product for the period covering May 24, 2020 (the time
GSP assumed control of Buckhorn) to present-day. GSP will continually work with BMI to
provide the records necessary to accomplish the Purpose, but BMI's extensive request far
surpasses the information required to ascertain overcharges or underpayments.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

To further the parties' relationship and directly address any concerns, GSP welcomes the opportunity to have a dialogue and discuss BMI's present and future aggregate needs.

GSP reserves all rights whether now existing or hereafter arising under the Agreement, at law and in equity.

Sincerely,

Justin G. Walden, Esq.
Corporate Counsel

Extremely Urgent

This envelope is for use with the following services:

UPS Next Day Air®
UPS Worldwide Express™
UPS 2nd Day Air®

Page 1 of 2

for details on our privacy practices.

Call 1-800-PICKUPS® (1-800-742-5877)

PSIShip - UPS Label

- For UPS Next
for envelopes
urgent docum
Next Day Air s
containing lette
to the corresp

- For UPS World
may be used o
There is no lim
can enclose.

- For UPS 2nd Da
weighing one p
corresponding

- Do not send ca

CORPORATION SERVICE COMPANY
508 MEETING ST
WEST COLUMBIA SC 29169

P:RED        S: BB
17F — 1414
6208                    I: R1
1030

Reference No.1: 1294603
Reference No.2: 02523_Chick_Shawn

BILLING: P/P
SIGNATURE REQUIRED

TRACKING #: 1Z 865 062 24 9646 6208

UPS NEXT DAY AIR        1

SC 292 9-02

SHIP TO:
8009279800
CORPORATION SERVICE COMPANY
REED AGT FOR GEORGIA STONE PRODUCTS
508 MEETING STREET
WEST COLUMBIA SC 29169-7535

LTR        1 OF 1

SHAWN CHICK
20529580020
KILPATRICK TOWNSEND & STOCKTON
607 14TH STREET, NW, SUITE 900
WASHINGTON DC 20005

100% Recycled fiber
80% Post-Consumer

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

STATE OF SOUTH CAROLINA
COUNTY OF CHESTERFIELD

IN THE COURT OF COMMON PLEAS
FOURTH JUDICIAL CIRCUIT
Case No.: 2022-CP-_____

BOGGS MATERIALS, INC., BOGGS
CONTRACTING, INC., and LYNCHES
RIVER CONTRACTING, INC.,

Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN
MATERIALS COMPANY, LLC; and
GEORGIA STONE PRODUCTS, LLC,

Defendants.

MOTION FOR PRELIMINARY
INJUNCTION

COMES NOW, Plaintiffs Boggs Materials, Inc. ("BMI"), Boggs Contracting, Inc. ("BCI"), and Lynches River Contracting, Inc. ("LRCI") (collectively, "Plaintiffs" or "Paving Contractors"), by and though counsel, hereby move the Court for a preliminary injunction pursuant to Rule 65 of the South Carolina Rules of Civil Procedure against Defendants Summit Materials, LLC ("Summit"), American Materials Company, LLC ("AMC"), and Georgia Stone Products, LLC ("GSP") (collectively, "Defendants" or "Suppliers"), and state as follows:

1.    This Motion seeks injunctive relief to allow an audit specifically bargained for and agreed to by the Parties.

2.    The Parties entered into the Supply Agreement in June 2014.

3.    Despite the plain and unambiguous terms of the Supply Agreement, Suppliers have repeatedly and consistently failed to supply aggregates to the Paving Contractors as required by the Agreement.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

4.      Paving Contractors notified Suppliers of their breaches of the contract for failure to supply aggregates in the quantities and qualities and with the timeliness agreed to under the Agreement.

5.      With respect to quantity, Suppliers have failed to fill Purchase Orders from the Paving Contractors from April 2021 to present.

6.      Suppliers, through GSP, notified Paving Contractors, that Suppliers do not maintain, and do not intend to maintain, adequate supply of aggregates to fill Purchase Orders from the Paving Contractors for current projects and those the Paving Contractors are committed to in 2022.

7.      Suppliers are unable to fill Purchase Orders from the Paving Contractors because they have given priority to orders from third parties and have supplied third parties with aggregates despite agreeing to allocate any and all aggregates to the Paving Contractors on a first priority basis, in direct breach of the express terms of the Supply Agreement.

8.      After formal notice of its breaches, Suppliers still failed and refused to cure those breaches, and, in fact, have continued to knowingly commit repeated material breaches of the Supply Agreement. The Paving Contractors' Complaint asserts claims for these breaches.

9.      To avoid further detrimental impacts on their businesses and existing contracts, and to urge Suppliers to meet their obligations under the Supply Agreement going forward, the Paving Contractors gave further notice of breach in January 2022 and requested assurances that Suppliers would provide aggregates in the quantities and quality needed by the Paving Contractors in accordance with the terms of the Agreement.

10.     The Paving Contractors also sent a notice to Suppliers invoking their right to conduct an audit pursuant to Section 4(f) of the Supply Agreement "to determine if Supplier is in compliance with the terms of [the Supply Agreement]."

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

11.     Pursuant to the terms of the Supply Agreement, Plaintiffs are entitled to an audit of Suppliers records to determine compliance with the Supply Agreement's terms. (Supply Agreement § 4(f)).

12.     Without addressing any of the concerns raised in the Paving Contractors' request for assurances, Suppliers simply stated they are not in default under the Supply Agreement and refused to comply with the Paving Contractors audit notice, stating that the Supply Agreement only allows audits "to the extent necessary to determine overcharges or underpayments ...."

13.     Suppliers' attempt to limit the Paving Contractors' right to conduct the audit, and the scope of that audit, by citing a "Purpose" provision that does not exist in the Supply Agreement.

14.     Pursuant to Rule 65, Paving Contractors move the Court for an order commanding Suppliers to make available all records as requested by Paving Contractors and authorized under the Supply Agreement. Paving Contractors can show a likelihood of success on the merits, irreparable harm, and no adequate remedy at law, as set-forth in the accompanying brief in support and the supporting affidavits of Charles "Chuck" Steele and Dustin Greene.

WHEREFORE, the Paving Contractors pray unto the Court for relief as follows:

1.     That the Court grant the Paving Contractors motion for preliminary injunction;

2.     That the Court enter an order commanding Suppliers to make available all records as requested by Paving Contractors and authorized under the Supply Agreement.

3.     That the Court grant the injunction without or with minimal bond;

4.     That the Court grant such other and further relief as the Court deems just and proper.

ELECTRONICALLY FILED - 2022 Mar 07 7:26 PM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

KILPATRICK TOWNSEND & STOCKTON, LLP
607 14th Street, NW, Suite 900
Washington, DC 20005-2018
Tel:   202-508-5800
Fax:   202-508-5858
Email: abullock@kilpatricktownsend.com

 /s/ Alexander McMillan Bullock
Alexander McMillan Bullock (SC #1004)

*Attorney for Plaintiffs*

Dated: March 7, 2022.
Washington, DC

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

STATE OF SOUTH CAROLINA
COUNTY OF CHESTERFIELD

IN THE COURT OF COMMON PLEAS
FOURTH JUDICIAL CIRCUIT
Case No.: 2022-CP-130075

BOGGS MATERIALS, INC., BOGGS
CONTRACTING, INC., and LYNCHES
RIVER CONTRACTING, INC.,

        Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN
MATERIALS COMPANY, LLC; and
GEORGIA STONE PRODUCTS, LLC,

        Defendants.

**AFFIDAVIT OF SERVICE**

COMES NOW the affiant Alexander McMillian Bullock , Esq., and states as follows:

1.    The facts set forth in this affidavit are made upon personal knowledge or when indicated upon information and belief.

2.    I am over eighteen (18) years of age and am competent to testify to the matters stated herein.

3.    I am a duly licensed attorney in the state of South Carolina.

4.    A copy of the Summons and Complaint, Motion for Preliminary Injunction, Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Affidavit of Dustin T. Greene with Exhibits and Affidavit of Charles "Chuck Steele with exhibits filed in this matter was served on Summit Materials LLC on March 9, 2022 via process server to their registered agent at  Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.  See the Affidavit of Capitol Process Services, Inc. attached as Exhibit A.

5.    A copy of the Summons and Complaint, Motion for Preliminary Injunction, Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Affidavit of Dustin T.

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Greene with Exhibits and Affidavit of Charles "Chuck Steele with exhibits filed in this matter was served on American Materials Company, LLC via UPS on March 9, 2022, to their registered agent at  Corporation Service Company,  508 Meeting Street, West Columbia, SC  29169.  See delivery confirmation attached as Exhibit B.

      6.    A copy of the Summons and Complaint, Motion for Preliminary Injunction, Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Affidavit of Dustin T. Greene with Exhibits and Affidavit of Charles "Chuck Steele with exhibits filed in this matter was served on Georgia Stone Products LLC via UPS on March 9, 2022, to their registered agent at  Corporation Service Company,  508 Meeting Street, West Columbia, SC  29169.  See delivery confirmation attached as Exhibit C.

      Further Affiant Sayeth Naught.

[Signature on Separate Page]

2

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Executed on March 21, 2022

Alexander M. Bullock (SC#1004)

KILPATRICK TOWNSEND & STOCKTON, LLP
607 14th Street, NW, Suite 900
Washington, DC 20005-2018
Tel:   202-508-5800
Fax:   202-508-5858
Email: abullock@kilpatricktownsend.com

*Attorney for  Plaintiffs*

Washington, D.C.
Washington County

I, a Notary Public for said County and District, hereby certify that Alexander McMillian Bullock personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this the 21st day of March, 2022

Notary Signature

Notary Printed Name

My commission expires:

EVELYN F. THOMPSON
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires December 14, 2025

3

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# EXHIBIT A

EXHIBIT A

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

## IN THE COURT OF COMMON PLEAS, FOURTH JUDICIAL CIRCUIT
## CHESTERFIELD COUNTY, SOUTH CAROLINA

Boggs Materials, Inc., et al.

                          Plaintiff(s)

                                                      Case No.: 2022-CP-1300175

                                    vs.

Summit Materials, LLC, et al.

                          Defendant(s)

### AFFIDAVIT OF SERVICE

I, Adam Golden, a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Summons, Complaint with Exhibits, Motion for Preliminary Injunction, Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Affidavit of Charles "Chuck" Steele with Exhibits, and Affidavit of Dustin T. Greene with Exhibits in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 03/09/2022 at 2:44 PM, I served Summit Materials, LLC c/o Corporation Service Company, Registered Agent with the Summons, Complaint with Exhibits, Motion for Preliminary Injunction, Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Affidavit of Charles "Chuck" Steele with Exhibits, and Affidavit of Dustin T. Greene with Exhibits at 251 Little Falls Drive, Wilmington, Delaware 19808. Service was accepted by a Legal Representative of Corporation Service Company, who received on behalf of the registered agent.

I declare under penalty of perjury that this information is true.

Sworn to before me on March 14, 2022

Notary Public
My Commission Expires:

THOMAS M. MARSHALL
COMMISSION
EXPIRES
September 28, 2022
NOTARY PUBLIC
STATE OF DELAWARE

Adam Golden

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

Client Ref Number:1294603
Job #: 1600166

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# EXHIBIT B

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

**From:**       UPS
**To:**         Chick, Shawn
**Subject:**    UPS Delivery Notification, Tracking Number 1Z8650622499056191
**Date:**       Wednesday, March 9, 2022 10:11:49 AM

**CAUTION: External Email**



## Hello, your package has been delivered.

**Delivery Date:**   Wednesday, 03/09/2022
**Delivery Time:**   10:05 AM
**Left At:**   FRONT DESK
**Signed by:**   ZHENG

## KILPATRICK TOWNSEND & STOCKTON

| | |
|---|---|
| **Tracking Number:** | 1Z8650622499056191 |
| **Ship To:** | CORPORATION SERVICE COMPANY<br>508 MEETING STREET<br>REGD AGT AMERICAN MATERIALS COMPANY<br>WEST COLUMBIA, SC 291697535<br>US |
| **Number of Packages:** | 1 |
| **UPS Service:** | UPS Next Day Air® |
| **Package Weight:** | 0.0 LBS |
| **Reference Number:** | 1294603 |
| **Reference Number:** | 02522 CHICK, SHAWN |

### Discover more about UPS:

Visit www.ups.com

Sign Up For Additional E-Mail From UPS

Read Compass Online

Download the UPS mobile app

© 2022 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.

All trademarks, trade names, or service marks that appear in connection with UPS's services are the property of their respective owners.

Please do not reply directly to this email. UPS will not receive any reply message.

**Review the UPS Privacy Notice**

**For Questions, Visit Our Help and Support Center**



ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# EXHIBIT C

**EXHIBIT C**

ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

| | |
|---|---|
| **From:** | UPS |
| **To:** | Chick, Shawn |
| **Subject:** | UPS Delivery Notification, Tracking Number 1Z8650622496466208 |
| **Date:** | Wednesday, March 9, 2022 10:11:50 AM |

**CAUTION: External Email**



## Hello, your package has been delivered.

**Delivery Date:**   Wednesday, 03/09/2022

**Delivery Time:**   10:05 AM

**Left At:**   FRONT DESK

**Signed by:**   ZHENG

## KILPATRICK TOWNSEND & STOCKTON

| | |
|---|---|
| **Tracking Number:** | 1Z8650622496466208 |
| **Ship To:** | CORPORATION SERVICE COMPANY<br>508 MEETING STREET<br>REGD AGT FOR GEORGIA STONE PRODUCTS<br>WEST COLUMBIA, SC 291697535<br>US |
| **Number of Packages:** | 1 |
| **UPS Service:** | UPS Next Day Air® |
| **Package Weight:** | 0.0 LBS |
| **Reference Number:** | 1294603 |
| **Reference Number:** | 02522 CHICK, SHAWN |

### Discover more about UPS:

Visit www.ups.com

Sign Up For Additional E-Mail From UPS

Read Compass Online

Download the UPS mobile app

© 2022 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.

All trademarks, trade names, or service marks that appear in connection with UPS's services are the property of their respective owners.

Please do not reply directly to this email. UPS will not receive any reply message.

**Review the UPS Privacy Notice**

**For Questions, Visit Our Help and Support Center**



ELECTRONICALLY FILED - 2022 Mar 21 11:13 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 25 11:17 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

STATE OF SOUTH CAROLINA
COUNTY OF CHESTERFIELD

IN THE COURT OF COMMON PLEAS
FOURTH JUDICIAL CIRCUIT
Case No.: 2022-CP-130075

BOGGS MATERIALS, INC., BOGGS
CONTRACTING, INC., and LYNCHES
RIVER CONTRACTING, INC.,

        Plaintiffs,

v.

SUMMIT MATERIALS, LLC; AMERICAN
MATERIALS COMPANY, LLC; and
GEORGIA STONE PRODUCTS, LLC,

        Defendants.

**NOTICE OF HEARING**

PLEASE TAKE NOTICE THAT the hearing the Motion for Preliminary Injunction filed by Plaintiffs Boggs Materials, Inc. ("BMI"), Boggs Contracting, Inc. ("BCI"), and Lynches River Contracting, Inc. ("LRCI") (collectively, "Plaintiffs" or "Paving Contractors"), will be heard in the Court of Common Pleas, Fourth Judicial Circuit for the County of Chesterfield, South Carolina beginning at 9:30 a.m. EST on April 13, 2022. A copy of the Chesterfield County Fourth Judicial Circuit Court Roster is attached as Exhibit A.

        KILPATRICK TOWNSEND & STOCKTON, LLP

        607 14th Street, NW, Suite 900
        Washington, DC 20005-2018
        Tel:   202-508-5800
        Fax:  202-508-5858
        Email: abullock@kilpatricktownsend.com

        /s/ Alexander McMillan Bullock
        Alexander McMillan Bullock (SC #1004)

        *Attorney for Plaintiffs*

Dated: March 25, 2022.
Washington, DC

## CERTIFICATE OF SERVICE

I hereby certify I have this day served a true and correct copy of the foregoing via Federal

Express on the following:

Summit Materials LLC
Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

American Materials Company c/o Registered Agent
Corporation Service Company
508 Meeting Street
West Columbia, SC  29169

Georgia Stone Products c/o Registered Agent
Corporation Service Company
508 Meeting Street
West Columbia, SC  29169

This 25th day of March 2022.

/s/ Alexander M. Bullock
Alexander M. Bullock

ELECTRONICALLY FILED - 2022 Mar 25 11:17 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 25 11:17 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

# EXHIBIT A

EXHIBIT A



## Chesterfield County
## Fourth Judicial Circuit
## Court Rosters

South Carolina Judicial Department Home Page  Return To Roster Selection  Jury Roster News  Non-Jury Roster News  Motion Roster News

| Court Agency | 13002 | Judge | | Holt | Roster Description | Common Pleas Motion Roster 9:30 AM |
|---|---|---|---|---|---|---|
| Roster Type | Motion Roster | Roster Begin Date | | 04/13/2022 | Roster End Date | 04/13/2022 |
| Roster Id | 103 | Roster Begin Time | | 9:30 AM | | |

**Attorney Bar Number**     **Case #**     **Filed From** 🔲 **Filed Thru** 🔲 Search   Print Version

| # | Scheduled Date | Start Time | Duration Hrs:Mins | Description | Filing Party | Filed Date | Case / Case Caption | Sub Type | Plaintiff Attorney | Defendant Attorney | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 04/13/2022 | 9:30 AM | | Motion/Summary Judgment | South Carolina Department Of Social Services-DEF | 03/19/2019 | 2016CP1300244 A M VS South Carolina Department Of Social Services , defendant, et al | Personal Injury 350 | Deborah J Butcher (803) 432-7599 Robert J. Butcher (803) 432-7599 | William H. Davidson II (803) 806-8222 Lyrae Rogers | |
| 2 | 04/13/2022 | 9:30 AM | | Motion/Relieve As Counsel | Magen Stewart Mills-PLT | 01/14/2022 | 2018CP1300567 Magen Stewart Mills VS Jay Brooks, Chesterfield County Sheriffs , defendant, et al | Motor Veh Accid 320 | Sarah Crawford Campbell (843) 623-6896 | C. Heath Ruffner (843) 537-5204 | |
| 3 | 04/13/2022 | 9:30 AM | | Motion/Sanctions | Antonette Harrell-PLT | 09/23/2021 | 2019CP1300096 Antonette Harrell VS James E Bentley , defendant, et al | Motor Veh Accid 320 | Ivey Blaire Franklin (888) 429-5529 Kathryn Lynn Harden (864) 534-3063 Lane Douglas Jefferies (843) 614-8888 Eric Marc Poulin (843) 614-8888 Vanisa Tamar Siler (843) 214-5902 | Leslie Sherrill Bolick (704) 247-8525 Trevor A. Cangelosi (843) 345-3471 Lonnie Ray Doles Jr. (843) 729-8800 Deidre Webb Smallwood (800) 774-8242 x2419 | |
| 4 | 04/13/2022 | 9:30 AM | | Motion/Dismiss | Velvet Williams-DEF | 12/16/2021 | 2019CP1300154 Jessica Ashley Peninger VS Velvet Williams | Motor Veh Accid 320 | Sarah Crawford Campbell (843) 623-6896 Melvin Wayne Cockrell III (843) 623-5911 | Jeffrey Ammons (919) 920-2096 | |
| 5 | 04/13/2022 | 9:30 AM | | Motion/Compel | Barron Edgeworth-PLT | 12/07/2021 | 2019CP1300743 Barron Edgeworth , plaintiff, et al VS Loius Haynes , defendant, et al | Motor Veh Accid 320 | Gregory Brian Collins (803) 432-4391 Christopher Mark Kovach (843) 577-7700 Justin Paul Novak (843) 577-7700 Vincent Austin Sheheen (803) 432-4391 R. Scott Wallinger Jr. (843) 577-7700 | Clair Gilliland Campbell (704) 333-0885 Robert Fredrick Goings (803) 350-9230 Jessica Lee Gooding (803) 350-9230 James Robert Martin (704) 864-6751 Carrie Hallman OBrien (704) 572-4761 | |
| 6 | 04/13/2022 | 9:30 AM | | Motion/Motion for Approval of Minor Settlement | Kenneth A Brock-PLT | 03/03/2022 | 2020CP1300287 Kenneth A Brock , plaintiff, et al VS Terrie C Crocker | Motor Veh Accid 320 | Sarah Crawford Campbell (843) 623-6896 Melvin Wayne Cockrell III (843) 623-5911 | John Martin Grantland (803) 454-1237 Catherine Ortmann Hart (803) 212-6684 | |
| 7 | 04/13/2022 | 9:30 AM | | Motion/Restore Case | Shirley Milliner-PLT | 10/20/2021 | 2020CP1300345 Shirley Milliner VS Chesco Services | Premises Liab 330 | John Richard Moorman (803) 775-1263 | D. Malloy McEachin Jr. (843) 665-0135 | |
| 8 | 04/13/2022 | 9:30 AM | | Motion to Dismiss | Wallace Funderburk Jr.-DEF | 09/11/2020 | 2020CP1300385 Goodman Creek Baptist Church VS Wallace Funderburk Jr. , defendant, et al | Real Prop/Other 499 | Benson Hall Driggers (843) 332-5151 | Neil Terrence Phillips (803) 810-5423 | **Completed 03/16/2022** |
| 9 | 04/13/2022 | 9:30 AM | | Motion/Summary Judgment | Lvnv Funding Llc-PLT | 11/26/2021 | 2020CP1300603 Lvnv Funding Llc VS Sue Mills | Debt Collection 110 | Michael Brittain Travis (843) 573-4350 | Rose D Manos (803) 563-8854 Sue Mills | |
| 10 | 04/13/2022 | 9:30 AM | | Motion/Damages | American Stainless & Supply Llc-PLT | 12/07/2021 | 2020CP1300642 American Stainless & Supply Llc VS Gregs Dock Doors & More Llc , defendant, et al | Breach of Cont 140 | John Brian Kelchner (803) 227-4234 | Greg Gilliard Gregs Dock Doors & More Llc | |
| 11 | 04/13/2022 | 9:30 AM | | Motion/Summary Judgment | Town Of Mcbee-DEF | 11/01/2021 | 2020CP1300672 Michael Qualls VS Town Of Mcbee | Personal Injury 350 | Skyler Bradley Hutto (803) 534-5218 | Katherine McLean Ryan (843) 664-3386 | |
| 12 | 04/13/2022 | 9:30 AM | | Motion/Compel Plaintiff's Discovery Responses | Hilary Pratt-DEF | 02/22/2022 | 2021CP1300346 Viola Paris VS Hilary Pratt | Motor Veh Accid 320 | Jerry Andrew Meehan Jr. (864) 617-3245 | G. Michael Smith Sr. (843) 248-5741 | |
| 13 | 04/13/2022 | 9:30 AM | | Motion/Judgment on the Pleadings | Discover Bank-PLT | 08/06/2021 | 2021CP1300379 Discover Bank VS Ethel E Miller | Debt Collection 110 | Jerry T. Myers (919) 250-2133 | Ethel E Miller | |
| 14 | 04/13/2022 | 9:30 AM | | Motion/Compel | Cross Country Managed Repair, Llc-PLT | 01/12/2022 | 2021CP1300380 Cross Country Managed Repair, Llc VS Timber Warriors, Llc | Breach of Cont 140 | James Edward Cox Jr. (864) 242-8212 | Jeremy R. Summerlin (864) 233-4351 | |
| 15 | 04/13/2022 | 9:30 AM | | Motion/Alter | Michael F | 11/26/2021 | 2021CP1300406 | Real | Michael F. Talley Sr. | Neil Terrence Phillips | |

ELECTRONICALLY FILED - 2022 Mar 25 11:17 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 25 11:17 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

| # | Date/Time | | Motion | Party | Date Filed | Case # | Caption | Case Type | Attorney(s) | Attorney(s) | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | and/or Amend | Talley-PLT | | | Michael F Talley VS Frank Talley Jr | Prop/Other 499 | Prop/Other 499 Michael F Talley (864) 233-6229 Michanna Talley Tate (864) 498-7411 | (803) 810-5423 | |
| 16 | 04/13/2022 9:30 AM | | Motion/Entry of Confidentiality | Cagle Brothers Logging, Inc.-DEF | 12/13/2021 | 2021CP1300465 | Sheanna Simmons VS Ronnie Dewayne James Jr. , defendant, et al | Personal Injury 350 | Kathryn Lynn Harden (864) 534-3063 Lane Douglas Jefferies (843) 614-8888 Eric Marc Poulin (843) 614-8888 Vanisa Tamar Siler (843) 214-6903 Roy T. Willey IV (843) 614-8888 | James Andrew Bradshaw (864) 231-8090 Fiona R. Reed (803) 779-2300 x2318 T. David Rheney (864) 271-9580 | |
| 17 | 04/13/2022 9:30 AM | | Motion/Enlarge Time | Cagle Brothers Logging, Inc.-DEF | 12/13/2021 | 2021CP1300465 | Sheanna Simmons VS Ronnie Dewayne James Jr. , defendant, et al | Personal Injury 350 | Kathryn Lynn Harden (864) 534-3063 Lane Douglas Jefferies (843) 614-8888 Eric Marc Poulin (843) 614-8888 Vanisa Tamar Siler (843) 214-6903 Roy T. Willey IV (843) 614-8888 | James Andrew Bradshaw (864) 231-8090 Fiona R. Reed (803) 779-2300 x2318 T. David Rheney (864) 271-9580 | |
| 18 | 04/13/2022 9:30 AM | | Motion/Summary Judgment | Portfolio Recovery Associates Llc-PLT | 08/26/2021 | 2021CP1300490 | Portfolio Recovery Associates Llc VS Kenneth J Sellers | Debt Collection 110 | Sharonda James (843) 588-1349 Michael Brittain Travis (843) 573-4350 | Kenneth J Sellers (843) 910-4991 | |
| 19 | 04/13/2022 9:30 AM | | Motion/Compel | Randy Hall-PLT | 12/29/2021 | 2021CP1300591 | Randy Hall , plaintiff, et al VS Palmetto Ridge Assisted Living And Memory Care, Llc | Wrongful Death 360 | Jacob Born (803) 929-3600 | Kathleen Spencer Craig Gill (843) 720-3460 x3468 Ashley Sumner Heslop (843) 720-3473 | |
| 20 | 04/13/2022 9:30 AM | | Motion/Compel | Randy Hall-PLT | 03/03/2022 | 2021CP1300591 | Randy Hall , plaintiff, et al VS Palmetto Ridge Assisted Living And Memory Care, Llc | Wrongful Death 360 | Jacob Born (803) 929-3600 | Kathleen Spencer Craig Gill (843) 720-3460 x3468 Ashley Sumner Heslop (843) 720-3473 | Completed 03/10/202 |
| 21 | 04/13/2022 9:30 AM | | Motion/Alter and/or Amend | Randy Hall-PLT | 03/03/2022 | 2021CP1300591 | Randy Hall , plaintiff, et al VS Palmetto Ridge Assisted Living And Memory Care, Llc | Wrongful Death 360 | Jacob Born (803) 929-3600 | Kathleen Spencer Craig Gill (843) 720-3460 x3468 Ashley Sumner Heslop (843) 720-3473 | |
| 22 | 04/13/2022 9:30 AM | | Motion/Summary Judgment | Ford Motor Credit Company Llc-PLT | 02/09/2022 | 2021CP1300595 | Ford Motor Credit Company Llc VS Marjorie Lynch , defendant, et al | Debt Collection 110 | Wylie Westmoreland Clarkson (803) 602-0789 Stephen Elias Fain (803) 602-0789 | Marjorie Lynch | |
| 23 | 04/13/2022 9:30 AM | | Motion/Set Aside Entry of Default Judgment | Tonya Yvette Ellerbe-DEF | 02/01/2022 | 2021CP1300624 | Tavonte Jones VS Tonya Yvette Ellerbe | Motor Veh Accid 320 | James Eric Cavanaugh (803) 888-2200 Joseph Odell Thickens (803) 888-2200 | Anthony W. Livoti (803) 454-1209 | Completed 03/10/202 |
| 24 | 04/13/2022 9:30 AM | | Motion/Default Judgment | Tavonte Jones-PLT | 10/25/2021 | 2021CP1300624 | Tavonte Jones VS Tonya Yvette Ellerbe | Motor Veh Accid 320 | James Eric Cavanaugh (803) 888-2200 Joseph Odell Thickens (803) 888-2200 | Anthony W. Livoti (803) 454-1209 | Completed 03/14/202 |
| 25 | 04/13/2022 9:30 AM | | Motion/Relieve As Counsel | Larry W Tapp-PLT | 02/10/2022 | 2021CP1300641 | Larry W Tapp VS Larry W Tapp II , defendant, et al | Real Prop/Other 499 | Richard Edward Conner Jr. (843) 332-1678 | Michael Christopher Sgobbo (843) 402-0300 | |
| 26 | 04/13/2022 9:30 AM | | Motion/Summary Judgment | Prime Media Productions, Inc.-PLT | 11/24/2021 | 2021CP1300690 | Prime Media Productions, Inc. VS Cheraw Chevrolet Buick, Llc | Debt Collection 110 | Baxter Lindsay Crawford IV (803) 790-2626 x106 | Christopher Michael Ramsey (843) 571-2525 | |
| 27 | 04/13/2022 9:30 AM | | Motion/Compel | Nationwide Insurance Company Of America-OTH | 03/09/2022 | 2021CP1300698 | Steward R Albert VS Fallon Alexis Williams | Motor Veh Accid 320 | Robert David McKissick (843) 669-0089 | Jody Clinton Lyles (803) 782-4163 John Robert Murphy (803) 454-1231 | |
| 28 | 04/13/2022 9:30 AM | | Motion/Summary Judgment | Portfolio Recovery Associates Llc-PLT | 01/27/2022 | 2021CP1300709 | Portfolio Recovery Associates Llc VS Tony Freeman | Debt Collection 110 | Michael Brittain Travis (843) 573-4350 | Tony Freeman | |
| 29 | 04/13/2022 9:30 AM | | Motion/Compel | Roderick Carlton Watts-DEF | 02/23/2022 | 2021CP1300811 | Wendy Singletary VS Roderick Carlton Watts , defendant, et al | Motor Veh Accid 320 | Barry B. George (803) 254-7222 Paige B George (803) 400-1219 | John Adam Ribock (803) 779-2300 | |
| 30 | 04/13/2022 9:30 AM | | Motion/Summary Judgment | Lvnv Funding Llc-PLT | 02/23/2022 | 2022CP1300047 | Lvnv Funding Llc VS Darryl Funderburk | Debt Collection 110 | Michael Brittain Travis (843) 573-4350 | Darryl Funderburk | |
| 31 | 04/13/2022 9:30 AM | 0:15 | Motion/Injunction | Boggs Materials, Inc.-PLT | 03/07/2022 | 2022CP1300175 | Boggs Materials, Inc. , plaintiff, et al VS Summit | Breach of Cont 140 | Alexander M. Bullock (202) 824-1416 | | |

| | | | | | Materials, Llc , defendant, et al | | | |

CMSWeb 6.1 © 2013 South Carolina Judicial Department • All rights reserved

ELECTRONICALLY FILED - 2022 Mar 25 11:17 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

ELECTRONICALLY FILED - 2022 Mar 25 11:17 AM - CHESTERFIELD - COMMON PLEAS - CASE#2022CP1300175

Exhibit B

# STATE OF SOUTH CAROLINA
# COUNTY OF CHESTERFIELD

Alexander M. Bullock
607 14th St, NW, Ste. 900
Washington, DC 20005

## SUMMONS

Case Number:    **2022CP1300175**

You are hereby summoned to appear in the Court of the **Common Pleas** on Wednesday, April 13, 2022 **at 9:30 AM** for a Motion For Injunction in the case of**: Boggs Materials Inc., et. al**. **VS Summit Materials, LLC**
**Meeting Location: Chesterfield County Courthouse**
                  **200 West Main Street**
                  **Chesterfield, SC 29709**

 If your contact information changes you should contact the court immediately and provide your updated contact information. If you have any questions, please contact the court via telephone.

**Common Pleas**
**200 West Main Street**
**P O Box 529**
**Chesterfield, SC 29709**
**Phone: (843) 623-2574**
**Fax:**

**March 21, 2022**

SC7